# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

EVANSTON INSURANCE COMPANY,

      Plaintiff,

vs.                                         No. CIV 18-0654 JB\KK

DESERT STATE LIFE MANAGEMENT;
CHRISTOPHER MOYA, in his capacity as
Receiver for the receivership estate of DESERT
STATE LIFE MANAGEMENT; PAUL A.
DONISTHORPE; L. HELEN BENNETT;
LIANE KERR; AYUDANDO GUARDIANS,
INC., a New Mexico Nonprofit Corporation, on
behalf of seven protected persons; JOSEPH
PEREZ; CHRISTINE GALLEGOS,
individually and as Guardian of VICTOR
BALDIZAN, an incapacitated adult; SCOTT K.
ATKINSON, as Guardian Ad Litem for
VINCENT ESQUIBEL, JR., an Incapacitated
Person; and CHARLES REYNOLDS, as
Conservator for J.W., an Incapacitated Person,
and CAMERON GRAHAM, as trustee for
ANDREW GRAHAM, CHRISTOPHER
MOYA; ASCENDING HOPE, LLC; CNRAG,
INC.; and DECADES, LLC,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Summary Judgment,

filed July 25, 2019 (Doc. 89)("MSJ"). The Court held a hearing on September 5, 2019. The

primary issues are: (i) whether, under the Professional Liability Insurance Policy for Specified

Professions issued to Desert State, filed July 25, 2019 (Doc. 89-5)("Insurance Policy"), the

Defendants can satisfy the condition precedent to coverage that prior to the effective date of the

policy, no insured party had knowledge of facts, circumstances, situations or incidents which

would lead him or her to conclude that a claim was likely; (ii) whether the Insurance Policy's misappropriation of funds exclusion bars coverage; and (iii) whether Defendant Paul Donisthorpe's misrepresentations on the Application render the Insurance Policy *ab initio*. The Court concludes that: (i) the Defendants have satisfied all conditions precedent for coverage under the Insurance Policy; (ii) the Insurance Policy's misappropriation of funds exclusion does not exclude coverage for all claims; and (iii) the Insurance Policy is not void *ab initio*. Accordingly, the Court denies the MSJ.

## **FACTUAL BACKGROUND**

The Court draws the factual background from the parties' assertions of undisputed material fact in their summary judgment motion papers. <u>See</u> MSJ at 3-9;[1] Former Clients of Desert State Life Management's Response in Opposition of Plaintiff's Motion for Summary Judgment ¶¶ 1-16, at 3-5, filed August 8, 2019 (Doc. 98)("Client Response");[2] Defendant Desert State Life Management's Response to Motion for Summary Judgment ¶¶ A1-4, B1-5, at 3-5, filed August 8, 2019 (Doc. 99)("Moya Response"); Defendant L. Helen Bennett's Response to Plaintiff's Motion for Summary Judgment ¶¶ 1-6, at 3, filed August 8, 2019 (Doc. 100)("Bennett Response"); <u>id.</u>,

---

[1]Pages 3 through 9 of the MSJ are organized under the heading "Statement of Facts," but the MSJ does not present the facts in consecutively numbered paragraphs in violation of D.N.M.LR-Civ. 56.1(b). <u>See</u> D.N.M.LR-Civ. 56.1(b) ("The Memorandum must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies."). Accordingly, the Court cites to the MSJ's pages.

[2]The local rules provide that the "Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies." D.N.M.LR-Civ. 56.1(b). The Client Response sets out "additional facts relevant to resolution of Evanston's motion," but have ordered them 1-16, rather than A-P. The Court keeps with the Client Response's convention when citing its additional facts.

¶¶ 1-8, at 3-4;[3] Plaintiff's Reply to Helen Bennett's Response to Plaintiff's Motion for Summary Judgment ¶¶ A-B, at 4-5, filed August 22, 2019 (Doc. 113)("Reply to Ms. Bennett"); and Plaintiff's Combined Reply to Moya's and to the Former Clients of DSLM's Respective Responses to Plaintiff's Motion for Summary Judgment ¶¶ A-E, at 3-4, filed August 23, 2019 (Doc. 116)("Combined Reply").[4]

1.     **The Underlying Class-Action Claims Against Donisthorpe and Desert State.**

Desert State Life Management is a New Mexico nonprofit trust corporation that acted as a trustee for disabled individuals. See MSJ at 3 (asserting this fact)(citing New Mexico Secretary of State Corporate Records at 2 (dated July 23, 2019), filed July 25, 2019 (Doc. 89-1)("Corporate Records")); Client Response at 1;[5] Moya Response at 1;[6] Bennett Response ¶ 1, at 3 (not disputing

---

[3]The local rules provide that the "Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies." D.N.M.LR-Civ. 56.1(b). Bennett uses numbers rather than letters to set forth her additional material facts. The Court keeps with Bennett's convention when citing her additional facts.

[4]Evanston Insurance includes "Additional Undisputed Facts" in its Combined Reply. Combined Reply at 5. The local rules do not provide for this additional section, and the former Desert State clients objected to these additional facts at the hearing and asked that the motion be dismissed for this reason. See Tr. at 25:12-21 (Davis). The Court, therefore, deems these facts disputed for this motion's purposes.

[5]The former Desert State clients does not specifically controvert any proffered fact. The Court deems the former Desert State clients to admit all facts that Evanston Insurance proffers in the MSJ. See D.N.M.LR-Civ. 56.1(b).

[6]Moya's argument does not specifically controvert any proffered fact. Moya instead challenges admissibility of all of Evanston Insurance's exhibits other than Exhibit G, which is Evanston Insurance's rescission offer returning the premiums it paid to Desert State. See Moya Response at 3; id. at 3 n.1. He notes that, under rule 56, parties may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Moya Response at 3. He argues:

> Evanston's motion completely ignores the requirements of Rule 56. None of its exhibits A through G are sworn statements or otherwise satisfy this rule.

> Perhaps the most salient example is Evanston's reliance on Mr. Donisthorpe's statements at his sentencing (Exhibit C) and in his plea agreement (*Motion, Exhibit D*), neither of which are sworn testimony

Moya Response at 3 (italicized as in original).  Beyond this statement, Moya does not specifically state why he believes that any exhibit is inadmissible, including Evanston Insurance's Exhibit A -- which purports to be Desert State's corporate records from the New Mexico Secretary of State's office.

Concerning the Corporate Records, several potential objections lack a sound basis in the applicable law or in the case's facts.  First, authentication for these records is not an issue.  The Court previously has concluded that authentication "is not a high threshold," at the summary judgment stage, especially where the party objecting to the evidence's authenticity "gives the Court no evidence to question" the evidence's "genuineness."  Lopez v. Delta Int'l Mach. Corp., 312 F. Supp. 3d 1115, 1154 (D.N.M. 2018)(Browning, J.)("Lopez").  In Lopez, the Court held that a purchase agreement was sufficiently authenticated where the defendants, "at least one of whom [wa]s a successor to the corporate entity that signed the contract," provided the purchase agreement, the document was entitled "Purchase Agreement between the Black & Decker Corporation and Pentair, Inc., dated as of July 16, 2004," and the agreement "appear[ed] to be what it purport[ed] to be."  Lopez, 312 F. Supp. 3d at 1154.  The United States Court of Appeals for the Tenth Circuit has also stated that it does "not require an affidavit to authenticate every document submitted for consideration at summary judgment."  Law Co., Inc. v. Mohawk Constr. and Supply Co., Inc., 577 F.3d 1164, 1170 (10th Cir. 2009)("Law Co.")(citing Anderson v. Cramlet, 789 F.2d 840, 845 (10th Cir. 1986)).  The Tenth Circuit in Law Co. concluded that the district court abused its discretion by summarily disregarding exhibits because no witness offered authentication for them, rather than considering each document to determine whether it was authenticated.  See Law Co., 577 F.3d at 1170-71 (citing Wyandotte Nation v. Sebelius, 443 F.3d 1247, 1252 (10th Cir. 2006)).  The Tenth Circuit concluded that the exhibits in question "might be sufficiently authenticated taking into consideration the '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'" Law Co., 577 F.3d at 1171 (quoting Fed. R. Evid. 901(b)(4)).  Here, Moya has given the Court no reason to question the evidence's genuineness.  See Lopez, 313 F. Supp. 3d at 1154.  Given the records' appearance, contents, substance, and internal patterns, the records also appear to be what Evanston Insurance purports them to be.  See Law Co., 577 F.3d at 1171; Fed. R. Evid. 901(b)(4).  Reviewing the records online reveals no difference between the records attached as an exhibit to Evanston Insurance's MSJ and the records that are publicly available online.  See Business Search, https://portal.sos.state.nm.us/BFS/online/CorporationBusinessSearch/CorporationBusinessInformation (last visited Dec. 2, 2019).

Second, the Court previously has held that a "relevance argument . . . does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion.  SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).  Further, no evidentiary privilege protects the information in these public records.  The Corporate Records are introduced for the truth of the matter they assert, however, and therefore raise hearsay concerns.  They fall under hearsay exceptions for business records, see Fed. R. Evid. 803(6), and public records, see Fed. R. Evid. 803(8)(A)(i), and Moya does not dispute their trustworthiness, see Fed. R. Evid. 803(6)(E); 803(8)(B).

this fact).[7]  Paul A. Donisthorpe was the Chief Executive Officer of Desert State.  See MSJ at 3

(asserting that Donisthorpe was the CEO of Desert State)(citing New Mexico Secretary of State

Corporate Records at 2, filed July 25, 2019 (Doc. 89-1)("Corporate Records")).[8]  Desert State

provided trustee services and representative payee services to more than seventy-five clients.  See

MSJ at 3 (stating that Desert State provided trustee payee services)(citing Amended Plea

Agreement ¶ 10a, at 5 (dated February 21, 2019), filed July 25, 2019 (Doc. 89-2)("Plea

Agreement")).[9]

_____

[7]Ms. Bennett disputes five facts that Evanston Insurance proffers.  See Bennett Response ¶¶ 2-6, at 3.  She disputes that Donisthorpe was the "sole owner" of DSLM, Bennett Response ¶ 2, at 3, that "DSLM was the trustee providing trustee services under the New Mexico Uniform Trust Code, not Paul Donisthorpe," Bennett Response ¶ 3, at 3, that Donisthorpe's misrepresentations on the Application were DSLM's misrepresentations, see Bennett Response ¶ 4, at 3, that DSLM's Board of Directors was "never made aware of any fact, circumstance, situation or incident which would lead it, on behalf of DSLM, to conclude that a Claim was likely," Bennett Response ¶ 5, at 4, and that Evanston rescinded the policy rather than making a rescission offer, see Bennett Response ¶ 6, at 4.  For all other facts, Ms. "Bennett agrees that the facts included in the Plaintiff's Statement of Facts are undisputed."  Bennett Response ¶ 1, at 3.  This fact is one that Ms. Bennett does not dispute.

[8]Ms. Bennett disputes Evanston Insurance's proffered fact that "Paul A. Donisthorpe was the Chief Executive Officer, sole owner and operator of DSLM."  MSJ at 3.  See Bennett Response at 3 (citing Corporate Records at 2).  Ms. Bennett states that Donisthorpe was not Desert State's "sole owner," because Desert State "is a nonprofit corporation and as such has no owners."  Bennett Response at 3 (citing Corporate Records at 2).  Donisthorpe's ownership over Desert State, and his status as sole owner and operator of the corporation finds no support in the record that Evanston Insurance cites.  The Corporate Records state that Desert State is a Domestic Nonprofit Corporation.  In New Mexico, nonprofit corporations do not have owners, and a board of directors manages their affairs.  See N.M. Stat. Ann. §§ 53-8-1 to -99.  The Court, therefore, alters the proffered fact to better reflect the record -- that Donisthorpe was not the "sole owner" of Desert State.

[9]Ms. Bennett disputes the proposed fact that both Desert State and Donisthorpe provided trustee services to clients.  See Bennett Response at 3 (citing Corporate Records).  Desert State's Corporate Records state that its "Character of Affairs" was "Trustee services for special needs trusts and conservator services."  Corporate Records at 1.  Donisthorpe is listed as Desert State's chief executive officer and registered agent, but he is nowhere said to provide trustee services.  See

On November 27, 2017, Donisthorpe pled guilty to a two-count federal felony information charging him with wire fraud and money laundering. See MSJ at 15 (stating this fact)(citing Transcript of Plea Hearing 21:13-22 (taken November 27, 2017)(Court, Donisthorpe), filed July 26, 2019 (Doc. 90-1)("Plea Tr.")).[10] From at least 2009 through 2016, Donisthorpe violated a duty of trust to Desert State clients by transferring client funds from individual client investment accounts to accounts he controlled, thus converting those client funds to his own use. See MSJ at 3 (stating this fact)(citing Plea Agreement ¶ 10(b), at 6).[11] Donisthorpe made the fraudulent transfers knowing that he was not entitled to the funds, knowing that the clients were not informed of the transfers, and knowing that the clients would not have approved of the transfers if they had

---

Corporate Records at 2. The Court alters the proposed fact to better reflect the record, that only Desert State provided trustee services.

Moya objects to Evanston Insurance's use of Donisthorpe's plea agreement and argues that the evidence violates rule 56, because Donisthorpe's statements were not sworn and because the agreement does not "otherwise satisfy this rule." Moya Response at 3. To the extent that Moya is objecting because Donisthorpe was not under oath, the Court notes that Donisthorpe was sworn under oath at his plea hearing, see Plea Tr. at 5:10, and he agreed that the factual information in his plea agreement was true and correct, see Plea Tr. at 16:16-17:8 (Court, Donisthorpe). To the extent Moya raises a hearsay objection, the Tenth Circuit admits plea agreements at the summary judgment stage under rule 807 of the Federal Rules of Evidence. See Thomas v. Durastanti, 607 F.3d 655, 665 n.8 (10th Cir. 2010)(citing In re Slatkin, 525 F.3d 805, 811 (9th Cir 2008)).

[10]In its "Statement of Facts," Evanston Insurance inaccurately states that Donisthorpe pled guilty on November 17, 2017. See MSJ at 3. Elsewhere in the MSJ, Evanston Insurance correctly notes the guilty plea occurred on November 27, 2017. See MSJ at 15 (citing Transcript of Audio Proceedings at 1 (taken November 27, 2017), filed July 25, 2019 (Doc. 90-1)("Plea Tr.")). The Court has amended the proffered fact to better reflect the record -- that Donisthorpe pled guilty on November 27, 2017. See Plea Tr. at 1.

Moya objects to Evanston Insurance's use of Donisthorpe's statements at his plea hearing and argues that the evidence violates rule 56, because Donisthorpe's statements were not sworn testimony. See Moya Response at 3. The Plea Hearing transcript, however, reflects the fact that Donisthorpe was sworn under oath. See Plea Tr. at 5:10.

[11]This fact is undisputed. See nn.5-7.

been informed.  See MSJ at 3 (stating this fact)(citing Plea Agreement ¶ 10(c), at 6-7).[12]

Donisthorpe presented false and fraudulent investment and disbursement reports to the Desert

State board of directors and presented materially false and fraudulent documents to the New

Mexico Regulation and Licensing Department -- Financial Institutions Division to conceal the

fact that he had fraudulently obtained client funds.  See MSJ at 3 (stating this fact)(citing Plea

Agreement ¶ 10(c), at 6-7).[13]  Donisthorpe spent the illegally obtained funds on personal items

including business ventures, his home mortgage, the mortgage for a vacation home, vehicles, credit

card expenditures, and IRS debts.  See MSJ at 3-4 (stating this fact)(citing Plea Agreement ¶ 10(d),

at 7).[14]  In his plea agreement, Donisthorpe also admitted to violating federal statutes.  See Bennett

Response ¶ 7, at 4 (stating this fact)(citing Plea Agreement ¶ 10(c)); Reply to Ms. Bennett at 3-4

(not disputing this fact).  At the plea hearing, Donisthorpe reaffirmed his guilt, stating:

> I was in fact in charge of a trust company here in Albuquerque named Desert State
> Life Management and was responsible for assets of accounts therein.  And from the
> period of time from 2009 to 2016, I did knowingly and intentionally obtain money
> and property through materially false and fraudulent pretenses and representations,
> transferring these funds to an account that I controlled personally.  I presented -- I
> basically presented false and materially incorrect investment and distribution,
> unfortunately, to these clients, and I do admit that I fraudulently obtained client
> funds through this scheme.  I spent these monies on personal assets, including other
> business ventures, a home mortgage and other expenditures that had no relation to
> these accounts.

MSJ at 4 (stating this fact)(quoting Plea Tr. at 17:18-18:16, at 5).[15]  The Honorable Laura Fashing,

United States Magistrate Judge for the United States District Court for the District of New Mexico,

---

[12]This fact is undisputed.  See nn.5-7.

[13]This fact is undisputed.  See nn.5-7.

[14]This fact is undisputed.  See nn.5-7.

[15]This fact is undisputed.  See nn.5-7.

finding Donisthorpe competent and his guilty plea to be knowing, voluntary, and supported by sufficient evidence, adjudged Donisthorpe guilty of wire fraud and money laundering. See MSJ at 4 (stating this fact)(citing Plea Tr. at 22:2-7, at 7).[16] On June 27, 2019, the Court sentenced Donisthorpe to 144 months in prison, ordered him to pay $6,834,952.46 in restitution and imposed a $4,812,857.00 money judgment against him. See MSJ at 4 (stating this fact)(quoting Judgment as to Paul A. Donisthorpe (dated February 22, 2019), filed in this case June 27, 2019 (Doc. 89-4)("Judgment")).[17]

Donisthorpe's embezzlement scheme generated multiple demands for restitution and lawsuits by Desert State's former clients, and all of these matters are now consolidated into a proposed class action: Graham v. Desert State Life Management, No. D-202-cv-2018-04655 (Second Judicial District Court, County of Bernalillo, State of New Mexico, filed June 20, 2018). See MSJ ¶ 9, at 4-5 (stating this fact)(citing Amended Class Action Complaint (filed in state court December 17, 2018), filed in federal court July 25, 2019 (Doc. 89-4)("Client Complaint")).[18] The

---

[16]This fact is undisputed. See nn.5-7.

[17]Moya objects to Evanston Insurance's use of the Judgment for ignoring the rule 56's requirements. See Moya Response at 3. This fact is otherwise undisputed. See nn.5-7. The Court may, however, take notice of its own files and records, as well as of other facts which are a matter of public record. See Duhart v. Carlson, 469 F.2d 471, 473 (10th Cir. 1972); De Baca v. United States, 2019 WL 1923387 (D.N.M. 2019)(Browning, J.). The facts that the Judgment supports for purposes of the MSJ -- that the Court sentenced Donisthorpe to 144 months in prison and that it ordered him to pay $6,834,952.46 -- have independent legal significance and are not hearsay.

[18]Moya objects to Evanston Insurance's use of the Client Complaint for ignoring rule 56's admissibility requirements without specifically saying why it is inadmissible. See Moya Response at 3. This fact is otherwise undisputed. See nn.5-7. The Court sees no reason why the Client Complaint is inadmissible. The Court previously concluded that authentication "is not a high threshold," especially where the party objecting to the evidence's authenticity "gives the Court no evidence to question" the evidence's "genuineness." Lopez, 312 F. Supp. 3d at 1154. Given the Client Complaint's appearance, contents, substance, and internal patterns, the Court has no reason to doubt that it is what Evanston Insurance purports it to be. See Law Co., 577 F.3d at 1171; Fed.

- 8 -

Client Complaint's allegations mirror the admissions from Donisthorpe's guilty plea.  See MSJ at

5 (stating this fact)(citing Client Complaint ¶¶ 30-31, at 5).[19]  The Client Complaint alleges that

Donisthorpe and Desert State diverted at least $4,900,000.00 from Desert State clients.  See MSJ

at 5 (stating this fact)(citing Client Complaint ¶ 48, at 7).[20]  In addition to suing Donisthorpe and

Desert State for conversion, Desert State's former clients also sue Donisthorpe, Desert State, and

former director and defendant Helen Bennett for negligence, breach of fiduciary duty, and

violating the New Mexico Uniform Trust Code, N.M. Stat. Ann. §§ 46A-1-01 through 46A-1-113.

See MSJ at 5 (stating this fact)(citing Client Complaint ¶¶ 151-171, at 23-25).[21]  The Client

Complaint also seeks disgorgement of the benefits that Donisthorpe's ex-wife, Defendant Liane

Kerr, wrongly received as a result of Donisthorpe's theft.  See MSJ at 5 (stating this fact)(citing

Client Complaint ¶¶ 178-187, 206-213, at 26-27, 31-32).[22]

The Client Complaint alleges ten claims.  See Client Complaint ¶¶ 151-213, at 27-32.

Claim 1 is for negligence and gross negligence against Desert State, Donisthorpe, and Ms. Bennett.

See Client Complaint ¶¶ 151-156, at 27-28.  Claim 2 alleges breach-of-fiduciary-duty against

Desert State, Donisthorpe, and Ms. Bennett.  See Client Complaint at 28-29.  Claim 3 alleges

conversion against Desert State and Donisthorpe.  See Client Complaint ¶¶ 162-166, at 28.  Claim

4 alleges violations of the New Mexico Uniform Trust Code against Desert State, Donisthorpe,

---

R. Evid. 901(b)(4).  Further, the Court it is not admitting the Client Complaint for the truth of its allegations against Donisthorpe; it is admitting the Client Complaint to show merely that the former Desert State clients make the allegations.

[19]This fact is undisputed.  See nn.5-7.

[20]This fact is undisputed.  See nn.5-7.

[21]This fact is undisputed.  See nn.5-7.

[22]This fact is undisputed.  See nn.5-7.

and Ms. Bennett.  See Client Complaint ¶¶ 167-171, at 29.  Claim 5 alleges violations of NMUPA against Desert State, Donisthorpe, and Ms. Bennett.  See Client Complaint ¶¶ 172-177, at 29-30. Claim 6 alleges violations of the New Mexico Uniform Voidable Transactions Act, N.M. Stat. Ann. §§ 56-10-14 through 56-10-29, against Desert State, Donisthorpe, Spectrum Capital Markets, LLC,[23] Corazon Cattle Co., LLC,[24] Corazon-Pitchford,[25] Liane Kerr, and Paul A. Donisthorpe, LLC.  See Client Complaint ¶¶ 178-187, at 30-32.  Finally, Claim 10 alleges unjust enrichment against Ms. Kerr.  See Client Complaint ¶¶ 205-213, at 31-32.

### 2.    The Insurance Policy Between Desert State and Evanston Insurance.

On October 10, 2016, Donisthorpe, in his capacity as Desert State's Chief Executive Officer, applied for professional liability insurance coverage from Evanston Insurance.  See MSJ at 5 (stating this fact)(citing Application for Specified Professions Professional Liability Insurance

---

[23]Spectrum Capital Markets was an organization Donisthorpe controlled through which he transferred Desert State client funds.  See United States v. Donisthorpe, No. CR 17-3311 JB, Information at 2, filed January 27, 2017 (Doc. 1).  The Court offers this information solely as background for the reader's edification and does not present these facts as the truth or as facts material to the issues in this opinion

[24]Corazon Cattle Co., LLC, refers to Donisthorpe's cattle company.  He transferred money from Desert State client accounts to accounts owned by Corazon Cattle.  See United States v. 130 Hidden Lake Circle, Angel Fire, NM 87710, No. CIV 17-0644, First Amended Verified Complaint for Forfeiture In Rem, filed June 20, 2017 (Doc. 5).  The Court offers this information solely as background for the reader's edification and does not present these facts as the truth or as facts material to the issues in this opinion

[25]Corazon-Pitchford refers to a cattle-breeding partnership Donisthorpe started with Darrell Pitchford;    Donisthorpe funded the partnership with money from Desert State client accounts.    See Colleen Heild, Ex-business partner says Donisthorpe 'was really slick', Albuquerque J., December 24, 2017, https://www.abqjournal.com/1110729/exbusiness-partner-says-donisthorpe-was-really-slick.html.  The Court offers this information solely as background for the reader's edification, and does not present these facts as the truth or as facts material to the issues in this opinion

and Service and Technical Professional Liability Insurance at 1 (dated October 10, 2016), filed

July 25, 2019 (Doc. 89-6)("Application")).[26]   In the Application, Donisthorpe answered the

following question negatively:

> Is the applicant or any principal, partner, owner, officer, director, employee,
> manager or managing member of the Applicant or any person(s) or organization(s)
> proposed for this insurance aware of any fact, circumstance, situation, incident or
> allegation of negligence or wrongdoing, which might afford grounds for any claim
> such as would fall under this proposed insurance?

MSJ at 5-6 (stating this fact)(quoting Application at 3); Bennett Response at 3.[27]   The Policy's

Insuring Agreement for Professional Liability Coverage provides:

---

[26]Moya objects that Desert State's Insurance Policy and Application are inadmissible, but
he does not state why he believes these documents are inadmissible.  See Moya Response at 3.
This fact is otherwise undisputed.  See nn.5-7.  The Court sees no reason why the Insurance Policy
is inadmissible.  Moya has not given the Court any reason to question the Insurance Policy and
Application's authenticity -- Moya has, in fact, excerpted two pages of the Insurance Policy in his
own Motion for Summary Judgment, filed July 26, 2019 (Doc. 91-4)("Moya MSJ").  See Moya
Response at 3 n.1.  Given the Client Complaint's appearance, contents, substance, and internal
patterns, the Court has no reason to doubt that it is what Evanston Insurance purports it to be.  See
Law Co., 577 F.3d at 1171; Fed. R. Evid. 901(b)(4).  Second, the Court has previously held that
any "relevance argument . . . does not dispute the fact" and that "relevance is a legal argument that
is best left for the Analysis Section" of this opinion.  SEC v. Goldstone, No. CIV 12-0257
JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).  Finally, these
documents raise no hearsay concerns; the Policy and Application have independent legal
significance and are not hearsay.  See Cagle v. The James Street Group, 400 F. App'x 348, 356
(10th Cir. 2010)(unpublished)(rejecting an argument that the district court should not have
considered a written contract as evidence for summary judgment, because it "constituted an act of
legal significance between Norris and her attorneys, not a 'statement' offered for its truth" (quoting
Schindler v. Seiler, 474 F.3d 1008, 1010-11 (7th Cir. 2007))); 2 McCormick on Evid. § 249 (7th
ed.)("When a suit is brought for breach of a written contract, no one would think to object that a
writing offered as evidence of the contract is hearsay.").

[27]Evanston Insurance proffered that both "Donisthorpe and DSLM" made the
representation that no insured was aware of any fact that a claim was likely.  See MSJ ¶ 10, at 5.
Bennett argues that, "to the extent that Plaintiff's allegations regarding the representations made
in the Application by Donisthorpe include the allegation that they were misrepresentations of
DSLM, Plaintiff states that the allegation is a legal conclusion to be made by the Court in the
Underlying Claim."  See Bennett Response ¶ 4, at 3.  The Court agrees and has altered the proffered
fact to better reflect the record.

The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 5.A. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to the Section Claims A., Claims Reporting provision,

By reason of:

    1. A Wrongful Act; or

    2. A Personal Injury;

In the Performance of Specified Professional Services rendered or that should have been rendered by the Insured or by any person for whose Wrongful Act or Personal Injury the Insured is legally responsible,

Provided:

    a. The entirety of such Wrongful Act(s) or Personal Injury(ies) happens during the Policy Period or on or after the applicable Retroactive Date stated in Item 5.A. of the Declarations and before the end of the Policy Period; and

    b. Prior to the effective date of this Coverage Part the Insured had no knowledge of such Wrongful Act(s) or Personal Injury(ies) or any fact, circumstance, situation or incident, which may have led a reasonable person in the Insured's position to conclude that a Claim was likely.

MSJ at 7 (quoting Insurance Policy at 15).[28] The Insurance Policy defines "insured" persons to include past or current Desert State officers and directors, as well as "any past or current employee." Moya Response ¶ B3, at 4 (stating this fact)(quoting Insurance Policy at 14); Combined Response at 3 (not disputing this fact). Under Exclusion P, the Insurance Policy excludes coverage for "'any claim . . . [b]ased upon or arising out of any conversion, misappropriation, commingling or defalcation of any funds or property.'" MSJ at 8-9 (quoting Insurance Policy at 20).[29]

---

[28]This fact is undisputed. See nn.5-7.

[29]This fact is undisputed. See nn.5-7.

3.        **The Investigations into Donisthorpe and Desert State.**

Evanston Insurance first received notice of circumstances likely to give rise to claims triggering coverage in March, 2017, when Ms. Bennett reported that Donisthorpe had mismanaged and stolen funds belonging to former Desert State clients. See Client Response ¶ 1, at 3 (stating this fact)(citing Claim-E0400944-Note27 at 1 (dated March 29, 2017), filed July 26, 2019 (Doc. 92-1)("Evanston Memo")); Combined Reply ¶ III.a, at 3.[30] After Evanston Insurance heard from Ms. Bennett, Evanston Insurance first considered rescission of the Insurance Policy. See Client Response ¶ 2, at 3 (stating this fact)(citing Evanston Memo; Deposition of Glenn Fischer 101:22-102:3 (taken June 25, 2019), filed July 26, 2019 (Doc. 92-2)("Fischer Depo.")); Combined Reply ¶ III.b, at 4.[31] Shortly after Evanston Insurance received Ms. Bennett's report, Evanston Insurance received several claims from individuals who once were Desert State's clients that corroborated Ms. Bennett's report. See Client Response ¶ 3, at 3 (stating this fact)(citing Letter from Daniel Dougherty Letter to Emily Lukes (dated June 30, 2017), filed July 26, 2019 (Doc. 92-3); Letter from Corbin Hildebrandt to Evanston Insurance (dated May 25, 2017), filed July 26,

---

[30]Evanston Insurance "disputes only the implication" that, "in March of 2017 it had actual knowledge that Donisthorpe had mismanaged and stolen DSLM client funds," because "the document referenced merely confirms that such allegations were being asserted." Combined Reply at 3. The legal implications to be drawn from the facts are left to the Analysis section. Evanston Insurance does not specifically controvert the fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[31]Evanston Insurance disputes this proffered fact, arguing that "the documents referenced confirm only that after receiving notice" from Ms. Bennett of Donisthorpe's theft, "Evanston recognized that facts might exist to support rescission." Combined Reply at 4. The portions of the record both parties cite supports the former Desert State clients' articulation of the fact. In the Fischer's Depo., Fischer stated that "[t]he consideration of rescission started back [when Ms. Bennett made her report]." Fischer Depo. 102:2-3. In the Evanston Memo, on March 29, 2017, Fischer wrote "CHECK PRIOR KNOWLEDGE AS THEFTS APPEAR TO HAVE OCCURE [sic] OVER YEARS. RESCISSION?" Evanston Memo at 1 (capitalization in original).

2019 (Doc. 92-4); <u>Ayudando Guardians Inc., et al. v. Desert State Life Mgmt., et al.</u>, No. D-202-cv-2017-03997, Complaint for Damages Due to Negligence, Gross Negligence, Breach of Fiduciary Duty, Fraud, Employee Dishonesty, Embezzlement, Employee Misconduct, Unfair Practices Act Violations, and Punitive Damages (Second Judicial District Court, County of Bernalillo, State of New Mexico (filed in state court June 6, 2017), filed in federal court July 26, 2019)(Doc. 92-6)("Ayudando Complaint")); Combined Reply ¶ III, at 3-4 (not disputing this fact). In addition, at least one lawsuit related to Donisthorpe's and Desert State's conduct was filed. <u>See</u> Client Response ¶ 7, at 4 (stating this fact)(citing Ayudando Complaint); Combined Reply ¶ III, at 3-4 (not disputing this fact). Around the same time, Evanston Insurance hired James H. Johansen, of Butt Thornton & Baehr P.C. to provide a coverage opinion regarding the policy in relation to the notice of circumstances that Ms. Bennett provided, and the claims made against its insureds. <u>See</u> Client Response ¶ 7, at 4 (stating this fact)(citing Fischer Depo., 87:13-88:10; Plaintiff Evanston Insurance Company's Second Amended Privilege Log at 3 (undated), filed July 26, 2019 (Doc. 92-7)); Combined Reply ¶ III, at 3-4 (not disputing this fact).

Approximately one month after it hired counsel to provide it with a coverage opinion, on July 24, 2017, Evanston Insurance sent Desert State a Notice of Nonrenewal of the Insurance Policy. <u>See</u> Client Response ¶ 8, at 4 (stating this fact)(citing Notice of Nonrenewal (dated July 24, 2017), filed July 26, 2019 (Doc. 92-8)); Combined Reply ¶ III, at 3-4 (not disputing this fact). Before issuing the Notice of Nonrenewal to Desert State, Denise Butler, a Professional Insurance Underwriter for Markel West Insurance Services, had a discussion with a claims representative for Evanston Insurance about rescinding the Insurance Policy. <u>See</u> Client Response ¶ 9, at 4 (stating this fact)(citing Deposition of Denise Butler at 51:11-18 (taken June 25, 2019), filed July

26, 2019 (Doc. 92-9)("Butler Depo.")); id, at 53:18-54:25; Combined Reply ¶ III.d, at 4.[32]

Evanston Insurance took no action to rescind the Insurance Policy or to notify its insureds that it was considering rescinding the policy before its June 4, 2018, letter. See Client Response ¶ 10, at 4-5 (stating that Evanston Insurance took no "timely" action to rescind its Insurance Policy or to notify its insureds)(citing Butler Depo. 52:5-53:2);[33] Combined Reply ¶ III, at 3-4 (not disputing this fact).

Based on the statements that Donisthorpe made at his plea hearing, Evanston Insurance formally concluded that Donisthorpe made material misrepresentations on the Application. See Client Response ¶ 12, at 4 (stating this fact)(citing Letter to the Acting Receiver of Desert State Life Management (dated June 4, 2018)), filed June 26, 2019 (Doc. 92-10); Fischer Depo. at 75:24-76:6 & 101:22-102:11); Combined Reply ¶ III, at 3-4 (not disputing this fact). Discovery also revealed that Evanston Insurance does not have any evidence or basis to believe that any of its insureds, aside from Donisthorpe, committed fraud or participated in Donisthorpe's scheme. See Client Response ¶ 14, at 4 (stating this fact)(citing Fischer Depo. at 23:12-18; 50:2-11; 103:20-104:14); Combined Reply ¶ III, at 3-4 (not disputing this fact). Donisthorpe is the only insured

---

[32]Evanston Insurance disputes "the implication" of this fact that "prior to issuing the notice of non-renewal, Evanston believed there to be a basis to rescind the policy." Combined Reply at 4. The legal implications to be drawn from the facts are left to the Analysis section. Evanston Insurance does not dispute the fact. See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). Accordingly, the Court deems the fact undisputed.

[33]The former Desert State clients cite the Butler Depo. for the proposition that Evanston Insurance did not act in a "timely" way to rescind the policy. Client Response at 4. Butler mentions timelines, but not the timeliness surrounding Evanston Insurance's rescission. The Court modifies the Clients' proposed fact to better reflect what the record supports -- that Evanston Insurance did not rescind the Insurance Policy or notify its clients that it was considering doing so until June 4, 2018. Whether the rescission is timely is a legal issue best left for the Analysis Section.

under the policy that Evanston Insurance believes made any material misrepresentations to Evanston Insurance. See Client Response ¶ 16, at 4 (stating this fact)(citing Fischer Depo. at 50:2-11; id. at 101:22-103:19); Combined Reply ¶ III, at 3-4 (not disputing this fact).

On June 4, 2018, Evanston Insurance offered to rescind the Insurance Policy based on the material misrepresentations made in the Application for the Insurance Policy and tendered to Desert State the premium that Desert State paid for the Insurance Policy plus interest. See MSJ at 9 (citing Letter from James H. Johansen to the Acting Receiver of Desert State Life Management at 2 (dated June 4, 2018), filed July 25, 2019 (Doc. 89-7)("Letter")).[34]

## PROCEDURAL BACKGROUND

Evanston Insurance filed its original complaint on July 10, 2018. See Complaint for Rescission and Declaratory Judgment, filed July 10, 2018 (Doc. 1). Evanston Insurance has since filed three amended complaints to add and drop Defendants -- most recently on February 15, 2019, when it added Ascending Hope, LLC, CNRAG, Inc., and Decades, LLC, as Defendants and dropped its claims against Ayudando Guardians, Inc. See Third Amended Complaint for Rescission and Declaratory Judgment, filed February 15, 2019 (Doc. 44)("Third Complaint"). Evanston Insurance seeks the Insurance Policy's rescission in Count I of the Complaint. See Third Complaint ¶¶ 46-55, at 10-11. In Count II, Evanston Insurance requests a declaration that it has no duty to defend or indemnify claims arising from Donisthorpe's actions. See Third Complaint

---

[34]Evanston Insurance proffers that it rescinded the Insurance Policy on June 4, 2018. See MSJ at 9. Ms. Bennett disputes this fact, arguing that the "Plaintiff made an offer of rescission to DSLM on June 4, 2018 and, when it was not accepted, filed this lawsuit." Bennett Response at 6. In light of the Letter's language, which states that, if Desert State's receiver "do[es] not accept this offer of rescission within 30 days of the date of this letter, Evanston will immediately file suit," the Court alters Evanston Insurance's proposed fact to better reflect the record -- that Evanston Insurance offered to rescind the policy on June 4, 2018.

¶¶ 56-59, at 10-11.  Evanston Insurance now moves for summary judgment on Counts I and II.
<u>See</u> MSJ at 16-17.

### 1.     <u>The MSJ</u>

Evanston Insurance filed for summary judgment on July 25, 2019, and first argues that the
Defendants cannot meet their burden of showing that they are insured under the Insurance Policy.
<u>See</u> MSJ at 10-11.  Evanston Insurance notes that, in New Mexico, the initial burden is on the
insured to establish coverage under insurance policies, <u>see</u> MSJ at 10, and that a condition
precedent to coverage under Policy Agreement is that "prior to the effective date of this Coverage
Part the Insured had no knowledge of such Wrongful act(s) or Personal Injury(ies) or any fact,
circumstance, situation, or incident, which may have led a reasonable person in the Insured's
position to conclude that a Claim was likely," MSJ at 11.  Evanston Insurance argues that there is
no coverage under the Insurance Policy, because it

> is beyond serious debate that a fiduciary who has over the course of several years
> stolen in excess of $4 million dollars from his disabled clients was aware of
> Wrongful Acts, facts, circumstances, situations and incidents which may have led
> a reasonable person in the Insured's position to conclude that a Claim was likely.

MSJ at 11.

Evanston Insurance next argues that the Insurance Policy's Exclusion P, the
misappropriation of funds exclusion, <u>see</u> MSJ at 12-14, bars coverage.  According to Evanston
Insurance, this exclusion bars coverage for any claim "'[b]ased upon or arising out of any
conversion, misappropriation, commingling or defalcation of any funds or property.'"  MSJ at 12
(quoting Insurance Policy at 8).  Evanston Insurance notes that Donisthorpe's misappropriation is
plainly evident.  <u>See</u> MSJ at 12.  Evanston Insurance also argues that courts interpret the term
"'arising out of'" broadly in similar insurance policies.  MSJ at 13-14 (quoting Insurance Policy
at 8).  In conclusion, Evanston Insurance argues that the Client Complaint asserts a conversion

claim and that, because all other causes of action "flow from Donisthorpe's looting of DSLM client funds," the Client Complaint's claims are barred. MSJ at 14.

Finally, Evanston Insurance argues that it is entitled to summary judgment because the Insurance Policy is void *ab initio*. See MSJ at 14-16. Evanston Insurance notes that, under New Mexico law, contracts "can be rescinded when it is discovered that during the formation of the contract, information material to the contract was withheld or misrepresented." MSJ at 14. Evanston Insurance asserts that it relied on misrepresentations that Donisthorpe made in the Application. See MSJ at 15. It points specifically to Donisthorpe indicating on the Application that he was not aware of any fact, circumstance, situation, incident or allegation of negligence or wrongdoing which might afford grounds for any claim. See MSJ at 15. Evanston Insurance argues that, in light of his subsequent guilty plea, "the only possible conclusion is that Donisthorpe withheld and/or misrepresented material facts." MSJ at 16.

### 2. The Client Response.

Several former Desert State clients filed a response to the MSJ on August 8, 2019. The former clients argue first that the Court should deny Evanston Insurance's MSJ for failure to comply with D.N.M.L.R-Civ. 56.1(b). See Client Response at 6-7. This rule requires that motions for summary judgment include a list of separately numbered paragraphs containing the undisputed facts and specific evidence supporting each fact. See Client Response at 6. The former clients argue that, because the Court has, in the past, denied a pro se plaintiff's motion for summary judgment because it did not follow this rule, the Court should also deny Evanston Insurance's MSJ. See Client Response at 7 (citing Foti v. Bernalillo Cty. New Mexico, No. CIV 14-0667 JB/SMV, 2015 WL 1640445 (D.N.M. Mar. 30, 2015)(Browning, J.)).

The former Desert State clients attempt to rebut Evanston Insurance's argument that the insured cannot establish coverage under the policy in two different ways. First, they argue that whether the insureds have satisfied the condition precedent to coverage -- that prior to the effective date of the Insurance Policy the insured had no knowledge of any fact, circumstance, situation or incident, which may have led a reasonable person to conclude that a claim was likely -- is an entirely new claim, and that, because Evanston Insurance raised the argument for the first time after the close of discovery, the Court should reject it. <u>See</u> Client Response at 7. The former clients note that the United States Court of Appeals for the Tenth Circuit considers new arguments made in motions for summary judgment as requests to amend the complaint. <u>See</u> Client Response at 7. The former clients argue that the Court must deny the condition precedent argument where "'a late shift in the thrust of the case will prejudice the other party in maintaining his defense upon the merits.'" Client Response at 7-8 (quoting <u>Evans v. McDonald's Corp.</u>, 936 F.2d 1087, 1090-91 (10th Cir. 1991)). The former clients apply Tenth Circuit precedent on the issue to this case and argue that the new argument will unfairly prejudice them, because "the window of opportunity for the parties to conduct discovery has closed, and Evanston's attempt to raise a new claim at this late stage of proceedings is unjustified." Client Response at 8.

Second, the former clients dispute the merits of Evanston Insurance's condition precedent argument. <u>See</u> Client Response at 8-10. The former clients argue that, contrary to Evanston Insurance's assertions, Donisthorpe was not necessarily aware that what he was doing was a "Wrongful Act" as the Insurance Policy defines the term. <u>See</u> Client Response at 9. The former clients argue that, because Evanston Insurance's representative stated that Donisthorpe believed he could get away with the fraud if he eventually replaced the money, Donisthorpe's "knowledge and intent at the time he engaged in the conduct at issue raises a question of fact that should not

be decided at summary judgment." Client Response at 9. Next, the former clients argue that, aside from Donisthorpe, there is no evidence that any other insured party participated or knew of the scheme. <u>See</u> Client Response at 9. The former clients say this fact is "critical," because the Insurance Policy "does not have any express language that allows Evanston to deny coverage to all insureds based on fraud committed by one of them." Client Response at 9. They argue that the Insurance Policy also does not have language permitting Evanston Insurance to impute the fraud of one insured to other insureds and note that this omission proved pivotal in a different case where Evanston Insurance attempted to deny coverage based on an applicant's fraudulent representations. <u>See</u> Client Response at 10 (citing <u>Evanston Ins. Co. v. Watts</u>, 52 F. Supp. 3d 761, 769 (D.S.C. 2014)(Anderson, Jr., J)).

The former clients next turn to Evanston Insurance's argument that Exclusion P denies coverage and argue that the Exclusion creates an ambiguity that must be resolved in favor of coverage. <u>See</u> Client Response at 10-13. The former clients note that there are no provisions in the Insurance Policy or caselaw in New Mexico explaining how to interpret "based upon or arising out of," Client Response at 10-11, but in New Mexico, ambiguities must be resolved in the insured's favor and in favor of coverage. <u>See</u> Client Response at 11. They argue that their claim against Desert State under the New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. §§ 57-12-1 through 57-12-24 ("NMUPA"), does not arise out of Donisthorpe's fraud, because the claim alleges that Desert Stated "billed for services and work as though the services were professional and in the best interests of Plaintiffs . . . when in fact professional services were not performed competently or not performed at all," and because it is possible to violate the NMUPA without committing an intentional tort, like fraud. Client Response 11-12. They similarly argue that their claims against Ms. Bennett for negligence, gross negligence, breach of fiduciary duty, and for

violating the Uniform Trust Code are not based upon or arise out of Donisthorpe's actions. <u>See</u> Client Response at 12. The former clients assert that, based on New Mexico caselaw which suggests that an insured's fraud should not void coverage for other insureds, "the exclusionary language should only be read to bar coverage for Donisthorpe and not for other insureds." Client Response at 12. The former clients argue that their case is stronger, because there is no evidence that Ms. Bennett or any other insured knew about Donisthorpe's scheme. <u>See</u> Client Response at 12.

Last, the former clients argue that insurance policy rescission is not appropriate in this case, because Evanston Insurance delayed for too long before attempting to rescind, and because the innocent insured doctrine prevents Donisthorpe's conduct from voiding his co-insureds' interests. <u>See</u> Client Response at 13. In support of their timeliness argument, the former clients note that, under New Mexico law, parties seeking to rescind contracts must promptly and immediately exercise this right. <u>See</u> Client Response at 13. The former clients argue that Evanston Insurance's delay in seeking rescission -- six months after Donisthorpe's guilty plea and fifteen months after it first received notice of claims -- was neither prompt nor immediate. <u>See</u> Client Response at 14. In support of their innocent insured argument, the former clients point to New Mexico caselaw and a case from the United States Court of Appeals for the Fourth Circuit which hold that fraudulent claims by an insurance applicant do not cancel coverage for innocent insureds. <u>See</u> Client Response at 15 (citing <u>Evanston Ins. Co. v. Agape Sr. Primary Care, Inc.</u>, 636 F. App'x 871, 876 (4th Cir. 2016)(unpublished)(per curiam); <u>Delph v. Potomac Ins. Co.</u>, 1980-NMSC-140, ¶ 14, 620 P.2d 1282).

3.      **The Moya Response.**

Defendant Christopher Moya, the receiver for Desert State's receivership estate, filed a response to the MSJ on August 8, 2019. See Moya Response at 1. Moya first argues that the Court should deny summary judgment, because parties may not make new claims in motions for summary judgment. See Moya Response at 5-8. Moya argues that the Third Complaint references "solely" the condition precedent "in the context of allegations of misrepresentation by DSLM," and "does not instead allege DSLM's knowledge of some wrongful act or personal injury as an independent grounds for denial." Moya Response at 5. Moya also asserts that this claim would unfairly prejudice him, because discovery is complete, dispositive motions have been filed, there is no opportunity for Desert State to either move for summary judgment on this claim or adequately defend itself from it, and trial is scheduled soon. See Moya Response at 6.

On this issue, Moya argues in the alternative that the Court should deny summary judgment, because Evanston Insurance has not presented any admissible evidence that any person had knowledge attributable to Desert State. See Moya Response at 7. Moya notes that the MSJ merely states that "'it is beyond serious debate' that a 'fiduciary' had knowledge of 'Wrongful Acts, facts, circumstances, situations and incidents which may [have] led a reasonable person in the Insured's position to conclude that a claim was likely.'" Moya Response at 7 (quoting MSJ at 11). Further, Moya argues that, to the extent that Evanston Insurance is referring to Donisthorpe's knowledge here, Donisthorpe's actions were criminal, not covered, and thus not likely to result in a claim. See Moya Response at 7. Moya bolsters his argument by pointing to New Mexico insurance caselaw's doctrine of reasonable expectations, which suggests that courts should interpret an insurance policy in the same way a hypothetical reasonable insured would. See Moya Response at 8. Moya argues that, with this reading, the "provision would warrant that some

knowledge other than this criminal activity was known -- and not necessarily by Mr. Donisthorpe. DSLM can only speculate on this point, and Evanston cannot fairly demand DSLM to do so in defense of this motion." Moya Response at 8.

Moya next argues that, contrary to Evanston Insurance's assertions, Desert State's claims arise from wrongful acts on the insureds' part. See Moya Response 9-11. He states that the Insurance Policy defines "wrongful act" as a "negligent act, error or omission in Specified Professional Services." Moya Response at 9. Moya says that it is undisputed that Donisthorpe's actions were not wrongful acts under the Insurance Policy, because they were intentional and criminal rather than negligent. See Moya Response at 9. Moya argues that, while claims based on Donisthorpe's actions are excluded from coverage, the Insurance Policy does cover the acts of others at Desert State. See Moya Response at 10. Moya argues: "But for the errors and omissions of [Ms. Bennett, Tom Rutherford, and Judy Mahar]," "some, if not all, of the losses now claimed by DSLM could have been avoided." Moya Response at 10. These individuals did not act intentionally, and Evanston Insurance, he argues, has not found any evidence that any other insured acted willfully, intentionally, or deliberately. Moya Response at 11. Any further limitation of fault, Moya asserts, is a factual issue that the Court may not decide at this litigation stage.

Finally, Moya argues that the Court should deny summary judgment for Evanston Insurance with respect to its reliance on the Application's misrepresentations for two reasons. First, Moya directs the Court to N.M. Stat. Ann. § 59A-18-11(A), which states: "The insured shall not be bound by any statement made in an application for a policy unless a copy of such application is attached to or endorsed on the policy when issued as part thereof." Moya Response at 11. Moya then points to examples in other states where courts have interpreted similar laws strictly against insurers and asserts that the insurance broker which Evanston Insurance used did not attach a copy

of Donisthorpe's Application to the issued policy.  See Moya Response at 12.  Second, Moya argues that, because Evanston Insurance has not offered any evidence that the misrepresentations in Desert State's Application were material,  Evanston Insurance cannot win rescission at summary judgment based on material misrepresentations.  See Moya Response at 13.

4.    **The Bennett Response.**

Ms. Bennett, a former Desert State director, filed a response to the MSJ on August 8, 2019. She first argues that the Court should deny summary judgment for Evanston Insurance's claims regarding the Application's materially false representations, because Evanston Insurance's delay bars rescission, and Ms. Bennett is an innocent insured.  See Bennett Response at 5.  Ms. Bennett adopts the arguments made in the Former Clients of Desert State Life Management's Motion for Summary Judgment for Rescission and Declaratory Judgment and Memorandum in Support Thereof, filed July 26, 2019 (Doc. 92)("Client MSJ"), regarding both Evanston Insurance's delay in seeking rescission and the innocent insured doctrine.  See Bennett Response at 6.  On the innocent insured doctrine, Ms. Bennett adds only that, because the adverse interest exception prevents imputing an agent's knowledge to the principal when the agent acts solely for his own benefit and against the principal's interest,  Donisthorpe's knowledge should not be imputed to Desert State or to any other insured party.  See Bennett Response at 6-7.

Ms. Bennett next disputes Evanston Insurance's assertion that Exclusion P bars her defense.  See Bennett Response at 7.  She states that some of the claims against her are "negligence and negligent supervision claims."  Bennett Response at 10.  Ms. Bennett cites three New York cases suggesting that there is a duty to defend in similar situations where the underlying complaint alleges negligence or negligent supervision.  See Bennett Response at 10-11 (discussing Watkins Glen Cent. Sch. Dist. V. Nat'l Union Fire Ins. Co., 286 A.D. 2d 48, 732 N.Y.S.2d 70 (N.Y. App.

Div. 2001); <u>Murphy v. Nutmeg Ins. Co.</u>, 5 A.D.3d 358, 360, 773 N.Y.S. 2d 413 (N.Y. App. Div. 2004); <u>Gladstein & Isaac v. Phila. Indem. Ins. Co.</u>, 82 A.D.3d 468, 468, 918 N.Y.S. 2d 92 (N.Y. App. Div. 2001)).

Ms. Bennett furthers disputes Evanston Insurance's Exclusion P argument by analyzing the Insurance Policy's language. <u>See</u> Bennett Response at 12-16. She cites several New Mexico canons of insurance contract construction requiring, among other things, that ambiguities in insurance policies be construed against insurers, exclusionary clauses be narrowly construed, and coverage clauses be broadly construed. <u>See</u> Bennett Response at 8 (citing <u>Sanchez v. Herrera</u>, 1989-NMSC-073, ¶ 2, 783 P.2d 465, 469; <u>Morton v. Great Am. Ins. Co.</u>, 1966-NMSC-206, ¶ 9, 419 P.2d 239; <u>Knowles v. United States Auto. Ass'n</u>, 1992-NMSC-030, ¶ 7, 832 P.2d 394, 396; <u>United Nuclear Corp v. Allstate Ins. Co.</u>, 2012-NMSC-032, ¶ 15, 285 P.3d 644, 649). She then argues that Exclusion J and Exclusion P of the Evanston Insurance policy create an ambiguity that the Court must resolve in favor of coverage. <u>See</u> Bennett Response at 9. Exclusion J, she notes, is written more broadly to exclude claims "based upon or arising out of, or in any way involving" the underlying bad conduct. Bennett Response at 12. She also notes that there is an exception to Exclusion J that adds back coverage for claims based on vicarious liability for "the conduct of another insured that constitutes a willful violation of any Statutes or Regulation." Bennett Response at 12-13. Bennett argues that this Exclusion expressly anticipates that some insureds may be held vicariously liable for other insureds' misconduct and restores coverage for them. <u>See</u> Bennett Response at 13. She argues that "the existence of these two provisions in the same insuring agreement applicable to the same claims made by Former DSLM clients, one of which provides coverage while the other excludes it, creates an ambiguity in the policy which must be read in favor of coverage for Bennett." Bennett Response at 14. Ms. Bennett argues that

Exclusion J's language suggests that it is a "specific provision which overrides the general provision of Exclusion P," and that "[a]ny other interpretation would render the Exclusion J exception meaningless and contrary to settled principles of insurance policy interpretation." Bennett Response at 14. She supports her argument by asserting that this interpretation "accords with the reasonable expectations of the ordinary person," by reiterating that Exclusion P is ambiguous when read cumulatively with Exclusion J, and that Evanston Insurance has never alleged that she engaged in any knowing or criminal behavior. See Bennett Response at 15-16.

     **5.**        **<u>The Reply to Ms. Bennett</u>.**

Evanston Insurance filed a response to Ms. Bennett on August 22, 2019, and argued, first, that agency law's adverse interest exception does not apply to this case. See Reply to Ms. Bennett at 5-8. Evanston Insurance notes that courts using the adverse interest exception to prevent insurance policy rescissions do so only in cases of fidelity insurance policies -- and this Insurance Policy is not a fidelity policy. See Reply to Ms. Bennett at 5. In further support of its argument, Evanston Insurance directs the Court to a case from the United States Court of Appeals for the Second Circuit, which rejected a similar argument to Ms. Bennett's, because "[a] principal may not disavow the act of an agent while simultaneously taking advantage of the benefits of the fraudulently procured bargain." Reply to Ms. Bennett at 6 (quoting <u>Pereira v. Aetna Cas. & Sur. Co.</u>, 186 F.3d 196, 207-08 (2d Cir. 1999), and citing Restatement (Second) of Agency § 282 cmt. h)). Finally, Evanston Insurance notes that the policy contains a clear, unambiguous imputation clause that provides that Donisthorpe's statements in the Application are imputed to all insureds. See Reply to Ms. Bennett at 8.

Next, Evanston Insurance argues that the Insurance Policy's Exclusion J and Exclusion P do not create ambiguities. In regard to Exclusion P, Evanston Insurance argues that courts "across

the country have overwhelmingly found that such exclusions apply to both intentional and negligent conduct," and directs the Court to several such cases.  Reply to Ms. Bennett at 9-10.

Last, Evanston Insurance argues that exceptions to policy exclusions like the one in Exclusion J do "not create coverage nor modify a separate stand-alone exclusion barring coverage."  Reply to Ms. Bennett at 11.  Further,  Evanston Insurance argues that the Insurance Policy is not "rendered ambiguous simply because there is some overlap in two policy exclusions." Reply to Ms. Bennett at 12.

6.    **The Combined Reply.**

Evanston Insurance filed a joint reply to Desert State's former clients and to Moya on August 23, 2019.  Evanston Insurance first apologizes for failing to adhere to D.N.M.LR-Civ. 56.1(b), but noted that its evidence was either the Insurance Policy or public records.  See Combined Reply at 6.  It argues that denying its motion for failing to adhere to D.N.M.LR-Civ. 56.1(b) "would exalt form over substance."  Combined Reply at 6.

Evanston Insurance next dives into the substantive arguments.  In response to Moya and the former clients' arguments about making a new claim, Evanston Insurance notes that its "original complaint and every subsequent amended complaint not only quoted the full text of the condition precedent but also asserted that the failure to satisfy the condition barred coverage" and argues that its briefs satisfied the notice pleading requirement.  Combined Reply at 7.

Evanston Insurance then advances its argument that, because Donisthorpe had knowledge of circumstances that could give rise to claims, the other insureds cannot meet their burden of establishing coverage under the second condition precedent.  See Combined Reply at 11.  It first notes that the Insurance Policy's definition of "insured" includes "[a]ny past or current principal, partner, officer, director, trustee or shareholder of the Named Insured . . . solely while acting on

behalf of the Named Insured and within the scope of their duties." Combined Reply at 8. Evanston Insurance argues that, because of the word "any" in the definition, Donisthorpe's knowledge is imputed to the rest of the insureds. See Combined Reply at 8-9. It then argues that Moya's and the former clients' argument that Donisthorpe had no knowledge of "Wrongful Acts" under the policy "strains credulity," and "ignores the common-sense conclusion" that, because Donisthorpe was aware of his embezzlement, his colleagues were negligent in failing to discover it or implement preventative controls. Combined Reply at 9. Of Donisthorpe's knowledge, Evanston Insurance says that a "reasonable person" aware of the same circumstances "would conclude that a Claim was likely," and directs the Court to Tenth Circuit precedent suggesting that the insureds' subjective belief is irrelevant. Combined Reply at 10-11 (citing Cohen-Esrey Real Estate Servs. v. Twin City Fire Ins. Co., 636 F.3d 1300, 1303, 1304 (10th Cir. 2011)). Evanston Insurance concludes its Reply by arguing that the term "arising out of" in Exclusion P is not ambiguous, and that "it is beyond reasonable debate" that the underlying claims arise out of Donisthorpe's illegal commingling and misappropriation. Combined Reply at 12.

**7.** **The Sept. 5, 2019, Hearing.**

The Court held a hearing on the MSJ and other motions on September 5, 2019. See Clerk's Minutes at 1, filed September 5, 2019 (Doc. 127). The Court quickly turned to the MSJ and suggested that all parties address the MSJ's three arguments sequentially. See Transcript of Motion Hearing at 4:3-20 (Court)(taken September 5, 2019), filed October 3, 2019 (Doc. 139)("Tr."). The Court then allowed Evanston Insurance to make an opening statement. See Tr. at 4:20-22 (Court).

a.        **Argument Regarding the Policy's Condition Precedent to Coverage.**

Evanston Insurance began argument on the MSJ by discussing the Insurance Policy's second condition precedent to coverage, which conditions coverage on the insured having no knowledge of wrongful acts that are likely to lead to a claim.  See Tr. at 5:16-6:16 (Borders).  After the Court asked Evanston Insurance how it could show that at least some of the insureds did not have knowledge, see Tr. at 6:4-7 (Court), Evanston Insurance argued that the definition of "insured" suggests that it means "any insured," which distinguishes it from innocent insured cases, Tr. at 6:8-7:6 (Borders).  Evanston Insurance then cited Miller v. Monumental Life Ins. Co., 761 F. Supp. 2d 1123 (D.N.M. 2009)(Browning, J.), for the proposition that excluding language in an insuring agreement does not shift the burden of establishing coverage to the insurance company.  See Tr. at 7:7-8:8 (Borders).  It then argued that Donisthorpe cannot show that he did not know about circumstances likely to lead to claims under the Insurance Policy, see Tr. at 8:20-9:6 (Borders), and directed the Court to Copeland-Williams, for further proof, see Tr. at 9:7-18 (Borders).

Moya then argued in opposition to Evanston Insurance's position.  See Tr. at 10:20-25 (Court, Rubin).  Moya first argued that "the so-called condition precedent" is a new argument.  Tr. at 11:6-7 (Rubin).  See Tr. at 11:4-12:10 (Rubin).  He noted that "there was mention of negligence in the application, not in the policy," and that the Court cannot conflate the two documents.  Tr. at 16:3-4 (Rubin).  After the Court asked about the Insurance Policy's language, see Tr. at 12:19-21 (Court), Moya stated that there are not enough facts before the Court to decide who had what knowledge,  see Tr. at 13:6-8.  Moya then cited Redux, Ltd. v. Commercial Union Insurance Co., 1995 WL 88251 (D. Kan. Feb. 7, 1995)(Lungstrum, J.), to argue that, under the Insurance Policy's

language, the burden to show knowledge shifts to the insurance company.  See Tr. at 13:23-14:23 (Rubin).

Ms. Bennett then argued in response to Evanston Insurance.  See Tr. at 16:17-18 (Court, Sanders).  She first read the Insurance Policy's definition of "insured" to the Court.  See Tr. at 16:22-17:15 (Sanders).  Pressed on how Evanston Insurance's arguments fail, Ms. Bennett pointed to the phrase "[t]he Company shall pay on behalf of the Insured . . . " in the Insuring Agreement's first line as evidence that the Court should not read "the Insured" as "any Insured."  Tr. at 18:8-20:8 (Sanders, Court).  Ms. Bennett then noted that Exclusion J uses both "the Insured" and "any Insured," which she argued is evidence that "every time the word 'insured' is used in the policy, it doesn't mean everybody all together."  Tr. at 20:25-21:7 (Sanders).  In response to a question from the Court about cases supporting and opposing her reading of "insured," Ms. Bennett stated that cases involving a duty of good faith and fair dealing support her reading, and that she does not recall seeing any supporting Evanston Insurance's reading.  See Tr. at 22:3-23:10 (Sanders).

The former Desert State clients then argued in response to Evanston Insurance.  See Tr. at 24:3-4 (Court, Davis).  The former clients first argued that the Court should dismiss the motion for failing to follow D.N.M.LR-Civ. 56.1(b).  See Tr. at 23:5-25:21 (Davis).  On "the actual dispute," Tr. at 25:23 (Davis), the former clients argued that Evanston Insurance is presenting a new claim, because Evanston Insurance never took the position that Insurance Policy creates a condition precedent.  Tr. at 25:22-26:10 (Davis).  They noted that the Insurance Policy explicitly states certain conditions precedent to coverage and thus "Evanston clearly knows how to create a condition precedent to coverage if they wanted to do so."  Tr. at 26:11-13 (Davis).  After expressing agreement with the other Defendants' arguments on this subject, the former clients then argued that the innocent insured doctrine should apply to this situation for public policy reasons, because

other courts have applied the doctrine in similar circumstances with ambiguous insurance policies. See Tr. at 26:25-27:16 (Davis). The former clients cited <u>Stettin v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 861 F.3d 1335 (11th Cir. 2017), as the case most supportive of their argument. See Tr. at 27:17-28:17 (Court, Davis).

Evanston Insurance then rebutted the responses of Moya, Bennett, and the former Desert State clients. See Tr. at 28:22 (Borders). Evanston Insurance first discussed two cases that it said supported its interpretation of the Policy. See Tr. at 29:13-30:16 (Borders)(citing <u>Copeland-Williams</u> and <u>Am. Nat'l Prop. & Cas. Co. v. Clendenen</u>, 238 W. Va. 249, 264 n.12 (W. Va. 2016))(Borders). The Court asked when the Insurance Policy would ever pay off if Evanston Insurance's reading is correct, <u>see</u> Tr. at 31:6-8 (Court), and Evanston Insurance stated it would pay off "all the time," because, although the Insurance Policy does not cover theft, like a fidelity policy, it covers negligent investments. Tr. at 31:9 (Borders). See Tr. at 31:10-32:10 (Borders). As to Exclusion J's language, Evanston Insurance argued that its choice of words "distinguish that for purposes of criminal or intentional wrongful acts that one insured's conduct isn't going to be imputed to another[.]" Tr. at 33:7-9. In rebutting Moya's argument that there are not enough facts regarding the insureds' knowledge to support summary judgment, Evanston Insurance cited <u>Thames v. Evanston Ins. Co.</u>, Case No. 13-CV-425-PJC, 2015 WL 7272214 (N.D. Okla. Nov. 17, 2015)(Clear, Mag. J.), to show that, comparatively, the parties have more than enough information about Doninsthorpe's knowledge. See Tr. at 32:24-33:24 (Borders). Evanston Insurance then apologized for not numbering its facts, but noted that all "were either a matter of public record and I believe one letter that one of the other parties submitted in their evidence." Tr. at 34:3-6. It then stated that its argument on the condition precedent to coverage was not new, but that the briefing "was clear from the get-go that this is one of the bases for denial of coverage." Tr. at 35:12-14.

Next, Evanston Insurance distinguished the cases Moya cites regarding the burden of proof.  <u>See</u> Tr. at 36:23-37:15 (Borders).  Finally, Evanston Insurance argued that the innocent insured doctrine is largely specific to arson and does not apply to unambiguous insurance policies.  <u>See</u> Tr. at 37:16-38:9 (Borders).

### b.  <u>Argument Regarding Exclusion P's Applicability.</u>

Evanston Insurance then turned to its argument that Exclusion P bars coverage under the Policy.  <u>See</u> Tr. at 38:18 (Borders).  It argued that the Insurance Policy is not ambiguous and that "courts across the country reading this exact same language" have agreed that the language is not ambiguous.  Tr. at 39:5-6 (Borders).  Evanston Insurance then discussed these cases.  <u>See</u> Tr. at 39:7-44:2 (Borders)(discussing <u>BancInsure, Inc. v. F.D.I.C.</u>, 796 F.3d 1226, 1239 (10th Cir. 2015); <u>Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co.</u>, 592 F. App'x 730 (10th Cir. 2014)(unpublished)[35]; <u>Bethel v. Darwin Select Ins. Co.</u>, 735 F.3d 1035 (8th Cir. 2013); <u>Murray v. Greenwich Ins. Co.</u>, 533 F.3d 644 (8th Cir. 2008); <u>Johnson v. Atl. Cas. Ins. Co.</u>, No. 13-CV-1002S, 2015 WL 5021953 (W.D.N.Y. Aug. 24, 2015)(Skretny, J.); <u>Nationwide Mut. Ins. Co. v. The</u>

---

[35]<u>American Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co.</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent . . . .  And we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that <u>Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co.</u>, <u>Mount Vernon Fire Ins. Co. v. Okmulgee Inn Venture, LLC</u>, 451 F. App'x 745, 749 (10th Cir. 2011), and <u>Cagle v. The James Street Group</u>, 400 F. App'x 348, 356 (10th Cir. 2010), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Overlook, LLC, 785 F. Supp. 2d 502 (E.D. Va. 2011)(Davis, J.); and Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 673 N.W. 2d 65 (2004)).

Moya responded to Evanston Insurance by first arguing that the Court does not have sufficient facts before it to decide the issue on summary judgment. See Tr. at 44:16-45:15 (Rubin). After conceding that Donisthorpe's plea agreement and plea colloquy were under oath, see Tr. at 46:5-7 (Rubin), Moya argued that his submitted affidavit nevertheless creates factual disputes, see Tr. at 46:11-20.

Ms. Bennett responded to Evanston Insurance by discussing the adverse interest exception. See Tr. at 47:1-11. Ms. Bennett argued that Donisthorpe's actions "were certainly for his own benefit" and "not for the benefit of DSLM," because lying on the insurance Application "would be leading DSLM to a result of having no insurance." Tr. at 48:3-9 (Sanders). Ms. Bennett further argued that Exclusion P does not apply to her, because "Evanston has not fulfilled its burden of proof to justify summary judgment being granted pursuant to Exclusion P because there are no facts presented to the Court that she herself has engaged in any conversion, misappropriation, commingling, or the defalcation of funds or property." Tr. at 48:25-49:5 (Sanders). She then argued that Exclusion P is ambiguous when read next to Exclusion J. See Tr. at 50:2-51:3 (Sanders). In response to the Court, Bennett cited Watkins Glen Central School District v. National Union Fire Insurance Co., and Murphy v. Nutmeg Insurance Co., as cases that courts decided differently than the many cases Evanston Insurance cite. See Tr. at 51:25-53:17 (Sanders). Ms. Bennett concluded by arguing that the claims against her do not arise from "any alleged commingling," Tr. at 53:17 (Sanders), and that New Mexico principles of insurance contract interpretation require Courts to read coverage provisions broadly and exclusion provisions narrowly, see Tr. at 53:18-54:1 (Sanders).

The former clients began their response to Evanston Insurance by joining Moya and Ms. Bennett's arguments. See Tr. at 54:9-10 (Davis). Next, the former clients argued that "the facts before the Court do not allow that sort of imputation of wrongdoing from Mr. Donisthorpe to the other insureds under the policy." Tr. at 55:7-9 (Davis). They pointed to Evanston Insurance's concession in its MSJ that there are no New Mexico cases interpreting the phrase "based upon or arising out of," and argued that, as a result, the language "must be construed here and it must be construed in favor of the coverage and in favor of the insureds." Tr. at 56:4-6 (Davis).

Evanston Insurance responded first to Ms. Bennett, and it argued that the cases that she cites are inapposite, because they interpret different policy exclusions. See Tr. at 56:15-57:4 (Borders). Evanston Insurance then cited Northland Ins. Co. v. Stewart Title & Guar. Co., 327 F.3d 448, 451 (6th Cir. 2003), as a more applicable case, see Tr. at 57:4-58:10 (Borders), and it argued that the negligence claims against Ms. Bennett arise from Donisthorpe's commingling, see Tr. at 58:11-59:2 (Borders). Evanston Insurance then argued that Ms. Bennett's adverse interest exception argument does not address its argument concerning Exclusion P. See Tr. at 59:3-59:16 (Borders). On the Moya Affidavit, Evanston Insurance argued that it stated legal conclusions and that it would soon move to strike it. See Tr. at 59:22-60:8 (Borders). Evanston Insurance concluded its argument on this topic by clarifying that, while no New Mexico court had interpreted "arising out of" or "based upon" in the context of a similar exclusion, the Tenth Circuit had discussed what the language meant in other circumstances, and the Court should follow its guidance. See Tr. at 60:20-61:14 (Borders).

c. **Argument Regarding the Timeliness of Rescission.**

Evanston Insurance then addressed its third argument: that the policy is void *ab initio*, because Donisthorpe made misrepresentations in the Application. See Tr. at 61:17. It began by

arguing that the innocent insured doctrine does not apply here, because the Insurance Policy has language that imputes one insured's knowledge to others. See Tr. at 61:17-62:16 (Borders). It then discussed the application attachment process it generally follows and noted that Desert State's agent failed to attach a copy of the application. See Tr. at 62:17-63:7 (Borders). Evanston Insurance argued that, because the fault is Desert State's, the Defendants' attachment arguments are "simply a red herring." Tr. at 64:15 (Borders). Evanston Insurance next discussed the timeliness of its decision to rescind, and it first argued that it could not rescind based merely on allegations of wrongdoing. See Tr. at 64:16-24 (Borders). Evanston Insurance stated that it first learned of Donisthorpe's misrepresentation "in December of . . . 2017." Tr. at 64:4 (Borders). It then noted that, under New Mexico law, a party asserting waiver has the burden of establishing it, and that courts "should not infer waiver from doubtful or dubious acts." Tr. at 65:20-21 (Borders). Evanston Insurance argued that the two cases on which the former Desert State clients rely did not support a rescission waiver here, because "we took no action that would give anyone a clear indication that we intended to waive our policy defenses," and because "we tendered the consideration." Tr. at 67:3-5 (Borders); id. at 67:11-12 (Borders). Next, it argued that "the only other argument they can possibly have" is that Evanston Insurance is estopped from rescinding the policy, Tr. at 67:14-15 (Borders), and that law from New Mexico and other states in the Tenth Circuit do not permit creating coverage by estoppel, see Tr. at 67:16-68:13 (Borders). Evanston Insurance argued that courts apply the adverse interest exception only in cases where theft or embezzlement is the risk against which the Insurance Policy insures. See Tr. at 69:14-70:13 (citing Everest Nat'l Ins. Co. v. Tri-State Bancshares, Inc., 2016 WL 5062155 (W.D. La. Aug. 2, 2016)(Foote, J.)). Further, Evanston Insurance cited Pereira v. Aetna Cas. & Sur. Co., 186 F.3d 196, for the holding that a "principal may not disavow an act of an agent while simultaneously

- 35 -

taking advantage of the benefits of the fraudulently procured bargain." Tr. at 72:5-8 (Borders)(quoting 186 F.3d at 208). Evanston Insurance concluded by citing Bird v. Penn. Cent. Co., 341 F. Supp 291 (E.D. Pa. 1972)(Lord, III, C.J.), for the same holding. See Tr. at 72:25-73:7 (Borders).

Moya responded first by arguing that, while the New Mexico law governing attachment of insurance policies is ambiguous, it applies to Evanston Insurance, and Evanston Insurance never supplied a copy of the Insurance Policy. See Tr. at 74:9-74:20 (Rubin). Moya then argued that the Insurance Policy was a new policy rather than a renewal and that the Court should "look at substance over form on that point." Tr. at 75:11-12 (Rubin). Moya concluded by reiterating that there are no facts on the record showing that there was any misrepresentation on the Application. See Tr. at 75:13-76:2 (Rubin).

Ms. Bennett first apologized for discussing the adverse interest exception earlier in the hearing and said that the arguments she raised earlier applies here. See Tr. at 76:24-77:5 (Sanders). Ms. Bennett then directed the Court to Everest National Insurance Co. v. Tri-State Bancshares, Inc., 2016 WL 5062155, and BancInsure, Inc. v. F.D.I.C., 796 F.3d at 1239, which held that the adverse interest exception applied against an insurance company's claim for rescission. See Tr. at 77:6-78:18 (Sanders). Bennett then noted that the cited case was decided in part on public policy grounds and predicted that New Mexico's public policy would allow the adverse interest exception to apply here. See Tr. at 78:19-79:8 (Sanders). Next, Ms. Bennett argued that Evanston Insurance would still be attempting to rescind the contract if Ms. Bennett, rather than Donisthorpe, had filled out the Application and that "the Court should not condone that kind of an argument." Tr. at 80:5-7 (Sanders). Finally, Ms. Bennett cited Puget Sound National Bank v. St. Paul Fire and Marine

Insurance Co., 645 P.2d 1122 (Wash. Ct. App. 1982), where an insured successfully asserted the adverse interest exception against the insurer. See Tr. at 80:8-16 (Sanders).

The former clients began by clarifying that they are not attempting to seek a waiver to create coverage. See Tr. at 80:24-81:5 (Davis). They then provided a timeline, based on facts learned from discovery, that describes when Evanston Insurance learned about Donisthorpe's fraud. See Tr. at 81:17-83:5 (Davis). After discussing Evanston Insurance's "cavalier attitude toward their discovery obligations," Tr. at 83:23-24 (Davis), and the Court's comments at the February Motion to Dismiss hearing, see Tr. at 84:8-19 (Davis), the former clients argued that the record became worse for the plaintiff during discovery, see Tr. at 84:20-85:18 (Davis). The former clients then turned to N.M. Stat. Ann. § 59A-18-11 and argued that the statute's first sentence concerns when an Application's statement binds an insured, while the statute's second two sentences discuss whether the application itself is admissible. See Tr. at 86:1-87:7 (Davis). Desert State's former clients concluded by arguing that the insurance application was not admissible under the law. See Tr. at 87:8-20 (Davis).

The Court then allowed Evanston Insurance to make any final argument. See Tr. at 87:23-25 (Court). Evanston Insurance began by stating that Donisthorpe "certainly" had knowledge about his lie on the application. Tr. at 88:17 (Borders). It then stated that New Mexico law allows for rescission regardless whether a misrepresentation is innocent. See Tr. at 88:19-89:7 (Borders). Evanston Insurance next argued that the public policy considerations Ms. Bennett discussed apply to fidelity coverage for embezzlement and not to the Insurance Policy here. See Tr. at 89:8-85:2 (Borders). It then stated that the Insurance Policy's language is unambiguous: the representations of Donisthorpe are Ms. Bennett's representations too, regardless whether she read it. See Tr. 85:3-90:1 (Borders). Evanston Insurance concluded the hearing by expressing sympathy for

Donisthorpe's fraud's victims but stated that "the type of insurance coverage that was provided by this policy doesn't cover" their claims.  Tr. at 90:20-21 (Borders).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.) (quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Sch.)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.</u>" *Celotex*, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex, 477

U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[36]  Once the movant meets this burden,

rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine

issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184

F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the

defendant when the plaintiff did not offer expert evidence supporting causation or proximate

causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.

See 184 F. Supp. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the

breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-

merchantability claim's proximate-causation requirement with mere common knowledge, and so

New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the

plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined

that, without the requisite evidence, the plaintiff failed to prove "an essential element of the

nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal

quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).  Thus,

if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant

may move, without any competent evidence itself, past the plaintiff's lack of competent evidence,

and secure summary judgment.  See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary

judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech.

---

[36]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme
Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the
law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727,
at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent
both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how
the standard was applied to the facts of the case.").

Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa,

896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249

(citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)(quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  <u>Liberty Lobby</u>, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 550-55 (1999); <u>Liberty Lobby</u>, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).  Fourth, the court cannot decide any issues of credibility.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In <u>Scott v. Harris</u>, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts.  <u>See</u> 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces). "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)] explained that the blatant contradictions of the record must

be supported by more than other witnesses' testimony." Lymon v. Aramark Corp., 728 F. Supp.

2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

To allege a claim for relief, rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8. Parties may allege new claims in motions for summary judgment. Evans v. McDonald's Corp., 936 F.2d at 1090-91. When this occurs, courts treat the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure. See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998). The Tenth Circuit has stated that "[a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quotation marks omitted). While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case." Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord

Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has

held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New

Mexico "opinion that [governs] a particular area of substantive law . . . [the district court]

must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics,

LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just

as a court engaging in statutory interpretation must always begin with the statute's text, a court

formulating an Erie prediction should look first to the words of the state supreme court." Peña v.

Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[37]  If the Court finds only an

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will

consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by

the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court

---

[37]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.).  Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts.  The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a state supreme court case that a federal court predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

decision." <u>Mosley v. Titus</u>, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it" (citing <u>Wade v. EMCASCO Ins.</u>, 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state"))).[38]  The Court may also rely on

---

[38]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Tr. v. WPX Energy

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[39]  Ultimately, "the Court's task is to predict what the

<hr>

diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions."  (emphasis and title case omitted)).

[39]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit caselaw, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit caselaw against more recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening caselaw directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within

a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is $x$. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law

issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's Federal Practice § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many

(Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., 353 F.3d 862 (10th Cir. 2003)(McConnell, J.) the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866.  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," Wankier v. Crown Equip. Corp., 353 F.3d at 866 -- might additionally compel the determination that any intervening caselaw must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, former United States Circuit Judge for the Tenth Circuit, limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at 1231.

state supreme court would do." Wade v. EMCASCO Ins., 483 F.3d at 666. Accord Mosley v.

Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174,

1188-89 (D.N.M. 2008)(Browning, J.).

## LAW REGARDING INSURANCE CONTRACT INTERPRETATION

Under New Mexico Law, "insurance contracts are construed by the same principles which

govern the interpretation of all contracts." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 18,

945 P.2d 970, 976 (quotation marks omitted). In interpreting insurance policies, courts must

consider the policy as a whole. See Weldon v. Commercial Union Assur. Co., 1985-NMSC-118,

¶ 9, 710 P.2d 89, 91. "The clauses in the policy must be construed as intended to be a complete

and harmonious instrument designed to accomplish a reasonable end." Safeco Ins. Co. of Am.,

Inc. v. McKenna, 1977-NMSC-053, ¶ 18, 565 P.2d 1033, 1037. "If any provisions appear

questionable or ambiguous, we will first look to whether their meaning and intent is explained by

other parts of the policy." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 20, 945 P.2d at 977.

When insurance contracts are unambiguous, courts must construe them "in their usual and ordinary

---

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior caselaw. Moore's Federal Practice lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's Federal Practice § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

sense," Slack v. Robinson, 2003-NMSC-083, ¶ 7, 71 P.3d 514, 517, and "enforce [them] as written," Truck Ins. Exch. v. Gagnon, 2001-NMCA-092, ¶ 7, 33 P.3d 901, 903.

When interpreting contracts, "courts should not 'create ambiguity where none exists.'" United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 10, 285 P.3d at 647 (quoting City of Santa Rosa v. Twin City Fire Ins. Co., 2006-NMCA-118, ¶ 7, 143 P.3d 196, 198). Policy terms are only deemed ambiguous when they are "reasonably and fairly susceptible of different constructions." Knowles v. United Servs. Auto Ass'n, 1992-NMSC-030, ¶ 9, 832 P.2d at 396. Ambiguous terms must be construed against the drafter; they are "given the strongest interpretation against the insurer which they will reasonably bear." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 22, 945 P.2d at 977. See United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 10, 285 P.3d at 648.

In construing an insurance policy, the distinction between an exclusion and a provision of coverage is very important, because it affects which party bears the burden of proof. See Miller v. Monumental Life Ins. Co., 761 F. Supp. 2d at 1147. The insured party initially bears the burden to show that coverage is established under a provision of coverage. See Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 6, 127 P.3d 1111, 1113 The insurer then bears the burden of proving the policy excludes coverage. See Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 6, 127 P.3d at 1113 (citing Eric Mills Holmes & Mark S. Rhodes, Holmes's Appleman on Insurance, § 1.10, at 43 (2d ed. 1996)("That the insurer has the burden of proof to prove no coverage under an all-risks policy is the American rule in all states, with the possible exception of Texas")); Lopez v. N.M. Pub. Schs. Ins. Auth., 1994-NMSC-017, ¶ 13, 870 P.2d 745, 749.

Insurance policy terms are frequently litigated, and courts have established consensus interpretations to many of the most common phrases. For example, "'unlike the phrase 'the

insured,' the phrase 'any insured' unambiguously expresses a contractual intent to create joint obligations and to prohibit recovery by an innocent insured.'" Axis Reinsurance Co. v. Bennett, 2008 WL 2485388, at *15 (S.D.N.Y. June 19, 2008)(Lynch, J.)(quoting Sales v. State Farm Fire & Cas. Co., 849 F.2d 1383, 1385 (11th Cir. 1988)). See also Am. Nat'l Prop & Cas. Co. v. Clendenen, 238 W. Va. at 264 n.12 (collecting cases); Stettin v. Nat. Union Fire Ins. Co. of Pittsburgh, Pa., 861 F.3d at 1337. Similarly, the Court of Appeals of New Mexico has defined "arising out of" broadly, stating that the term is "ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.'" Krieger v. Wilson Corp., 2006-NMCA-034, ¶ 14, 131 P.3d 661, 666 (quoting Baca v. New Mexico State Highway Dep't, 1971-NMCA-087, ¶ 14, 486 P.2d 625, 628). In analyzing the term in an insurance contract exclusion, the Tenth Circuit surveyed New Mexico caselaw and concluded that "we have every reason to suppose that New Mexico law applies the same broad definition of arising out of in the exclusion context as in the coverage context." Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x at 742.

### LAW REGARDING THE ADVERSE INTEREST EXCEPTION AND INSURANCE POLICY APPLICATIONS

Generally, "an agent's knowledge of matters within the scope of his authority is knowledge of his principal." U.S. Fid. & Guar. Co. v. State of Okla. ex rel Sebring, 383 F.2d 417, 419 (10th Cir. 1967). An agent's knowledge is not always imputed to the principal. See Restatement (Third) of Agency § 5.04 (2006); Restatement (Second) of Agency §§ 280, 282 (1958). "If an agent has done an unauthorized act or intends to do one, the principal is not affected by the agent's knowledge that he has done or intends to do the act." Restatement (Second) of Agency § 280. In addition, with a few exceptions, "[a] principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own

or another's purposes." Restatement (Second) of Agency § 282. See BancInsure, Inc. v. U.K. Bancorporation Inc./United Ky. Bank of Pendleton Cty. Inc., 830 F. Supp. 2d 294, 302 (E.D. Ky. 2011)(Bunning, J.)("BancInsure"); Restatement (Third) of Agency § 5.04 (2006).

Section 280, comment c, of the Restatement (Second) of Agency -- titled Agent's Knowledge of His Own Unauthorized Acts -- discusses a related circumstance where an agent's knowledge is not imputed to the principal.

> If, in order to protect himself against the embezzlement or other wrongdoing of an agent, the principal obtains a contract of indemnity which states that the signer has no knowledge of any prior wrongdoing by the agent, the knowledge of his own embezzlement by the agent who signs the contract is not imputed to the principal. The risk of embezzlement by dishonest agents is the risk insured against and it would defeat the purpose of the contract to bind the principal by the knowledge of such agents.

Restatement (Second) of Agency § 280 cmt. c (1958). See Restatement (Third) of Agency § 5.03 cmt. (b) ("[I]f a principal makes a claim under a fidelity bond covering an employee's dishonesty, the issuer of the bond may not decline to pay on the basis that the employee's knowledge of the employee's own wrongdoing is imputed to the principal."). In accordance with § 280(c) and § 282, courts generally do not impute a wrongdoer's knowledge to the principal when the agent has misrepresented his or her embezzlement on a fidelity bond application. See Nat'l Credit Union Bd. v. CUMIS Ins. Soc'y, Inc., 241 F. Supp. 3d 934, 941 (D. Minn. 2017)(Frank, J.)("CUMIS").

Courts have inconsistently applied Restatement (Second) of Agency § 282, the adverse interest exception, to misrepresentations on an application for insurance. The Second Circuit has suggested, without deciding, that a corporation's president acted on the corporation's behalf when procuring an insurance policy, even though he made misrepresentations in the application. See Pereira v. Aetna Cas. & Sur. Co., 186 F.3d at 208 (citing Gordon v. Cont'l Cas. Co., 181 A. 574, 576 (Pa. 1935); In re Maxwell Newspapers, Inc., 151 B.R. 63, 69 (Bankr. S.D.N.Y.

1993)(Brozman, J.); Restatement (Second) of Agency § 282 cmt. c (1958)). The Second Circuit noted in support that "a principal may not disavow an act of an agent while simultaneously taking advantage of the benefits of the fraudulently procured bargain." Pereira v. Aetna Cas. & Sur. Co., 186 F.3d at 208 (citing Restatement (Second) of Agency § 282 cmt. h ("[A] principal may not disclaim knowledge of the agent's fraud and yet attempt to retain a benefit obtained by the fraud; this is a restitution principle preventing the unjust enrichment of the principal.")). Further, the Tenth Circuit has held that, under Oklahoma law, an investment firm's treasurer "acted adversely to his principal in embezzling its funds and in [its] behalf in submitting the [fidelity bond] applications." Md. Cas. Co. v. Tulsa Indus. Loan & Inv. Co., 83 F.2d 14, 17 (10th Cir. 1936). The Supreme Court of Pennsylvania has likewise stated that, although "there would seem to be some confusion of thought," Gordon v. Cont'l Cas. Co., 181 A. at 576, over whether an embezzling agent acts in the principal's interest in lying to obtain a fidelity bond, in arranging for the bond, such agents do not act adversely. See Gordon v. Cont'l Cas. Co., 181 A. at 576. The Supreme Court of Pennsylvania stated that

> the rule that knowledge of a corporate officer is knowledge of the corporation, applies only where a third person seeks to enforce some demand against the corporation . . . , but the [adverse interest] exception has no application where the corporation seeks to enforce the benefit of a fraud perpetrated by its officer on a third person; that the exception to the rule of imputed knowledge is not a vehicle for the consummation of fraud.

Gordon v. Cont'l Cas. Co., 181 A. at 576. It also asserted that this rule accorded with §§ 261 and 282 of the Restatement (Second) of Agency. See Gordon v. Cont'l Cas. Co., 181 A. at 576-77.

On the other hand, several courts have applied the adverse interest exception to misrepresentations on an insurance application. In CUMIS, the Honorable Donovan Frank, United States District Judge for the District of Minnesota, held that, because the "*only* reason that Cofell did not disclose the existence of her theft was for her own benefit and to the detriment of the

company," CUMIS, 241 F. Supp. 3d at 940 (emphasis in original), the adverse interest exception

applied to her misrepresentation on the insurance application, see CUMIS, 241 F. Supp. 3d at 941.

Judge Frank emphasized that others should not read the opinion broadly:

> But the Court reiterates the narrowness of its holding: it is only when an employee who acting adversely to her employer by embezzling from the company misrepresents her knowledge of that embezzlement on an application for fidelity insurance that the employee's knowledge will not be imputed to the company to allow the insurer to rescind the fidelity insurance.

CUMIS, 241 F. Supp. 3d at 941.  In BancInsure, the Honorable David Bunning, United States

District Judge for the Eastern District of Kentucky, held that an embezzling CEO acted on her

own behalf and against her principal's interests when she lied on an insurance policy renewal

application:

> Wood was acting adverse to [the bank's] interests when she lied on the renewal application.  Had she been honest in completing the applications, [the bank] would have been able to submit a timely claim . . . .  Thus, by lying on the application, [the bank] did not benefit in any way.  For approximately eight years, Wood had been involved in [a] large scale fraudulent scheme which culminated in an embezzlement of over 2.2 million dollars from [the bank].  It is clear that she would not communicate this fact to [the bank] because it would necessarily prevent the consummation of the fraudulent scheme which she was engaged in perpetrating.  If Wood answered [the question] on the renewal application truthfully, her fraud would have been revealed, and she would not have been able to continue embezzling funds from [the bank].  Therefore, since Wood's interests in concealing her fraudulent activity [were] adverse to [the bank's] interests, her knowledge of her embezzlement will not be imputed to [the bank].

BancInsure, 830 F. Supp. 2d at 304.  See Everest Nat'l Ins. Co. v. Tri-State Bancshares, Inc., 2016

WL 5062155, at *10 (quoting this passage and noting that its "reasoning applies with equal force

in this case").  Finally, the Court of Appeals of Washington also concluded that it would not impute

a bank director's knowledge to the bank, because he "acted adversely both as to his defalcations

and as to his concealment of them on the bond application.  His motive to conceal continued

through the period in question, and he was not the sole representative of the bank." Puget Sound Nat. Bank v. St. Paul Fire and Marine Ins. Co., 645 P.2d at 1128.

Courts that do not impute an embezzling agent's knowledge to the principal rely on arguments based on allocation of risk. See CUMIS, 241 F. Supp. 3d at 941 (discussing cases). In Everest Nat'l Ins. Co. v. Tri-State Bancshares, Inc., 2016 WL 5062155, for example, the court called § 280 comment c a "persuasive and prudent" explanation why insurers should bear the risk that an applicant dishonestly applies for fidelity insurance rather than the applicant's employer. Everest Nat'l Ins. Co. v. Tri-State Bancshares, Inc., 2016 WL 5062155, at *12. The court reasoned that, while some principles of agency law suggest that courts should protect third parties when an agent fraudulently contracts with them on a principal's behalf, § 280 comment c suggests that the risks inherent in fidelity insurance belongs with the insurers or coverage would be rendered illusory. See Everest Nat'l Ins. Co. v. Tri-State Bancshares, Inc., 2016 WL 5062155, at *12. Judge Bunning also noted that, if an agent's knowledge was imputed to the principal for purposes of a fidelity bond application, organizations would be unable to protect themselves against the risk of dishonest employees. See BancInsure, 830 F. Supp. 2d at 305.

Although New Mexico courts have not cited either § 280 or § 282 of the Restatement (Second) of Agency, they are widely adopted in courts throughout the country. See Amelia Toy Rudolph et al., *Invoking in Pari Delicto to Bar Accountant Liability Actions Brought by Trustees and Receivers*, ST004 ALI-ABA 75, 92-94 (2011)(collecting cases adopting the adverse interest exception); Bogda M.B. Clarke et al., *Fraud in the Inducement as a Defense to Fidelity and Surety Claims,* 42 Tort Trial & Ins. Practice L. J. 181, 193 (2007)("the majority of courts endorse the position taken by section 280"). Further, the Court of Appeals of New Mexico has recognized two similar exceptions to the general rule that an agent's knowledge is imputed to the principal. See

Lihosit v. I & W, Inc., 1996-NMCA-033, ¶¶ 19-20, 913 P.2d 262, 267 (citing Restatement (Second) of Agency §§ 268 cmt. d, and 275 cmt. b). In light of the overwhelming acceptance of these agency principles, the Court concludes that the Supreme Court of New Mexico would recognize the adverse interest exception and the § 280 exception to the usual imputation of an agent's knowledge.

## LAW REGARDING RESCISSION OF CONTRACTS FOR MATERIAL MISREPRESENTATIONS

Rescission is an equitable remedy that voids a contract entered through mistake, fraud, or duress. See Branch v. Chamisa Dev. Corp., 2009-NMCA-131, ¶ 21, 223 P.3d 942, 946. "Rescission is an equitable remedy which seeks to restore the status quo ante," and "[t]he defrauded party must return or offer to return that which has been received under the contract as a condition precedent to maintaining a suit for rescission." Ledbetter v. Webb, 1985-NMSC-112, ¶ 15, 711 P.2d 874, 877-78. Under New Mexico law, rescission for fraud "is allowed where there has been a misrepresentation of a material fact, the misrepresentation was made to be relied on, and has in fact been relied on." Prudential Ins. Co. of Am. v. Anaya, 1967-NMSC-132, ¶ 8, 428 P.2d 640, 643. Rescission "may be allowed in certain cases of non-fraudulent, but material, nondisclosure." McElhannon v. Ford, 2003-NMCA-091, ¶ 15, 73 P.3d 827, 832; City of Raton v. Ark. River Power Auth., 611 F. Supp. 2d 1190, 1198 (D.N.M. 2008)(Browning, J.).[40] Rescission's

---

[40]In making its ruling under Erie, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d at 1332. As support for its conclusion that, "rescission may be allowed in certain cases of non-fraudulent, but material, nondisclosure," the Court of Appeals cites the Restatement (Second) of Contracts §§ 161, cmt. b, and 164(1) cmt. b. Given the similarity between these provisions and Prudential Ins. Co. of Am. v. Anaya, 1967-NMSC-132, the Court concludes that the Supreme Court of New Mexico would concur with McElhannon v. Ford, 2003-NMCA-091, ¶ 15, 73 P.3d at 832.

test of materiality is "whether plaintiff, as a reasonably prudent insurer, would have rejected the risk if it had known the true facts." Prudential Ins. Co. of Am. v. Anaya, 1967-NMSC-132, ¶ 17, 428 P.2d at 644. If the Court deems either the withheld information or the misrepresentations material, then rescission is available "in the absence of waiver or estoppel." Modisette v. Found. Reserve Ins. Co., 1967-NMSC-094, ¶ 19, 427 P.2d 21, 26. The parties' good faith to the contract is immaterial -- "it makes no difference whether the party acted fraudulently, negligently, or innocently." Modisette v. Found. Reserve Ins. Co., 1967-NMSC-094, ¶ 17, 427 P.2d at 25.

Parties who seek rescission may be estopped from asserting it and may also waive the right to rescind. Modisette v. Found. Reserve Ins. Co., 1967-NMSC-094, ¶ 19, 427 P.2d at 26. If rescission for fraud is sought, the party

> must immediately, upon discovering the fraud, restore, or offer to restore, all that he has received under the contract, as a condition precedent to his right to rescind the same. If he fails to do this, or if, after discovering the fraud, he takes any steps in affirmance of the contract, he will be held to have elected to affirm the same and will not thereafter be granted relief in equity from the burdens of the contract.

Putney v. Schmidt, 1911-NMSC-043, ¶ 10, 120 P. 720, 723. In New Mexico, "[b]efore an insurer can be held to have waived, or be estopped from asserting a right of forfeiture, it must have had knowledge of the facts." Modisette v. Found. Reserve Ins. Co., 1967-NMSC-094, ¶ 28, 427 P.2d at 27. Rescission based on misrepresentation is a remedy that "sounds partly in tort." City of Raton v. Ark. River Power Auth., 611 F. Supp. 2d at 1207.

## NEW MEXICO LAW REGARDING THE DUTY TO DEFEND AND THE DUTY TO INDEMNIFY

The "duty to indemnify is distinct from [the] duty to defend," and resolution whether a party has a duty to defend does not "necessarily depend on there being a duty to indemnify." City of Albuquerque v. BPLW Architects & Eng'rs, Inc., 2009-NMCA-081, ¶ 31, 726, 213 P.3d 1146, 1155 (Ct. App. 2009)(citing Ins. Co. of N. Am. v. Wylie Corp., 1987-NMSC-011, 733 P.2d 854,

857 (1987)).  In disputes stemming from insurance contracts, the "duty to defend arises out of the nature of the allegations in the complaint," <u>Miller v. Triad Adoption & Counseling Servs., Inc.</u>, 2003-NMCA-055, ¶ 9, 65 P.3d 1099, 1103 (citing <u>Bernalillo Cty. Deputy Sheriff's Ass'n v. Cty. of Bernalillo</u>, 1992-NMSC-065, ¶ 4, 845 P.2d 789, 791), and is determined "by comparing the factual allegations in the complaint with the insurance policy," <u>Lopez v. N.M. Pub. Sch. Ins. Auth.</u>, 1994-NMSC-017 at ¶ 8, 870 P.2d at 747. If a complaint "states facts that bring the case within the coverage of the policy," then the duty to defend will be triggered.  <u>Bernalillo Cty. Deputy Sheriffs Ass'n v. Cty. of Bernalillo</u>, 1992-NMSC-065, ¶ 8, 845 P.2d at 791.  Generally, an insurer's "duty to defend arises out of a potentially covered claim and lasts until the conclusion of the underlying lawsuit, or until it has been shown that there is no potential for coverage," and, when there are multiple causes of action, "the duty continues until every covered claim is eliminated."  <u>Guest v. Allstate Ins. Co.</u>, 2010-NMSC-047, ¶ 33, 244 P.3d 342, 348 (2010)(citing S. Plitt et al., <u>Insurer's Duty to Defend: Nature, Commencement, and Termination</u>, 14 Couch on Insurance 3d, § 200:47 (Supp. 2007)).  Known, but unpled facts, may bring a claim within the coverage of the policy at the beginning of the litigation or at a later stage.  <u>See</u> <u>Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.</u>, 1990-NMSC-094, ¶ 11, 799 P.2d 1113, 1116.  "If the allegations of the complaint or the alleged facts tend to show that an occurrence comes within the coverage of the policy, the insurer has a duty to defend regardless of the ultimate liability of the insured."  <u>Miller v. Triad Adoption & Counseling Servs., Inc.</u>, 2003-NMCA-055, ¶ 9, 65 P.3d at 1103 (citing <u>Found. Reserve Ins. Co., Inc. v. Mullenix</u>, 1982-NMSC-038, ¶ 6, 642 P.2d 604, 605).  With respect to the duty to indemnify, New Mexico courts have held that "[i]f the allegations of the federal complaint clearly fall outside the provisions of [the] liability insurance policies, indemnity by the insurer is not required."  <u>N.M. Physicians Mut. Liab. Co. v. LaMure</u>, 1993-NMSC-048, ¶ 8, 860 P.2d 734, 737 (1993).  A court

will "leave[ ] for later" determination whether the insurer must indemnify the insured, because that "ultimate determination is based on whether the insurer became legally obligated to pay damages because of a bodily injury or property damage that does, in fact, fall under the policy coverage." 12 Couch on Insurance § 172:2 (Supp. 2011). The Tenth Circuit has held that the "duty to indemnify relates to liability actually imposed on the insured for claims falling within the scope of coverage." Mount Vernon Fire Ins. Co. v. Okmulgee Inn Venture, LLC, 451 F. App'x 745, 749 (10th Cir. 2011)(unpublished)(addressing duty to indemnify in Oklahoma and applying Tenth Circuit case law from Colorado)(citing United Fire & Cas. Co. v. Boulder Plaza Residential, LLC, 633 F.3d 951, 956-57 (10th Cir. 2011)). See Valley Imp. Ass'n v. U.S. Fid. & Guar. Corp., 129 F.3d 1108, 1126 (10th Cir. 1997)(concluding that, under New Mexico law, a judgment regarding the duty to indemnify would be "premature," because "the duty to indemnify must be determined based on the facts as ultimately determined in the litigation against the insured").

In Hartford Fire Insurance Co. v. Gandy Dancer, LLC, 864 F. Supp. 2d 1157 (D.N.M. 2012)(Browning, J.), defendant Mercer LLC argued that it was entitled to Hartford Fire Insurance coverage for a negligent misrepresentation claim that it claimed caused property damage. See 864 F. Supp. 2d at 1199. The Court concluded that negligent misrepresentation could constitute an "occurrence" or "accident" -- which are events covered by the insurance policy. 864 F. Supp. 2d at 1199. The allegations were "sufficient to trigger coverage, because an insurer's 'duty to defend arises out of a *potentially* covered claim.'" 864 F. Supp. 2d at 1200 (quoting Guest v. Allstate Ins. Co., 2010-NMSC-047, ¶ 33, 244 P.3d at 348 (emphasis in Hartford Fire Ins. Co. v. Gandy Dancer, LLC)). The Court concluded that the duty to defend was not triggered by this allegation, because the policy excluded claims for property damage that arose out of the insureds' work. See 864 F.

Supp. 2d at 1200.  The plaintiff had a duty to defend, however, because the defendants' claims for

trespass and nuisance "arguably give rise to coverage."  864 F. Supp. 2d at 1202.

## ANALYSIS

The Court will deny Evanston Insurance's MSJ.  First, the Court considers whether

Evanston Insurance is entitled to summary judgment on its claim that the Defendants cannot satisfy

the Insurance Policy's prior knowledge provision.  The Court concludes that Evanston Insurance

is not entitled to summary judgment on this claim, because Donisthorpe's knowledge is not

imputed to other insureds.  Second, the Court concludes that the Insurance Policy's Exclusion P

does not bar coverage for the underlying Client Complaint.  Finally, the Court concludes that

Evanston Insurance is not entitled to summary judgment on its claim that the Insurance Policy was

void *ab initio.*

## I.     EVANSTON INSURANCE IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM THAT THE DEFENDANTS CANNOT SATISFY THE INSURANCE POLICY'S PRIOR KNOWLEDGE PROVISION.

The Court first considers whether Evanston Insurance is entitled to summary judgment on

its claim that the Defendants cannot satisfy the Insurance Policy's prior knowledge provision.  The

Insurance Policy's "Insuring Agreement" states:

> The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 5.A. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to the Section Claims A., Claims Reporting provision,

> By reason of:

>> 1.   A Wrongful Act; or

>> 2.   A Personal Injury;

In the Performance of Specified Professional Services rendered or that should have been rendered by the Insured or by any person for whose Wrongful Act or Personal Injury the Insured is legally responsible,

Provided:

    a. The entirety of such Wrongful Act(s) or Personal Injury(ies) happens during the Policy Period or on or after the applicable Retroactive Date stated in Item 5.A. of the Declarations and before the end of the Policy Period; and

    b. Prior to the effective date of this Coverage Part the Insured had no knowledge of such Wrongful Act(s) or Personal Injury(ies) or any fact, circumstance, situation or incident, which may have led a reasonable person in the Insured's position to conclude that a Claim was likely.

Insurance Policy at 15. Evanston Insurance argues in the MSJ that subsection "b," or the prior knowledge provision, precludes coverage for all other insureds. The Court concludes that Evanston Insurance's Third Complaint states a claim for relief under the Federal Rules of Civil Procedure, that the prior knowledge provision is a condition precedent to coverage, and that Donisthorpe's knowledge is not imputed to other insureds.

## A. WHETHER THE INSUREDS HAVE SATISFIED THE PRIOR KNOWLEDGE PROVISION IS NOT A NEW CLAIM REQUIRING AMENDMENT OF THE PLEADINGS.

The former Desert State clients and Moya object to Evanston Insurance's argument that the insureds cannot satisfy the prior knowledge provision; they assert that this argument represents a new claim that the pleadings did not raise. See Client Response at 7-8; Moya Response at 5-6. The former Desert State clients argue that Evanston Insurance's claim "is untimely, unfairly prejudicial, and should not be considered by the Court. Particularly where the scope of the parties' discovery in this case did not relate to this claim." Client Response at 8. Moya argues that Desert State "would be unfairly prejudiced by this new claim. Discovery is complete. Dispositive motions have been filed, with no opportunity for DSLM to move for summary judgment on this new claim, or adequately defend Evanston's motion with respect to this new claim," and that

"accommodating this new claim in a manner fair to DSLM would unduly delay trial." Moya Response at 6.

In the Third Complaint's paragraph 59 in Count II, Declaration of No Duty to Defend or Indemnify Asserted Claims, Evanston Insurance requested

a judicial declaration to the effect that (*inter alia*, without limitation):

. . .

- As alternative relief, Coverage for the Claims described herein and any other undisclosed or related claims is excluded pursuant to Proviso no. 2 of the Insuring Agreement, which provides that coverage is unavailable if any Insured had any knowledge of any fact, circumstance, situation or incident which would lead a reasonable person in that Insured's position to conclude that a Claim was likely.

Third Complaint ¶ 59, at 12. The Third Complaint also quotes the Insurance Policy's prior knowledge provision. See Third Complaint ¶ 35, at 7-8.

Rule 8(a)(2) of the Federal Rules of Civil Procedure states that a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The Third Complaint states that Evanston Insurance seeks a declaration from the Court that it has no duty to defend or indemnify under the Insurance Policy in part because of the prior knowledge provision. The Court concludes that Evanston Insurance's Third Complaint satisfies the pleading standard rule 8(a)(2) requires and that no amendment is necessary to consider its first claim.

### B. THE PRIOR KNOWLEDGE PROVISION IN THE INSURANCE POLICY IS A CONDITION PRECEDENT TO COVERAGE.

Each Defendant argued in the hearing that the prior knowledge provision creates an exclusion to coverage rather than a condition precedent and thus that the burden is on Evanston Insurance to prove the insureds' knowledge. See Tr. at 13:19-15:1 (Rubin); id. at 21:5-12 (Sanders); id. at 25:19-26:9 (Davis). The Court concludes, for the reasons that follow, that the

prior knowledge provision is a condition precedent to coverage, and the burden of proof falls on the Defendants.

There is a lack of New Mexico law addressing similarly worded prior knowledge provisions. In Cohen-Esrey Real Estate Services, Inc., v. Twin City Fire Insurance Co., 636 F.3d at 1303, however, the Tenth Circuit noted as it interpreted an insurance policy under Kansas law that "prior-knowledge *conditions* are common in claims-made policies because they 'ensure that only risks of unknown loss are potentially incurred,' and prevent an insured from 'obtain[ing] coverage for the risk of a known loss,' which would be unfair to the insurer." (quoting Am. Special Risk Mgmt. Corp. v. Cahow, 192 P.3d 614, 621, 622 (Kan. 2008)(emphasis added)). In Bryan Brothers Inc. v. Continental Casualty Co., 660 F.3d 827 (4th Cir. 2011)(Wynn, J., joined by Motz and Berger, JJ.), the Fourth Circuit interpreted a similar insurance policy provision under Virginia law. See 660 F.3d at 828. The provision, which was located in the policy's Coverage Agreement, granted coverage to the insureds "provided that" "prior to the effective date of this policy, none of you had a basis to believe that any such act or omission, or interrelated act or omission, might reasonably be expected to be the basis of a claim." 660 F.3d at 828. The petitioner argued that this provision was an exclusion rather than a condition precedent. See 660 F.3d at 829. In affirming the district court's ruling, the Fourth Circuit stated that the provision's introductory words "provided that" made the provision a condition to coverage. 660 F.3d at 831 ("This language may be rephrased to say that if any defined 'you' knew prior to the effective date of the policy that an act or omission might become the basis for a claim, any claims arising from such acts or omissions are not covered."). The Fourth Circuit further noted that its

> interpretation melds with the concept of fortuity, a fundamental premise of insurance law. Insurers do not usually contract to cover preexisting risks and liabilities known by the insured. Thus, it is generally the insured's duty to provide truthful and complete information so the insurer can fairly evaluate the risk it is

contracting to cover. If the insured fails to comply with a clear condition required by the insurer, it is typically not liable on the policy.

660 F.3d at 831 (internal citations omitted).  See CAMICO Mut. Ins. Co. v. Hess, Stewart & Campbell, P.L.L.C., 240 F. Supp. 3d 476, 481-82 (S.D. W. Va. 2017)(Chambers, C.J.)(finding an insurance policy provision with similar language was a condition precedent to coverage); Axis Ins. Co. v. Farah & Farah, P.A., No. 3:10-cv-393-J-37JBT, 2011 WL 5510063, at *8 (M.D. Fla. Nov. 10, 2011)(Dalton, Jr., J.)(finding that a similarly worded provision was a condition precedent to coverage).   The Court concludes that the Supreme Court of New Mexico would consider persuasive Bryan Brothers Inc. v. Continental Casualty Co.'s analysis.   As in that case, the Insurance Policy conditions coverage on the insured's lack of knowledge about circumstances that are likely to give rise to claims.  See Insurance Policy at 15.  The Insurance Policy uses the term "provided that" to introduce the prior knowledge provision in the Insuring Agreement, while it contains a separate section that lists exclusions to coverage.  Insurance Policy at 15.  See Miller v. Monumental Life Ins. Co., 761 F. Supp. 2d at 1147.

The recently published Restatement of Law, Liability Insurance supports these courts.  See Restatement of Law, Liability Insurance (2018).  "Exclusion" is defined in the Restatement as a "term in an insurance policy that identifies a category of claims that are not covered by the policy." Restatement of Liability Insurance § 32(1).  Similarly, the Supreme Court of New Mexico has stated that "the very purpose of an exclusion" is "to restrict the scope of the policy beyond what would otherwise be covered."  United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 18, 285 P.3d at 650.  "Condition" is defined as "an event under the control of an insured, policyholder or insurer, that, unless excused, must occur, or must not occur, before performance under the policy becomes due under the policy."  Restatement of Liability Insurance § 34(1).  The provision stating that an insured must not know of any facts that suggest a claim is likely before the insurer must

provide coverage does not "identif[y] a category of claims that are not covered by the policy," Restatement of Liability Insurance § 32(1), or "restrict the scope of the policy beyond what would otherwise be covered," United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 18, 285 P.3d at 650. Instead, it is an event under the insureds' control that must not occur before performance becomes due. See Restatement of Liability Insurance § 34(1).

The only case that the Defendants cite in opposition, Redux, Ltd. v. Commercial Union Insurance Co., 1995 WL 88251 ("Redux"), is not on point; it concerns fraudulent insurance claims rather than misrepresentations on applications, 1995 WL 88251, at *3. In Redux, the Honorable John Lungstrum, United States District Judge for the District of Kansas, noted that "unlike most insurance policies which 'exclude' coverage when there has been fraud, the insurance policy at issue here specifically 'conditions' coverage upon the lack of fraud." 1995 WL 88251, at *2. The defendant insurance company sought a "determination as a matter of law" that the plaintiff bore the burden of proving at trial that it had not committed fraud. 1995 WL 88251, at *2. The plaintiff argued that the policy "does not shift the burden of proving the defense of fraud from where it traditionally sits -- with the defendant." 1995 WL 88251, at *2. Judge Lungstrum concluded that, under Kansas law, insurers bear the burden to prove "any provision in an insurance contract which 'intends to restrict or limit coverage.'" Redux, 1995 WL 88251, at *2 (quoting Dronge v. Monarch Ins. Co. of Ohio, 511 F. Supp. 1, 4-5 (D. Kan. 1979)). As support for this conclusion, he cited treatises discussing fraudulent *claims*. 1995 WL 88251, at *2 (citing 19 Couch on Insurance 2d §§ 79:355, 79:397 ("'The insurer has the burden of proof to establish that the insured violated a fire policy provision against fraud and false swearing'"); 21 Appleman, Insurance Law and Practice § 12305 (Supp. 1993)("[I]nsurers bear the burden of proving misrepresentation or concealment of material facts related to a claim for coverage.")). Although Judge Lungstrum does

- 67 -

not quote the policy's language, the disputed provision concerns insured's fraudulent claims, rather than misrepresentations on an application:

> Under the terms of the agreement, Commercial Union is relieved of its duties, coverage is deemed "void" and the agreement defeated, in the event that the insured intentionally conceals or misrepresents a material fact concerning the claim. Thus, the duty to perform, which was triggered here by the occurrence of the fire, is extinguished if the insured commits fraud.

1995 WL 88251, at *3. There is no allegation that any party in this case has "intentionally conceal[ed] or misrepresent[ed] a material fact concerning the claim" for coverage. 1995 WL 88251, at *3. If they had, Evanston Insurance would bear the burden of proof. Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 6, 127 P.3d at 1113; 1995 WL 88251, at *3. The Court concludes that the Supreme Court of New Mexico would analyze the Insurance Policy's language in accord with all courts and the Restatement of Liability Insurance and conclude that the Insurance Policy's language is a condition precedent to coverage rather than an exclusion.

### C. THE INSURANCE POLICY'S PRIOR KNOWLEDGE PROVISION DOES NOT IMPUTE DONISTHORPE'S KNOWLEDGE TO OTHER INSUREDS.

Because the prior knowledge provision is a condition to coverage, the burden is on the insureds to prove they had no knowledge of any fact, circumstance, situation or incident which may have led a reasonable person to conclude that a claim was likely. See Insurance Policy at 15. Evanston Insurance argues that, because Donisthorpe had that knowledge, and because his knowledge is imputed to the other insureds under the Insurance Policy's definition of "insured," it is entitled to summary judgment that there is no coverage under the Insurance Policy for the underlying Client Complaint. MSJ at 10-11. See Tr. at 6:11-7:18 (Borders). The Court concludes that Donisthorpe's knowledge is not imputed to the other insureds, and Evanston Insurance is therefore not entitled to summary judgment on this claim.

The Insurance Policy defines the unqualified word "insured," either in the singular or the plural as:

1.      The Named Insured herein defined as the person(s) or organization(s) stated in Item 1. of the Declarations;

2.      Any past or current principal, partner, officer, director, trustee or shareholder of the Named Insured stated in Item 1. of the Declarations solely while acting on behalf of the Named Insured and within the scope of their duties as such;

3.      Any past or current employee, including a leased employee, of the Named Insured stated in Item 1. of the Declarations solely while acting on behalf of the Named Insured and within the scope of their duties as such;

. . .

7.      The lawful spouse or Domestic Partner of each insured in Item A.2 above, but only for each such Insured's liability as is otherwise covered herein.

Insurance Policy at 2.

Evanston Insurance argues that, because the definition of "Insured" includes "any" past or current principal, partner, officer, director, trustee, or shareholder, and because "the term 'any' is unambiguously collective rather than several," the Insured had knowledge of facts and circumstances that could reasonably give rise to a claim.  Combined Reply at 8 (citing Copeland-Williams at 628); Tr. at 28:10-30:1.  As a preliminary matter, Evanston Insurance reads Copeland-Williams differently than the Tenth Circuit and other courts, which commonly cite the case for its interpretation of the phrase "any insured" in exclusionary clauses rather than for an interpretation of "any" across an entire Insurance Policy.  W. Am. Ins. Co. v. AV&S, 145 F.3d 1224, 1228 (10th Cir. 1998)(citing Copeland-Williams for holding that "the phrase 'any insured' unambiguously precludes coverage to all persons covered by the policy if any one of them engages in excludable conduct"); Am. Nat'l Prop. & Cas. Co. v. Clendenen, 238 W. Va. at 264 n. 12 (citing Copeland-Williams' holding that "'any insured' in the exclusionary clause is unambiguously collective rather

than several"); <u>Am. Fam. Mut. Ins. Co. v. Bower</u>, 752 F. Supp. 2d 957, 968 (N.D. Ind. 2010)(Lee, J.); <u>Minkler v. Safeco Ins. Co. of Am.</u>, Cal. Rptr. 3d 612, 626 (2010)(citing <u>Copeland-Williams</u> for the holding that "exclusion for damages from intentional act by 'any insured' is unambiguously collective rather than several"). <u>But</u> <u>cf.</u> <u>Allstate Ins. Co. v. Kim</u>, 121 F. Supp. 2d 1301, 1308 (D. Haw. 2000)(Kay, J.)(citing <u>Copeland-Williams</u>' holding as "determining that under exclusionary clause, which excluded coverage for injury expected or intended from standpoint of 'any' insured, wife was not covered for any negligent acts that stemmed from the husband's alleged sexual molestation of step-granddaughter, despite severability clause").

The Court concluded above that the prior knowledge provision is a condition to coverage rather than an exclusionary clause. Further, Evanston Insurance uses the term "the insured" rather "any insured" in its prior knowledge provision. The phrase "the insured" does not express a contractual intent to create joint obligations. <u>Axis Reinsurance Co. v. Bennett</u>, 2008 WL 2485388, at *15 ("'[U]nlike the phrase 'the insured,' the phrase 'any insured' unambiguously expresses a contractual intent to create joint obligations and to prohibit recovery by an innocent insured.'")(quoting <u>Sales v. State Farm Fire & Cas. Co.</u>, 849 F.2d at 1385); <u>Stettin v. Nat. Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 861 F.3d at 1337. Accordingly, Donisthorpe's knowledge is not imputed to the policy's other insureds. The other insureds' knowledge of wrongful acts or facts, circumstances, situations, or incidents that were reasonably likely to lead to a claim is a question of fact. Evanston Insurance is therefore not entitled to summary judgment on its claim that the defendants cannot satisfy the insurance policy's prior knowledge provision.

## II.   EXCLUSION P DOES NOT BAR COVERAGE FOR THE CLIENT COMPLAINT'S UNDERLYING CLAIMS.

The Insurance Policy's Exclusion P excludes coverage for "'any claim . . . [b]ased upon or arising out of any conversion, misappropriation, commingling or defalcation of any funds or

property.'"  Insurance Policy at 8.  The court first concludes that, contrary to arguments from the former Desert State clients and Ms. Bennett, the Insurance Policy is not ambiguous.  The Court then concludes that Exclusion P does not bar all Client Complaint claims.

### A. THE INSURANCE POLICY IS NOT AMBIGUOUS.

The former Desert State clients argue that the Insurance Policy's Exclusion P is ambiguous.  See Client Response at 10-13.  Ms. Bennett, meanwhile, argues that the Insurance Policy's Exclusion J creates an ambiguity when read in conjunction with Exclusion P.  See Bennett Response at 9-16.  Both parties point to New Mexico law that courts must resolve ambiguities in insurance contracts in the insureds' favor.  See Client Response at 11; Bennett Response at 8.  The Court concludes that Exclusion P is not ambiguous, and, because the policy is unambiguous, the Court will "give effect to the contract and enforce it as written."  Ponder v. State Farm Mut. Auto. Ins. Co., 2000-NMSC-033, ¶ 11, 12 P.3d 960, 964.

The former Desert State clients argue that the policy language is ambiguous, because the Insurance Policy does not define the term and there are no New Mexico cases interpreting "based upon or arising out of" in the context of Insurance Policy exclusions.  Client Response at 10-11; MSJ at 13 ("Evanston is unaware of any New Mexico cases interpreting the Policy language at issue.").  Language in insurance policies is not ambiguous merely because it is undefined and previously uninterpreted.  See Knowles v. United Servs. Auto Ass'n, 1992-NMSC-030, ¶ 9, 832 P.2d at 397 (stating that an insurance policy is ambiguous if it is "'reasonably and fairly susceptible of different constructions'")(quoting Sanchez v. Herrera, 1989-NMSC-073, ¶ 20, 783 P.2d at 469).  Further, New Mexico courts have not found ambiguity in very similar exclusionary clauses.  See Lopez v. N.M. Pub. Sch. Ins. Auth., 1994-NMSC-017, ¶ 7, 870 P.2d at 747 (finding no ambiguity where the insurance policy excluded all claims "arising from" sexual misconduct); Askew v.

Miller Mut. Fire Ins. Co. of Tex., 1974-NMSC-040, ¶¶ 4-5, 522 P.2d 574, 575 (stating that an exclusionary clause containing "arising from" was "clear and unambiguous"). Similarly, the Court of Appeals of New Mexico has defined "arising out of" in the context of insurance policy coverage provisions broadly as "'originating from,' 'having its origin in,' 'growing out of,' or 'flowing from,'" rather than finding the term ambiguous. City of Albuquerque v. BPLW Architects & Eng'rs, Inc., 2009-NMCA-081, ¶ 22, 213 P.3d at 1153. See Krieger v. Wilson Corp., 2006-NMCA-034, ¶ 14, 131 P.3d at 666 (quoting Baca v. N.M. State Highway Dep't, 1971-NMCA-087, ¶ 14, 486 P.2d at 628 (applying the definition to an exception to an insurance policy exclusion)).[41] The Tenth Circuit has also stated that under its interpretation of New Mexico law, "'arising out of' is not facially ambiguous just because it appears in an exclusion.'" Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x at 741. In light of the caselaw applying "arising out of" in insurance policies, the Court therefore concludes that Exclusion P's language contains no ambiguity.

Ms. Bennett argues that Exclusion P becomes ambiguous when read alongside the Insurance Policy's Exclusion J. See Bennett Response at 9-16. Exclusion J contains an exception to the exclusion that adds coverage back under specific circumstances. Exclusion J bars coverage for claims:

> Based upon, arising out of, or in any way involving:

_____

[41]The Court concludes that the Supreme Court of New Mexico would adopt this definition as well. The Supreme Court of New Mexico stated that an exclusion for actions "arising out of" a criminal act meant that the insurer would provide coverage "unless [liability] stems from 'criminal acts.'" N.M. Physicians Mut. Liab. Co. v. LaMure, 1993-NMSC-048, ¶ 11, 860 P.2d 734, 737. "'Stems' is plainly a broad word of the same ilk as 'originating from,' 'having its origin in,' 'growing out of,' or 'flowing from.'" Am. Nat. Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x 730, 741 (10th Cir. 2014)(citing Webster's Third New Int'l Dictionary 2235 (2002) and Black's Law Dictionary 122 (9th ed. 2009)).

**1.** Conduct of the Insured or at the Insured's direction that is intentional, willful, dishonest, fraudulent or that constitutes a willful violation of any statute or regulation; provided, however, this exclusion shall not apply to:

    **a.** The strictly vicarious liability of any Insured for the intentional, willful, dishonest or fraudulent conduct of another Insured or for the conduct of another Insured that constitutes a willful violation of any statute or regulation; or

Insurance Policy at 8. Ms. Bennett argues that the Insurance Policy is ambiguous, because Exclusion J grants coverage for non-criminal insureds, while Exclusion P "disclaim[s] all coverage 'arising out of the same' criminal activity." Bennett Response at 14. Evanston Insurance cites Weedo v. Stone-E-Brick, Inc., a Supreme Court of New Jersey case, for the holding that, "[i]f any one exclusion applies there should be no coverage, regardless of inferences that might be argued on the basis of exceptions or qualifications contained in other exclusions." Reply to Ms. Bennett at 11-12 (citing Weedo v. Stone-E-Brick, Inc., 405 A.2d 788 (N.J. 1979)(quoting Tinker, *Comprehensive General Liability Insurance Perspective and Overview*, 25 Fed. Ins. Coun. Q. 217, 218-21 (1975))).

Regarding exceptions to exclusionary clauses, the Supreme Court of New Mexico has stated that they "act[] as a restoration of coverage under the conditions specified and therefore should be construed broadly in favor of the insured as if the exclusion did not exist." United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 15, 285 P.3d at 649. It has also suggested, however, that it does not strain to find insurance policies ambiguities. In Battishill v. Farmers Alliance Insurance Co., the plaintiff argued that two separate coverage provisions made a policy exclusion ambiguous. See 2006-NMSC-004, ¶ 15, 127 P.3d at 1115. The Supreme Court of New Mexico disagreed with the plaintiff, stating that "[i]t is not necessary to read the coverages together to construe the all-risk dwelling exclusion at issue, because the exclusion read alone is clear and

unambiguous.  We only look to other sections in a policy for clarification, not in an attempt to create an ambiguity where none exists."  Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 17, 127 P.3d at 1115 (internal citations omitted).

A Court of Appeals of New Mexico decision also suggests that exceptions to exclusions will not create ambiguity where they overlap or contradict other exclusions.  In Pulte Homes of N.M. v. Ind. Lumbermans Ins. Co., the Court of Appeals of New Mexico analyzed the effect of an insured contract exception to a contractual liability exclusion in a commercial general liability policy.  See 2016-NMCA-028, 367 P.3d 869.  The plaintiff argued that, even if one of the policy's exclusions precluded coverage, the insurance company still had a duty to defend because an exception to another exclusion created coverage.  See 2016-NMCA-028, ¶ 28, 367 P.3d at 879. The Court of Appeals of New Mexico concluded that, "even if the insured contract exception renders the contractual liability exclusion inapplicable in this case, it does not render other separate and independent policy exclusions inapplicable."  2016-NMCA-028, ¶ 29, 367 P.3d at 879.  In support, the Court of Appeals of New Mexico cited Fed. Ins. Co. v. Tri-State Ins. Co., 157 F.3d 800 (10th Cir. 1998), for its holding that, "because 'the exclusions are separate and independent' and nothing in the policy indicates that one exception to one exclusion 'somehow trumps' the other exclusions."  2016-NMCA-028, ¶ 29, 367 P.3d 869, 879 (quoting Fed. Ins. Co. v. Tri-State Ins. Co., 157 F.3d at 805).  The Court of Appeals also cited Federated Mut. Ins. Co. v. Ever-Ready Oil Co., No. 09-CV-857 JEC/RHS, 2012 WL 11945481, at * 8 (D.N.M. Mar. 9, 2012)(Conway, J.), for the same holding.  While a Court of Appeals of New Mexico ruling does not bind a federal court sitting in diversity jurisdiction, see Wade v. EMCASCO Ins., 483 F.3d at 666, the Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico -- that exceptions to insurance policy exclusions do not alter or affect other exclusions.

The New Mexico Court of Appeals' approach accords with a number of state and federal courts. See Travelers Indem. Co. of Am. v. Miller Bldg. Corp., 142 F. App'x 147, 150 (4th Cir. 2005); Biebel Bros., Inc., v. U.S. Fid. & Guar. Co., 522 F.2d 1207, 1212 (8th Cir. 1975); Liberty Corporate Capital Ltd. v. Sec. Safe Outlet, Inc., 937 F. Supp. 2d 891, 908 (E.D. Ky. 2013)(Forester, J.); Nationwide Mut. Ins. Co. v. Overlook, LLC, 785 F. Supp. 2d at 530; Commercial Union Ins. Co. v. John Massman Contracting Co., 713 F. Supp. 1403, 1407 (D. Kan. 1989)(O'Connor, J.)(noting that "such exclusions generally have been held not to render the policy ambiguous"); U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 881 (Fla. 2007); Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc., 673 N.W.2d 65, 73 (Wis. 2004); Weedo v. Stone-E-Brick, Inc., 405 A.2d 788. See also Restatement of Liability Insurance §32(5) ("An exception to an exclusion narrows the application of the exclusion; the exception does not grant coverage beyond that provided in the insuring clauses."). The Supreme Court of New Mexico has stated that, where an exclusion is clear, it will "look to other sections in a policy for clarification, not in an attempt to create an ambiguity where none exists." Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 17, 127 P.3d at 1115. Accordingly, the Court predicts that the Supreme Court of New Mexico would not read separate insurance policy exclusions to affect other exclusions' scope or coverage and would apply Exclusion P "as written" and without regard to Exclusion J. Ponder v. State Farm Mut. Auto. Ins. Co., 2000-NMSC-033, ¶ 11, 12 P.3d at 964.

Nevertheless, were the Court to interpret Exclusion P in light of Exclusion J, the result is no different: even when read together, the Insurance Policy's exclusions do not create ambiguity or inconsistency. See Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 37, 945 P.2d at 980 (citing 2 Lee R. Russ & Thomas F. Segall, Couch on Insurance 3d § 21:9 ("[I]f two clauses are inconsistent and both were prepared by the insurer, . . . the one which affords the most protection

to the insured will control and be given effect.")).  First, the two exclusions are not co-extensive.

Exclusion J essentially excludes an individual insured's coverage for claims arising from his or

her own intentional, fraudulent conduct, or willful violations of statutes or regulations.  <u>See</u>

Insurance Policy at 20.  Exclusion P applies to more insureds, but it applies to less conduct than

Exclusion J -- Exclusion P only excludes coverage for claims against anyone that are based upon

or arise out of theft or similarly improper asset use.  <u>See</u> Insurance Policy at 20.  The Insurance

Policy excludes coverage, for example, under Exclusion J, but not Exclusion P, where an insured's

wrongful conduct violates the law but does not stem from theft or similar actions.  <u>See</u> Insurance

Policy at 20.  It excludes coverage under Exclusion P, but not Exclusion J, when an insured has

not acted willfully, intentionally, fraudulently, or violated any law, but is still liable for claims

arising from theft, misappropriation, commingling, or defalcation.  <u>See</u> Insurance Policy at 20.

Exclusion J's exception merely qualifies its scope; Exclusion P may exclude conduct that

Exclusion J does not without creating ambiguity in the Insurance Policy.  <u>See</u> <u>BancInsure, Inc. v.</u>

<u>F.D.I.C.</u>, 796 F.3d at 1239 (interpreting Kansas Law)(noting that insurance policies "'are notorious

for their simultaneous use of both belts and suspenders, and some overlap is to be expected.'  Here,

the mere fact of overlap between the two exclusions does not introduce ambiguity into the plain

language of the insured v. insured exclusion")(quoting <u>Certain Interested Underwriters at Lloyd's,</u>

<u>London v. Stolberg</u>, 680 F.3d 61, 68 (1st Cir. 2012))(internal citations omitted).

      The former Desert State clients also argue that their claims against Bennett for negligence,

gross negligence, breach of fiduciary duty, and for violating the Uniform Trust Code should not

be barred because New Mexico public policy does not allow one insured's fraud to void coverage

for another insured.  <u>See</u> Client Response at 12.  The former Desert State clients cite <u>Delph v.</u>

<u>Potomac Insurance. Co.</u>, 1980-NMSC-140, ¶ 14, 620 P.2d 1282 ("<u>Delph</u>") as authority for their

public policy argument.  See Client Response at 12.  In Delph, the plaintiff had separated from her husband, sued for dissolution of the marriage, and was awarded the couple's residence.  See Delph at 1980-NMSC-140, ¶ 2, 620 P.2d at 1283.  The husband then intentionally set fire to their home.  See Delph, 1980-NMSC-140, ¶ 3, 620 P.2d at 1283.  The insurance agency refused to pay the plaintiff when she demanded to recover under the insurance policy, alleging that her ex-husband's arson was "'fraud' by the 'insured.'"  Delph, 1980-NMSC-140, ¶ 4, 620 P.2d at 1283.  The New Mexico Supreme Court analyzed the issue as whether the husband's tort was a "community" or "separate" tort, and concluded that because it was a "separate" tort, the "responsibility for the fraud is several and separate rather than that of the community," and "the fraud of the co-insured husband does not void the policy as to plaintiff."  Delph, 1980-NMSC-140, ¶ 14, 620 P.2d at 1285.

Evanston Insurance does not argue, however, that Exclusion P voids coverage for co-insured parties.  It argues that the Exclusion P bars coverage for co-insured parties.  Hence, while the Court concludes in Part III of its analysis that a question of material fact remains over whether the Insurance Policy was void *ab initio,* this conclusion does not affect the scope or effect of the Insurance Policy's exclusions.  Accordingly, the Court will enforce the exclusion "as written." Ponder v. State Farm Mut. Auto. Ins. Co., 2000-NMSC-033, ¶ 11, 12 P.3d at 964.

**B.      EXCLUSION P DOES NOT BAR ALL CLAIMS IN THE CLIENT COMPLAINT "BASED UPON OR ARISING OUT OF" DONISTHORPE'S CONVERSION.**

The Court has concluded that Exclusion P is not ambiguous and will therefore apply it as written.  See Part II.A.  Exclusion P bars coverage for all claims "based upon or arising out of any conversion, misappropriation, commingling of or defalcation of funds or property."  Insurance Policy at 20.  The Court concludes that the Supreme Court of New Mexico would find that

Exclusion P does not excuse Evanston Insurance's duty to defend against the Client Complaint's claims.

In New Mexico, the duty to defend arises and is determined "from the allegations on the face of the complaint or from the known but unpled factual basis of the claim that brings it arguably within the scope of coverage." Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co., 1990-NMSC-094, ¶ 11, 799 P.2d at 1116. See Miller v. Triad Adoption and Counseling Services, Inc., 2003-NMCA-055, ¶ 9, 65 P.3d at 1103 (citing Found. Reserve Ins. Co., Inc. v. Mullenix, 1982-NMSC-038, ¶ 6, 642 P.2d at 605)("If the allegations of the complaint or the alleged facts tend to show that an occurrence comes within the coverage of the policy, the insurer has a duty to defend regardless of the ultimate liability of the insured")). New Mexico courts have not addressed whether an exclusion written similarly to Exclusion P reaches the type of negligence which the clients have alleged. Courts across the country have reached different conclusions on the same question.

**1.     New York Cases Suggest That Insurers Have a Duty to Defend Negligence Claims Even When the Claims Are Closely Related to Otherwise Excluded Conduct.**

Several New York cases suggest that an insurer has a duty to defend insureds where the underlying complaint alleged negligence or negligent supervision, even though the insurance policy excludes coverage for closely related claims. In Watkins v. Glen Central School District v. National Union Fire Insurance Co., 732 N.Y.S. 2d 70, 286 A.D. 2d 48 (N.Y. App. Div. 2001)("Watkins"), a school district sought defense and indemnification under an errors and omissions insurance policy against claims that it was negligent in hiring and supervising a teacher with a history of sexual misconduct who was alleged to have sexually abused students. See 732 N.Y.S. 2d at 71. The insurance company sought to disclaim coverage based on an exclusion in the policy for intentional acts. See 732 N.Y.S. 2d at 71. New York's Appellate Division of the

Supreme Court noted that sexual assaults are intentional acts which a general liability policy excludes from coverage, but that there are no New York cases "within the context of direct allegations of supervisory negligence against school officials under an errors and omissions policy for the intentional sexual misconduct of a teacher." 732 N.Y.S. 2d at 72. The Appellate Division of the Supreme Court concluded that, while the insurer did not have a duty to defend or to indemnify the teacher, "to the extent that the District may be held liable for its negligent hiring and supervision of [the teacher], this risk falls squarely within the type of errors and omissions coverage provided by the National Union errors and omissions policy: to wit, professional malpractice liability insurance." 732 N.Y.S. 2d at 72.

After supporting its argument by discussing Board of Public Education of School District of Pittsburgh v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania, 709 A.2d 910 (Pa. Super. Ct. 1998), the Appellate Division of the Supreme Court noted that New York applies a "'but for'" test to determine whether insurance policies cover certain conduct, but that no New York case had applied this test in a sexual or nonsexual intentional assault case under an errors and omissions insurance policy. 732 N.Y.S. 2d at 73-74. The court stated that to not apply "but for" causation "would completely undermine the purpose of such errors and omissions coverage." 732 N.Y.S. 2d at 74. It stated that an errors and omissions policy is "expressly intended to provide coverage for negligent acts, including negligence in the hiring or supervision of employees." 732 N.Y.S. 2d at 74. While the teacher "may have acted intentionally in perpetrating the sexual assaults against the two plaintiff students in the underlying action, liability as against the School District is predicated upon its conceptually independent negligent supervision." 732 N.Y.S. 2d at 74. Accordingly, "[a]pplication of the cited exclusions in the instant case would effectively eviscerate the errors and omissions policy altogether." 732 N.Y.S. 2d at 74, 286 A.D. 2d at 54.

Finally, the Appellate Division of the Supreme Court concluded that the school district bought the insurance policy "to insure its risk of loss arising from negligence committed by its employees in its role as parental substitute," and that the disclaimers "wholly thwart that intended coverage." 732 N.Y.S. 2d at 74. It cited <u>Search EDP v. American Home Assurance Co.</u>, 632 A.2d 286 (N.J. Super. Ct. App. Div. 1993), for its holding that, "where the risk insured against (professional negligence including negligent hiring) sets in motion a chain of events resulting in an excluded act (an intentional sexual assault), then the insured peril is the proximate cause of the entire loss" and the insurance policy covered the insured. 732 N.Y.S. 2d at 75. The Appellate Division of the Supreme Court ended the opinion by stating:

> Clearly, the instant National Union errors and omissions policy was intended to cover the School District's negligence in its rendering of professional services. Such coverage undeniably includes negligence in the hiring and supervision of employees. In the absence of any direct controlling authority to the contrary from any New York court precluding such errors and omissions coverage in a case such as this, we are persuaded that National Union is indeed obligated to provide the School District with defense and indemnification for its potential liability for its alleged professional malpractice.

732 N.Y.S. 2d at 75.

Ms. Bennett also cites <u>Murphy v. Nutmeg Insurance Co.</u>, 773 N.Y.S. 2d 413 (N.Y. App. Div. 2004), as evidence that Evanston Insurance has a duty to defend negligence claims against her. <u>See</u> Bennett Response at 11. That case stands for the proposition that, under New York law, when there are multiple underlying claims against an insured, and the insurance policy disclaims coverage for some but not all of the claims, the insurer must defend all claims so long as one remains that is subject to coverage. <u>See</u> 773 N.Y.S. 2d at 360. It does not analyze how to determine whether a claim is excluded from coverage and is therefore not relevant to the analysis of which claims in the Client Complaint are excluded.

In Board of Public Education of School District of Pittsburgh v. National Union Fire Insurance Co. of Pittsburgh, Pennsylvania, 709 A.2d 910 (Pa. Super. Ct. 1998)("Pittsburgh"), on which Watkins relied in support, the insurer disclaimed coverage for sexual assaults that the middle school's parent teacher organization's president committed.  See 709 A.2d at 911-912.  The policy provided coverage for any "Wrongful Act," which the policy defined as "'any actual or alleged breach of duty, neglect, error . . . or omission committed solely in performance of duties for the School District."  709 A.2d at 913.  It excluded coverage for "any claims arising out of . . . assault or battery," and claims "involving . . . criminal acts" or "arising out of . . . bodily injury."  709 A.2d at 912.  The underlying complaint alleged that the Board of Education failed to screen persons it knew would have access to young students, and failed to implement procedures, policies, or background checks of those in contact with students to discover criminal history of sexual abuse -- violating the students' civil rights  See 709 A.2d at 913.  It also alleged that the school district failed to train or instruct its employees not to permit unsupervised contact between unscreened volunteers and students.  See 709 A.2d at 913.  The policy contained no express exclusions for negligent supervision, control, or hiring, or for civil rights violations.  See 709 A.2d at 914.

The Pennsylvania Superior Court concluded that the policy's exclusions did not prevent coverage. According to that court, the criminal acts exclusion did not apply, because "allowing one's right to a defense against covered claims to rise or fall solely on the alleged nature of the acts of others" would be "an anomalous result at best."   709 A.2d at 915.  According to the Superior Court, the exclusions for claims arising from assault and battery, and for claims arising out of bodily injury, did not apply, because, in its opinion, the assaults and the injury "clearly" arose from the School District's failings and not from the teacher's actions. 709 A.2d at 916.  See

also <u>Durham City Bd. of Educ. v. Nat'l Union Fire Ins. Co of Pittsburgh</u>, 426 S.E.2d 451 (N.C. Ct. App. 1993). <u>But</u> <u>see</u> <u>Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh</u>, 99 F.3d 695, 708 n.15 (5th Cir. 1996); <u>Winnacunnet Coop. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 84 F.3d 32, 37 n.9 (1st Cir. 1996) ("We find [<u>Durham City Bd. of Educ. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.</u>'s] perfunctory treatment unpersuasive. Unlike that court, we are not content to decide the coverage issue based solely on the allegations on the face of the writ.").

American Automobile Insurance Co. v. Security Income Planners & Co., 847 F. Supp. 2d 454 (E.D.N.Y. 2012)(Bianco, J.), applied <u>Watkins</u> to facts more analogous to this case. In <u>American Automobile Insurance Co. v. Security Income Planners & Co.</u>, the president and chief financial officer of an insurance agency stole money from its clients. <u>See</u> 847 F. Supp. 2d at 457. The clients underlying suit against the agency alleged negligence, negligent training and supervision, and breach of fiduciary duty. <u>See</u> 847 F. Supp. 2d at 458. The agency's insurer argued that the policy's commingling exclusion barred coverage. <u>See</u> 847 F. Supp. 2d at 461. The Honorable Joseph Bianco, then United States District Judge for the Eastern District of New York, cited <u>Watkins</u> and <u>Murphy v. Nutmeg Insurance Co.</u>, and concluded that, "because New York courts hold that negligence or negligent supervision claims arising from fraudulent or intentional acts are not excluded by insurance policies similar to the policy at issue, the negligent supervision allegation set forth in [the] amended complaint suggests a 'reasonable possibility' of coverage." 847 F. Supp. 2d at 464. Judge Bianco also appears to base his decision on the fact that conversion and misappropriation were not elements of the underlying negligent supervision claim. <u>See</u> 847 F. Supp. 2d at 462. <u>See</u> <u>First Mercury Ins. Co. v. Schwartz</u>, CV 17-1763 (SJF)(AKT), 2019 WL

2053850, n.16 at *14 (E.D.N.Y March 1, 2019)(Tomlinson, Mag. J.); Bistricer v. Federal Ins. Co.,

No. 02 Civ.5366(JSR), 2003 WL 22251290, at *5 (S.D.N.Y. Sept. 30, 2003)(Rakoff, J.).

The two state cases that support the Defendants both concern sexual assaults against students in school, and in each there is much clearer causation between the negligent activities by the school and the underlying injury.  Watkins, 732 N.Y.S. 2d 70; Pittsburgh, 709 A.2d 910. In Watkins, the teacher who sexually assaulted students was convicted of similar crimes ten years before the school district hired him, allegedly without an adequate background check.  See 732 N.Y.S. 2d at 71.  The teacher was then the subject of sexual misconduct complaints while employed, which the school district allegedly failed to aggressively investigate.  See 732 N.Y.S. 2d at 71.  In Pittsburgh, the underlying complaint alleged that the defendants "'were aware that Walls had a history of arrests and/or convictions for committing sexual crimes against young children,'" "'knew or should have known that Walls was serving probation for committing sexual crimes,'" and failed to conduct a background check on him.  709 A.2d at 918.  In these circumstances, it is clearer that the injuries arose out of negligent hiring or supervision.

### 2.      Other Courts Conclude That Negligence Claims Related to Excluded Conduct Are Barred.

In contrast to these cases, many more courts across the country have concluded that dishonest act exclusions or commingling exclusions cover negligence or negligent supervision claims against those who have not committed the dishonest act or the financial misappropriation. In Northland Insurance Co. v. Stewart Title & Guaranty Co., 327 F.3d at 451, for example, the insurance policy at issue excluded "any damages" "arising out of any dishonest, fraudulent, criminal or malicious act or omission," and "arising out of the commingling, conversion, misappropriation or defalcation of funds or other property." 327 F.3d at 451-52.  A client subsequently sued the insured under Michigan law for, among other claims, breach of contract,

conversion, and breach of fiduciary duty.  See 327 F.3d at 456.  The complaint was amended to

add a claim of negligence.  See 327 F.3d at 456.  The United States Court of Appeals for the Sixth

Circuit noted that the addition of the negligence claim made no difference, because the insurance

policy's exclusions were written in such a way as to cover all acts, negligent or intentional.  See

327 F.3d at 457.  The Sixth Circuit then held that, because the claim for breach of fiduciary duty

was based on the commingling and conversion of funds, the commingling-and-conversion

exclusion barred the claim.  See 327 F.3d at 459.  Likewise, in Gulf Underwriters Insurance Co.

v. KSI Services, Inc., 233 F. App'x 239 (4th Cir. 2007)(Niemeyer, J.)(unpublished), a title

company's bookkeeper embezzled money and, after it entered bankruptcy, could not return client

escrow funds.  See 233 F. App'x at 240.  The title company recovered some money from a fidelity

bond, but the Fourth Circuit held that it was unable to recover under the firm's errors and omissions

policy, because its dishonest-and-criminal-acts exclusion barred the underlying claim for negligent

supervision.  See 233 F. App'x at 240.  In applying Virginia law, the Fourth Circuit concluded:

> The policy language excluding coverage for damages arising "*directly or
> indirectly*" out of criminal acts contemplates multiple causes of liability and does
> not restrict the exclusion's operation to circumstances in which the criminal act was
> the liability's *direct or sole cause* or even its proximate or primary cause. Thus, so
> long as one of the direct or indirect causes of the loss was a criminal act, the
> exclusion operates to deny coverage.

233 F. App'x at 241 (emphasis in original).  The Fourth Circuit declined to follow Watkins for

two reasons.  See 233 F. App'x at 242.  First, it noted that Watkins' conclusion -- that "a claim of

negligent supervision is different from a claim of assault and battery" -- is "irrelevant to this case,"

because the insurance policy before the Fourth Circuit "excludes *damages* arising *directly or

indirectly* out of any criminal act." 233 F. App'x at 242 (emphasis in original).  Second, the Fourth

Circuit noted that several other courts have decided the same issue as in Watkins differently.  See

233 F. App'x at 242 (citing Cont'l Cas. Co. v. H.S.I. Fin. Servs., 466 S.E.2d 4 (Ga. 1996); St. Paul

Fire & Marine Ins. Co. v. Aragona, 365 A.2d 309 (Md. Ct. Spec. App. 1976); Stouffer & Knight v. Cont'l Cas. Co., 982 P.2d 105 (Wash. Ct. App. 1999)). The Fourth Circuit ended its opinion by noting that "protection from dishonest or criminal acts is provided by fidelity bonds, not by errors and omissions policies that exclude damages arising out of dishonest or criminal acts." Gulf Underwriters Ins. Co. v. KSI Services, Inc., 233 F. App'x at 242. Further, in Bethel v. Darwin Select Insurance Co., the United States Court of Appeals for the Eighth Circuit concluded that, under Minnesota law, a commingling exclusion barred the underlying breach-of-contract and negligence claims against a title company whose leaders misappropriated escrow funds. See 735 F.3d 1035. The Eighth Circuit noted that neither of those two claims "specifically alleged any conduct that was unrelated to the general scheme to misappropriate escrowed funds." 735 F.3d at 1038. The negligence that had occurred "constituted a necessary component of the broader scheme to misappropriate funds." 735 F.3d at 1040. See Murray v. Greenwich Ins. Co., 533 F.3d 644.

Several federal district courts also have ruled against coverage in similar situations. In PNA LLC v. Interstate Insurance Group, No. Civ.A. 02-1130, 2003 WL 21488120 (E.D. La. June 20, 2003)(Englehardt, J.), a real estate firm sought coverage after it discovered that an employee had embezzled money. See 2003 WL 21488120, at *1. The insurance company sought to disclaim coverage based on an exclusion that barred coverage for "[a]ny claim or suit arising out of or in any way connected to . . . Conversion, misappropriation, etc." 2003 WL 21488120, at *4. The Honorable Kurt Engelhardt, then United States District Judge for the Eastern District of Louisiana, held that, under Louisiana law, the policy provided no coverage for an underlying complaint's negligent supervision claim, because any liability "stems from and is dependent on [the embezzler's] actions." 2003 WL 21488120, at *4. Judge Engelhardt noted that, but for this conduct, the real estate firm would have no obligation to pay damages; therefore, the negligent

supervision claim arose out of excluded conduct.  2003 WL 21488120, at *4.  In <u>Philadelphia Indemnity Insurance Co. v. Stazac Management, Inc.</u>, Case No. 3:16-cv-369-J-34 MCR, 2018 WL 2445816, at *14 (M.D. Fla. May 31, 2018)(Howard, J.), the Honorable Marcia Morales Howard, United States District Judge for the Middle District of Florida, held that, under Florida law, a commingling exclusion barred claims for negligent training and retention of employees against a firm that misappropriated client funds.  In <u>Bankers Multiple Line Insurance Co. v. Pierce</u>, 20 F. Supp. 2d 1004 (S.D. Miss. 1998)(Guirola, Jr., Mag. J.),  Louis Guirola, Jr., then United States Magistrate Judge for the Southern District of Mississippi, held that, under Mississippi law, a commingling-and-conversion clause barred negligent supervision claims against a firm whose employee misappropriated client funds.  <u>See</u> 20 F. Supp. 2d at 1008.  Finally, in <u>Fidelity National Title Insurance Co. v. Maxum Indemnity Co.</u>, No. 16–1360, 2017 WL 4048162 (E.D. Pa. Sept. 12, 2017)(Kelly, Sr., J.), the Honorable Robert Kelly, Sr., United States District Judge for the Eastern District of Pennsylvania, applied New York law and broadly construed an insurance exclusion for claims "'alleging, arising out of, based upon, relating to, or attributable to, directly or indirectly, any . . . commingling of funds or accounts, inability to pay or failure to safeguard funds.'"  2017 WL 4048162, at *7 (citation omitted).  Judge Kelly, Sr., found that the underlying negligent supervision claim was, "at the very least, indirectly related to, and attributable to [the agent]'s commingling of the funds," and "directly" related to the failure to safeguard those funds.  2017 WL 4048162, at *7.

Multiple state courts have also concluded that dishonest-act-or-commingling exclusions bar underlying negligence claims.  In <u>Continental Casualty Co. v. H.S.I. Financial Services, Inc.</u>, the United States Court of Appeals for the Eleventh Circuit certified the question whether a "law partner's negligence with respect to supervising and mitigating a fellow partner's criminal act

'arise out of' 'any dishonest, fraudulent, criminal or malicious act.'"  466 S.E.2d at 5.  The Supreme Court of Georgia resolved the question in the affirmative and barred coverage for a client's suit regarding a partner's conversion.  See 466 S.E.2d at 6.  While the innocent partners argued that their negligence in failing to properly supervise client accounts were independent and concurrent causes of client losses, the Supreme Court of Georgia disagreed with the partners, because

> the exclusionary clause is focused solely upon the genesis of HIS's claims-if those claims *arose out of* Page's culpable conduct, as they did, then coverage need not be provided.  Consequently, the fact that Sevy and Henderson may have negligently allowed Page to perpetuate his theft of HSI's funds does not negate the plain effect of the policy's exclusionary clause.

466 S.E.2d at 6 (emphasis in original).  The Supreme Court of Georgia further noted that, if it adopted the innocent partner's reasoning, underlying plaintiffs could guarantee insurance coverage every time "merely by amending a complaint to allege failure of supervision."  466 S.E.2d at 6 n.4.  Similarly, in Stouffer & Knight v. Continental Casualty Co., a dishonest acts exclusion barred a client's negligent supervision claims against a lawyer whose secretary had embezzled from the client.  See 982 P.2d at 111 ("Knight argues that his negligent failure to supervise Lachelt enabled her to embezzle from Woodhams' account.  While this may be true, nevertheless, the loss was [a] direct result of Lachelt's embezzlement, a dishonest and criminal act.").  The Court of Appeals of Washington also noted that allowing the negligence claim "would effectively eliminate the exclusion because whenever an employee commits a dishonest/criminal act, allegations framed in negligence can always be claimed against the employee's superiors."  982 P.2d at 111 n.13. See Chi. Title Ins. Co. v. Northland Ins. Co., 31 So.3d 214, 216 (Fla. Dist. Ct. App. 2010)(finding that a commingling exclusion barred coverage, because "[a]ny liability based on negligence stems from

and is dependent on the misappropriation of funds by the attorney. But for the attorney's actions, Chicago Title would have had no obligation to pay damages").

### 3. The Supreme Court of New Mexico is Wary of Reading Insurance Policy Exclusions Broadly.

The Supreme Court of New Mexico reads insurance policy exclusions narrowly and places the burden of clearly excusing coverage on the insurers. In Rummel v. Lexington Insurance Co., 1997-NMSC-041, 945 P.2d 970 ("Rummel"), Lexington Insurance argued that a condition precedent to its excess coverage obligation was that other insurers on the claim first pay the limits of their obligations "in full, in cash." 1997-NMSC-041, ¶ 13, 945 P.2d at 975. In support, it cited a provision in the insurance policy that stated "'Liability of the Company under this policy shall not attach unless and until the Insured's Underlying Insurance *has paid or has been held liable to pay* the total applicable underlying limits.'" Rummel, 1997-NMSC-041, ¶ 26, 945 P.2d at 977 (quoting Lexington Policy ¶ I)(emphasis added by Rummel). The Supreme Court of New Mexico disagreed that this provision excused Lexington Insurance's obligation to pay, and as it discussed its reasoning, it expressed great reservation about interpreting policy exclusions broadly. See 1997-NMSC-041, ¶ 2, 945 P.2d at 973. First, it noted the fundamental rule that exclusions "must be clearly expressed in the policy." 1997-NMSC-041, ¶ 23, 945 P.2d at 977 (citing 2 Couch on Insurance 3d § 22:30 (1996)). Second, it emphasized that insurers, as policy drafters, have substantial power to write terms to exclude precisely the activities they wish to exclude and that courts should not stretch to help insurers exclude additional claims which are not clearly expressed:

> Lexington could have included a provision in its policy that made its excess layer of coverage operative only after all underlying insurance was applied to the compensatory damages part of an award. It is not the province of the courts to supply provisions to an insurance policy when insurers are faced with an unanticipated liability.

1997-NMSC-041, ¶ 50, 945 P.2d at 982.  The Supreme Court of New Mexico reiterated elsewhere in the opinion that, "[i]f the insurer urges an exclusion to coverage that the policy does not clearly express, 'the courts will not write an exception into it by construction, for the purpose of exempting the insurer from liability,'" 1997-NMSC-041, ¶ 49, 945 P.2d at 982 (quoting 2 Couch on Insurance 3d §22:30), and that "Lexington could have included explicit language that would have insisted upon [payment in full being a condition precedent to coverage]," 1997-NMSC-041, ¶ 33, 945 P.2d at 979.  In <u>United Nuclear Corp. v. Allstate Insurance Co.</u>, 2012-NMSC-032, 285 P.3d 644, meanwhile, the Supreme Court of New Mexico found that a policy exclusion for claims caused by non-sudden and non-accidental pollution was ambiguous and interpreted it against the insurer. <u>See</u> 2012-NMSC-032, ¶ 1, 285 P.3d at 646.  It did so, in part, because "[i]nsurance policies almost always are contracts of adhesion, meaning that 'the insurance company controls the language' and 'the insured has no bargaining power.'"  2012-NMSC-032, ¶ 10, 285 P.3d at 648 (quoting <u>Cal. Cas. Ins. Co. v. Garcia-Price</u>, 2003-NMCA-044, ¶ 20, 63 P.3d 1159, 1163).  It further noted:

> [t]he typical insured does not bargain for individual terms within policy clauses; the insured makes only broad choices regarding general concepts of coverage, risk, and cost.  Not only does the insurance company draft the documents, but it does so with far more knowledge than the typical insured of the consequences of particular words.

2012-NMSC-032, ¶ 10, 285 P.3d at 648 (quoting <u>Sanchez v. Herrera</u>, 1989-NMSC-073, ¶ 21, 783 P.2d at 469)(alteration in original).

**4.**     **The Court Concludes That the Supreme Court of New Mexico Would Not Interpret Exclusion P to Cover Negligence Claims Against Desert State's Directors.**

The Court concludes that the Supreme Court of New Mexico would determine, like some other state and federal courts, that negligence claims against insureds do not necessarily "arise out of" other insureds' related and excluded acts.  Insurance Policy at 20.  While it is the minority rule,

the Court concludes that, based on <u>Rummel</u>, 1997-NMSC-041, 945 P.2d 970, the Supreme Court of New Mexico would share its own disinclination to read Exclusion P broadly to cover claims that Evanston Insurance could have foreseen and could have expressly disclaimed. The Supreme Court of New Mexico has been clear that exclusions are interpreted narrowly, <u>see</u> <u>Knowles v. United Servs. Auto. Ass'n</u>, 1992-NMSC-030, ¶ 7, 832 P.2d at 936; <u>King v. Travelers Ins. Co.</u>, 1973-NMSC-013, ¶ 22, 505 P.2d 1226, 1232 (quoting <u>Roach v. Churchman</u>, 431 F.2d 849, 851 (8th Cir. 1970)), and it is firm that New Mexico courts not strain to find exclusions in vaguely written exclusionary provisions, <u>see</u> <u>Rummel</u>, 1997-NMSC-041, ¶¶ 33, 49-50, 945 P.2d at 979, 982. Exclusion P excludes coverage for any act "based upon or arising out of any conversion, misappropriation, commingling of or defalcation of funds or property." Insurance Policy at 20. With this exclusion, Evanston Insurance is relieved from defending claims against Donisthorpe based upon or arising out of his misappropriation of funds. The provision does not, however, clearly excuse Evanston Insurance from defending independent negligence claims against other insureds that relate -- in some way -- to the excluded conduct.[42] The cases in the minority,

---

[42]The Court notes that Evanston Insurance has written stronger exclusionary clauses in other insurance contracts. In <u>Thames v. Evanston Insurance Co.</u>, No. 13-CV-425 PJC, 2015 WL 7272214 (N.D. Okla. Nov. 17, 2015), the parties litigated an insurance policy exclusion with a first sentence that closely matched the exclusion here, but which added extra protection in a second sentence. The exclusion in that case precluded coverage for all claims

> **based upon or arising out of any conversion, misappropriation, commingling, defalcation, theft, disappearance, insufficiency in the amount of escrow funds**, monies, monetary proceeds, funds or property, or any other assets, securities, negotiable instruments or any other things of value. This exclusion shall apply irrespective of which individual, party, or organization actually or allegedly committed or caused in whole or part the conversion, misappropriation, commingling, defalcation, theft, disappearance, insufficiency [*sic*] in amount[.]

<u>Thames v. Evanston Ins. Co.</u>, 2015 WL 7272214, at *7 (bold and alterations in <u>Thames v. Evanston Ins. Co.</u>).

Watkins, 732 N.Y.S. 2d 70, Pittsburgh, 709 A.2d 910, American Automobile Insurance Co. v. Security Income Planners & Co., 847 F. Supp. 2d 454, and Bistricer v. Federal Insurance Co., 2003 WL 22251290, are not new, and they continue to serve as fodder for arguing an issue that consumes the resources of courts and litigants. See First Mercury Ins. Co. v. Schwartz, CV 17-1763 (SJF)(AKT), 2019 WL 2053850, at *14 n.16; Phila. Indem. Ins. Co. v. Stazac Mgmt., Inc., 2018 WL 2245816, at *11. Evanston Insurance and other insurers could clarify the issue, if they wanted, with the stroke of a pen.

III.   **EVANSTON INSURANCE DELAYED TOO LONG BEFORE ATTEMPTING TO RESCIND THE INSURANCE POLICY.**

Evanston Insurance argues that Donisthorpe's misrepresentations on the Insurance Policy's renewal application rendered it void *ab initio* and entitles Evanston Insurance to rescind the Insurance Policy. See MSJ at 14. The Court concludes that N.M. Stat. Ann § 59A-18-11(A) does not prevent Evanston Insurance from relying on misrepresentations in the Application, but the adverse interest exception does. It further concludes that Donisthorpe's misrepresentations were material to Evanston Insurance's decision to reissue the policy. Finally, the Court does not grant summary judgment to Evanston Insurance, because its decision to seek rescission was neither prompt nor immediate.

A.   **EVANSTON INSURANCE'S FAILURE TO ATTACH A COPY OF DESERT STATE'S APPLICATION DOES NOT VIOLATE N.M. STAT. ANN. § 59A-18-11(A).**

Moya and the former Desert State clients argue that Evanston Insurance cannot rely solely on Donisthorpe's misrepresentations in the Application, because Evanston Insurance did not attach a copy of the Application when it issued the policy to Desert State. See Moya Response at 11. N.M. Stat. Ann. § 59A-18-11(A) sets strict guidelines for insurance policy admissibility:

The insured shall not be bound by any statement made in an application for a policy unless a copy of such application is attached to or endorsed on the policy when issued as a part thereof. If any such policy delivered or issued for delivery to any person in this state shall be reinstated or renewed and the insured or the beneficiary or assignee of such policy shall make written request to the insurance company for a copy of the application, if any, for such reinstatement or renewal, the insurance company shall within fifteen days after the receipts of such request at its home office or any branch office of the insurance company, deliver or mail to the person making such request, a copy of such application. If such copy shall not be so delivered or mailed, the insurance company shall be precluded from introducing such application as evidence in any action or proceeding based upon or involving such policy or its reinstatement or renewal.

N.M. Stat. Ann. § 59A-18-11(A). This language, or language very similar to it, is commonly found in state insurance codes across the country. See, e.g., Ariz. Rev. Stat. Ann. § 20-1108; Cal. Ins. Code § 10381.5; Del. Code. Ann. § 2710; Fla. Stat. § 627.408; Haw. Rev. Stat. § 431:10-208; Idaho Code § 41-1810; Ind. Code § 27-8-5-5; Kan. Stat. Ann. § 4-420; Ky. Rev. Stat. Ann. § 304.14-100; Me. Stat. tit. 24-A, § 2410; Md. Code. Ann., Ins. § 12-206; Mass. Gen. Laws ch.175, § 108; Mich. Comp. Laws § 500.2214; Minn. Stat. §62A.06; Miss. Code Ann. § 83-9-11; Mont. Code. Ann. § 33-15-402; Nev. Rev. Stat. § 687B.100; N.J. Stat. Ann. § 17B:24-3; N.Y. Ins. Law § 3204; Okla. Stat. tit. 36, § 36-4407; 27 R.I. Gen. Laws § 27-18-14; S.D. Codified Laws §§ 58-11-40, 58-11-41; Utah Code Ann. § 31A-21-105; Va. Code Ann. § 38.2-3511; Vt. Stat. Ann. tit. 8, § 4073; Wash. Rev. Code § 48.18.080; W. Va. Code § 33-6-6; Wis. Stat. § 631.11; Wyo. Stat. Ann. §-26-15-108. Cf. 215 Ill. Comp. Stat. 5/154; La. Stat. Ann. § 22:857; Or. Rev. Stat. § 3911.03; Pa. Stat. and Cons. Stat. Ann. § 441. While New Mexico courts have not yet interpreted its language, several courts in other states have.

The attachment requirement is generally understood to guarantee that the applicant is aware of the contract's terms and can correct any mistakes surrounding the contract. See Copeland v. United Sec. Life Ins. Co., 154 So.2d 747, 747 (Ala. 1963)("[T]he statute was designed to put all facts relating to the insurance before the insured; to guard against overzealous or unscrupulous

agents selling insurance to an applicant only to have the insurance policy defeated in a subsequent lawsuit by purportedly false answers in the application form, of which the insured was not fully informed."); John Hancock Mut. Life Ins. Co. v. Banerji, 858 N.E.2d 277, 285 (Mass. 2006)("The requirement that an insured's application be attached to the policy primarily protects the insured by giving him the opportunity to "correct material errors in the application."); Schiller v. Metro. Life Ins. Co., 3 N.E.2d 384, 386 (1936)(stating that attachment's purpose is to "furnish to every person holding insurance . . . a copy of the application, upon which the effectiveness of the policy may in some circumstances depend, so that he may know the exact terms of the contract"); John D. Ingram, *Misrepresentations in Applications for Insurance*, 14 U. Miami Bus. L. Rev. 103, 109 (2005)(stating that the attachment's purpose is "clearly to 'allow for objective evidence of negotiations at the time of application for protection of the insured from possible frauds by insurance agents in falsifying answers given by the insured in applying for insurance.'" (quoting Gibraltar Cas. Co. v. A. Epstein & Sons, Int'l, Inc., 562 N.E. 2d 1039, 1042 (Ill. App. Ct. 1990))).

The parties dispute how to interpret N.M. Stat. Ann. § 59A-11-18(A)'s three sentences. Every single other court facing the same issue have interpreted identical or highly similar language as creating separate attachment requirements for initial applications, on one hand, and renewals or reinstatements, on the other; initial applications automatically require attachment, while attachment is only upon request for insurance policy renewals or reinstatements. See Juneau v. Pittman, No. CIVA 07-9782, 2008 WL 4758611, at *3 (E.D. La. Oct. 27, 2008)(Barbier, J.); Nieto v. Blue Shield of Cal. Life & Health Ins. Co., 181 Cal. App. 4th 60, 81 (Ct. App. 2010); John Hancock Mut. Life Ins. Co. v. Banerji, 858 N.E.2d at 286. The Supreme Judicial Court of Massachusetts held that its insurance code, which is identical in all material respects to N.M. Stat. Ann. § 59A-18-11(A), "permits two exceptions to the attachment requirement: reinstatement or

renewal of an insurance policy." John Hancock Mut. Life Ins. Co. v. Banerji, 858 N.E.2d at 286.

This is longstanding policy in Massachusetts:

> Nearly one century ago, this court determined that the requirements currently contained in G. L. c. 175, §§ 131 and 132 (3) -- which essentially prevent insurers from denying coverage based on alleged misrepresentations in an application for life insurance unless that application was attached to the policy when issued -- do not apply to applications to reinstate a lapsed life insurance policy.

Opara v. Mass. Mut. Life Ins. Co., 806 N.E.2d 924, 925 (Mass. 2004). The Honorable Carl Barbier, United States District Judge for the Eastern District of Louisiana, meanwhile, rejected an argument that Louisiana and Mississippi laws nearly identical to New Mexico's statute require attachment for all applications. See Juneau v. Pittman, 2008 WL 4758611, at *3. Judge Barbier held that reinstatement applications were inadmissible as evidence "[o]nly if a reinstatement application *exists,* is *requested* by the insured, and is *not properly mailed* within the 15 day period." 2008 WL 4758611, at *3 (emphasis in the original). See Nieto v. Blue Shield of California Life & Health Ins. Co., 181 Cal. App. 4th at 81 (noting that the law's second and third sentences "provide[] that the consequence of nondelivery following the insured's request is that the application may not be introduced into evidence"); N.Y. Life Ins. Co. v. Rosen, 227 A.D. 79, 82 (N.Y. App. Div. 1929)("[T]he insurance company was not required to attach the application for reinstatement to the policy,"); Larson v. Union Cent. Life Ins. Co., 137 N.W.2d 327, 335 (Minn. 1965). This interpretation makes sense, given the statute's purposes: to guarantee that the insured has full knowledge of the contract's terms and to protect against fraud. Applications for renewal of insurance policies do not alter the policy's fundamental terms and conditions. See Occidental Life Ins. Co. of Cal. v. Fried, 245 F. Supp. 211, 216-17 (D. Conn. 1965)(Timbers, C.J.).

The only court to require attachment of a renewal policy interpreted a statute written differently than N.M. Stat. Ann. § 59A-18-11. In National Union Fire Insurance Co. of Pittsburgh,

<u>Pa. v. Continental Illinois Corp.</u>, 658 F. Supp. 781 (N.D. Ill. 1987)(Shadur, J.), the Honorable

Milton Shadur, United States District Judge for the Northern District of Illinois, interpreted

Illinois' attachment requirements, which state, in part:

> No misrepresentation or false warranty made by the insured or in his behalf
> in the negotiation for a policy of insurance, or breach of a condition of such policy
> shall defeat or avoid the policy or prevent its attaching unless such
> misrepresentation, false warranty or condition shall have been stated in the policy
> or endorsement or rider attached thereto, or in the written application therefor, of
> which a copy is attached to or endorsed on the policy, and made a part thereof.

215 Ill. Comp. Stat. 5/154. Judge Shadur concluded that, under this Illinois law, "[t]o rely on the

alleged misrepresentations in the [renewal applications] as a basis for rescinding the Policies,

Insurers must be able to allege in good faith that copies of the relevant documents were *physically*

attached to the Policies when issued." <u>Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Cont'l Ill.</u>

<u>Corp.</u>, 658 F. Supp. at 787. There are two important differences between Illinois' and New

Mexico's attachment laws that suggest that the Supreme Court of New Mexico would not reach

the same conclusion. First, while New Mexico's law addresses requirements for instatement and

renewal applications, Illinois does not expressly address reinstatement or renewals at any point in

its attachment law. <u>Compare</u> N.M. Stat. Ann. § 59A-18-11(A) ("If any such policy . . . shall be

reinstated or renewed and the insured . . . shall make written request to the insurance company for

a copy of the application, . . . the insurance company shall . . . deliver or mail to the person making

such request, a copy of such application.") <u>with</u> 215 Ill. Comp. Stat. 5/154 ("No misrepresentation

or false warranty made by the insured . . . shall defeat or avoid the policy or prevent its attaching

unless such misrepresentation, false warranty or condition shall have been stated in the policy or

endorsement or rider attached thereto, or in the written application therefor, of which a copy is

attached to or endorsed on the policy."). Similarly, Illinois does not, like New Mexico, require the

insurer to attach the application to the policy "when issued," which suggests that the attachment

requirement extends beyond the initial issuance.  N.M. Stat. Ann. § 59A-18-11.  <u>Cf.</u> 215 Ill. Comp.

Stat. 5/154.   Accordingly, the Court predicts that the Supreme Court of New Mexico would

interpret N.M. Stat. Ann § 59A-11-18(A) like every other court that has interpreted similar

language and hold that insurers are only required to attach applications along with initial

applications.  Desert State's application was indisputably an application for renewal.  <u>See</u> Client

Response ¶ 8, at 4.  Accordingly, Evanston Insurance was not required to attach the application

and is entitled to rely on Donisthorpe's misrepresentations in the application.

While the Supreme Court of New Mexico has not interpreted N.M. Stat. Ann. § 59A-19-11,

it has extensively discussed attachment requirements in the context of uninsured ("UM") and

underinsured ("UIM") motorist insurance coverage.  <u>Jordan v. Allstate Ins. Co.</u>, 2010-NMSC-051,

245 P.2d 1214; <u>Marckstadt v. Lockheed Martin Corp.</u>, 2010-NMSC-001, 229 P.3d 462; <u>Kaiser v.

DeCarrera</u>, 1996-NMSC-050, 923 P.2d 588; <u>Romero v. Dairyland Ins. Co.</u>, 1990-NMSC-111, 803

P.2d 243.  N.M. Stat. Ann. §§ 66-5-301 to 66-5-303 contains New Mexico's law governing UM

and UIM insurance.  Section 66-5-301(C) states:

> . . . .  [T]he named insured shall have the right to reject uninsured motorist coverage
> as described in Subsections A and B of this section; provided that unless the named
> insured requests such coverage in writing, such coverage need not be provided in
> or supplemental to a renewal policy where the named insured has rejected the
> coverage in connection with a policy previously issued to him by the same insurer.

N.M. Stat. Ann. § 66-5-301(C).   New Mexico Code Regulation 13.12.3.9, which elaborates on

§ 66-5-301, provides the attachment requirements for rejecting uninsured motorist coverage.  It

states: "The rejection of the provisions covering damage caused by an uninsured or unknown

motor vehicle as required in writing by the provisions of Section 66-5-301 NMSA 1978 must be

endorsed, attached, stamped, or otherwise made a part of the policy of bodily injury and property

damage insurance."  N.M. Code R. § 13.12.3.9.

The Supreme Court of New Mexico has interpreted UM/UIM attachment requirements several times. In Romero v. Dairyland Insurance Co., the Court held that an insured's written rejection of uninsured motorist insurance was invalid, because it did not conform to regulations that require such rejections to be attached or otherwise made a part of the policy. See 1990-NMSC-111, ¶ 1, 803 P.2d at 244. The Supreme Court of New Mexico noted that these regulations' purpose is

> to ensure that the insured has affirmative evidence of the extent of coverage. Upon further reflection, consultation with other individuals, or after merely having an opportunity to review one's policy at home, an individual may well reconsider his or her rejection of uninsured motorist coverage. Providing affirmative evidence of the rejection of the coverage comports with a policy that any rejection of the coverage be knowingly and intelligently made. Any individual rejecting such coverage should remain well informed as to that decision.

Romero v. Daisyland Ins. Co., 1990-NMSC-111, ¶ 9, 803 P.2d at 245. The Supreme Court of New Mexico concluded that the statute on which the regulations are based "embodies a public policy of New Mexico to make uninsured motorist coverage a part of every automobile liability insurance policy issued in this state, with certain limited exceptions," and is "intended to expand insurance coverage and to protect individual members of the public against the hazard of culpable uninsured motorists." Romero v. Daisyland Ins. Co., 1990-NMSC-111, ¶ 6, 803 P.2d at 245. See Anczarski v. Travelers Indem. Co., No. CIV 16-0856 JB/SCY, 2017 WL 3084457, at *25 (D.N.M. July 17, 2017)(Browning, J.). The Supreme Court of New Mexico reached a similar conclusion regarding the regulation's effect in Kaiser v. DeCarrera, 1996-NMSC-050, 923 P.2d 588. In that case, appellant Kaiser had signed a Notice of Rejection as part of his insurance application, stating that he did not want UM/UIM coverage, but the issued policy did not state whether UM/UIM was included in the coverage. See 1996-NMSC-050, ¶ 2, 923 P.2d at 589. The insurer attempted to mail an amended policy reflecting the fact that he had rejected this coverage, but the address Kaiser

provided on the application did not contain his apartment number, and the letter was returned undelivered.  See 1996-NMSC-050, ¶ 4, 923 P.2d at 589.  The Supreme Court of New Mexico concluded that Kaiser's written rejection was not valid, because it was not "'endorsed, attached, stamped or otherwise made a part of the policy.'"  1996-NMSC-050, 923 P.2d at 590 (quoting Regulations of the New Mexico Department of Insurance, Art. 5, Part 4, Ch. 66, Rule 1, § 5-1-4 (undated)).  Like in Romero v. Daisyland Ins. Co., the Supreme Court of New Mexico noted that the attachment regulation "recognizes the fact that people reconsider their insurance coverage and provides the insured with affirmative evidence of the extent of coverage for *future* reference." Kaiser v. DeCarrera, 1996-NMSC-050, ¶ 10, 923 P.2d at 590-91 (emphasis in original).

In Marckstadt v. Lockheed Martin Corp., 2010-NMSC-001, 229 P.3d 462, the Supreme Court of New Mexico consolidated cases before it, including a case that the Tenth Circuit certified to it, to answer what § 66-5-301 and N.M.A.C. § 13.12.3.9 require to effectively reject uninsured motorist coverage**.**  See Marckstadt v. Lockheed Martin Corp., 2010-NMSC-001, ¶ 12, 229 P.3d at 467.  The Supreme Court of New Mexico held that, any rejection of coverage must be in writing, but that it need not be signed by the insured or attached to the policy.  See Marckstadt v. Lockheed Martin Corp., 2010-NMSC-001, ¶¶ 26, 228 P.3d at 471.  This conclusion applied even to renewed policies, such as the one at issue in the case.  See Marckstadt v. Lockheed Martin Corp., 2010-NMSC-001, ¶ 10, 228 P.3d at 466.  So long as "some evidence of the insureds' written rejection of UM/UIM coverage" was made a part of the policy by some means, the regulations do not require attachment.  Marckstadt v. Lockheed Martin Corp., 2010-NMSC-001, ¶ 26, 228 P.3d at 471.  See Farm Bureau Mut. Ins. v. Jameson, 472 F. Supp. 2d 1272, 1280 (D.N.M. 2006)(Browning, J.)(predicting that the Supreme Court of New Mexico would require a signed, written rejection included in the policy).  Finally, in Jordan v. Allstate Ins. Co., 2010-NMSC-051,

245 P.2d 1214, the Supreme Court of New Mexico held that, when an insurance policy did not expressly state that UM/UIM coverage was rejected, the rejection was not valid even if the insured had knowingly and intelligently signed forms disclaiming the coverage. See Jordan v. Allstate Ins. Co., 2010-NMSC-051, ¶ 32, 245 P.2d at 1223-24. The rejection must be incorporated into the policy "in a way that affords the insured a fair opportunity to reconsider the decision to reject." Jordan v. Allstate Ins. Co., 2010-NMSC-051, ¶ 22, 245 P.2d at 1221.

These four cases reflect a "strict mandate." Kaiser v. DeCarrera, 1996-NMSC-050, ¶ 17, 923, P.2d at 592. No matter how clearly the insured has rejected attachment in an insurance application, the rejection is invalid if the insurer does not later provide an opportunity to reconsider the decision by somehow incorporating the rejection into the policy. See Marckstadt v. Lockheed Martin Corp., 2010-NMSC-001, ¶¶ 26, 228 P.3d at 471. The Supreme Court of New Mexico does not, however, require the insurer to attach the rejection, so long as the issued policy contains some evidence of this choice for the insured. See Marckstadt v. Lockheed Martin Corp., 2010-NMSC-001, ¶ 26, 228 P.3d at 471. The public policy supporting the strict requirement on insurers is to encourage drivers to adopt UM and UIM coverage to protect themselves and the public. See Romero v. Daisyland Ins. Co., 1990-NMSC-111, ¶¶ 6, 9, 803 P.2d at 245.

The Supreme Court of New Mexico cases interpreting UM/UIM attachment requirements do not suggest that it will apply the same strict regime to N.M. Stat. Ann. § 59A-18-11. First, the language in the statute at issue here and in the UM/UIM regulations are significantly different. New Mexico Code Regulation 13.12.3.9 states: "The rejection of the provisions covering damage caused by an uninsured or unknown motor vehicle as required in writing by the provisions of Section 66-5-301 NMSA 1978 must be endorsed, attached, stamped, or otherwise made a part of the policy of bodily injury and property damage insurance." N.M. Code R. § 13.12.3.9. It neither

expressly nor implicitly suggests that New Mexico requires different processes for renewals or reinstatements. See N.M. Code R. § 13.12.3.9. By contrast, the second and third sentence of N.M. Stat. Ann. § 59A-18-11 create a cohesive, alternative attachment requirement for renewals and reinstatements, whereas the statute's first sentence only discusses attachment for initial policy applications.

Second, the public policy concerns behind UM/UIM coverage are not present in this case. New Mexico has stated a strong preference towards increasing UM/UIM coverage. See Romero v. Daisyland Ins. Co., 1990-NMSC-111, ¶ 6, 803 P.2d at 245 (concluding that it is New Mexico public policy "to make uninsured motorist coverage a part of every automobile liability insurance policy issued in this state, with certain limited exceptions"). The State of New Mexico mandates that insurers offer UM and UIM coverage to all applicants in an amount equal to their policy limits. See N.M. Stat. Ann. § 66-5-301(A); Progressive Northwestern Ins. Co. v. Weed Warrior Servs., 2010-NMSC-050, ¶ 12, 245 P.3d at 1213. New Mexico courts also "assume the average purchaser of automobile insurance 'will have limited knowledge of insurance law,'" and therefore they "will not impose on the consumer that she or he will be able to make an informed decision" without "receiving information from an insurance company." Progressive N.W. Ins. Co. v. Weed Warrior Servs., 2010-NMSC-050, ¶ 13, 245 P.3d at 1213 (quoting Computer Corner, Inc. v. Fireman's Fund Ins. Co., 2002-NMCA-054, ¶ 7, 46 P.3d 1264, 1266). Here, § 59A-18-11's attachment requirements apply to every single insurance policy in the state. There is no New Mexico public policy generally favoring maximizing insurance coverage in all possible situations. More specifically, there are no New Mexico requirements encouraging organizations to adopt professional liability policies, such as the one in this case. Nor is there a presumption that those applying for professional liability insurance policies cannot make an informed decision without

information from the insurer. The Court concludes that the Supreme Court of New Mexico's UM/UIM attachment rulings do not suggest that it will require attachment for renewed insurance policies under N.M. Stat. Ann. § 59A-18-11, because the language in N.M. Code R. § 13.12.3.9. is significantly different than this statute, and public policy does not encourage such a position.

### B. THE ADVERSE INTEREST EXCEPTION PREVENTS EVANSTON INSURANCE FROM RELYING ON THE APPLICATION'S MISREPRESENTATIONS.

The Court concludes that the Supreme Court of New Mexico would apply the adverse interest exception to these facts and hold that Donisthorpe was acting adversely to Desert State's interests in completing the Application. Bennett argues that, because Donisthorpe acted in his own interest and not in Desert State's interest when he filled out the Application, the adverse interest exception prevents the Court from imputing Donisthorpe's knowledge to Desert State. See Bennett Response at 6-7; Tr. at 45:22-46:3 (Sanders). Evanston Insurance proposes that the adverse interest exception does not apply, because Donisthorpe's fraudulent application for insurance is not adverse to Desert State's interests. See Reply to Ms. Bennett at 6. In CUMIS, the District of Minnesota held that the "*only* reason that Cofell did not disclose the existence of her theft was for her own benefit and to the detriment of the company," 241 F. Supp. 3d at 940 (emphasis in original), and that, therefore, the adverse interest exception applied to her misrepresentation on the insurance application, see 241 F. Supp. 3d at 941. Similarly, in BancInsure, the Honorable David Bunning, United States District Judge for the Eastern District of Kentucky, held that an embezzling CEO acted on her own behalf and against her principal's interests when she lied on an insurance policy renewal application, because "[t]his misrepresentation allowed her to continue embezzling funds." 830 F. Supp. 2d at 304. See Puget Sound Nat. Bank v. St. Paul Fire and Marine Ins. Co., 645 P.2d at 1128 (concluding that a bank's

director's knowledge would not be imputed to the bank, because he "acted adversely both as to his defalcations and as to his concealment of them on the bond application").

The Court concludes that the Supreme Court of New Mexico would follow CUMIS and BancInsure, and it would conclude that Donisthorpe was not acting adversely to Desert State when he completed the Application. As in CUMIS, Donisthorpe's "only misrepresentation was about the fraud itself -- as opposed to misrepresentation tangentially related to the fraud, such as the existence of internal controls." Donisthorpe's misrepresentation also allowed him to continue to embezzle funds and prevented Desert State from learning of his misrepresentations. Where Donisthorpe's misrepresentations allowed him to continue to steal millions from his trust clients without alerting either them or Desert State to his acts, the Court concludes that the Supreme Court of New Mexico would hold that he acted adversely to his principal, and would not impute his knowledge to Desert State. See BancInsure, 830 F. Supp. 2d at 304.

## C.    DONISTHORPE'S MISREPRESENTATIONS ARE MATERIAL.

Moya argues that, under New Mexico law, to rescind an insurance policy, the burden of proving a material misrepresentation is on the insurance company. See Moya Response at 13 (citing Tsosie v. Found. Reserve Ins. Co., 1967-NMSC-095, ¶ 11, 427 P.2d 29). Moya says that, because the MSJ "fails to offer any evidence that the misrepresentations in DSLM's application were material," the Court "should deny summary judgment on this issue." Moya Response at 13. The Insurance Policy states that, "[b]y acceptance of this policy, the Insureds agree" that "the information and statements contained in the application(s) are their representations, and they shall be deemed material to the acceptance of the risk or hazard assumed by the Company under this policy, and that this policy is issued in reliance upon the truth of such representations." Insurance Policy at 9. Furthermore, "courts generally will construe a statement as material when the

applicant acknowledges in the application that the insurer will rely and act upon the basis of the representations contained therein." Paul Koepff, Overview of the governing principles -- Fraud and misrepresentation -- Materiality, 3 Law and Prac. of Ins. Coverage Litig. § 37:4 (2019). Finally, in its Combined Reply, Evanston Insurance submits an affidavit from an underwriting manager stating that it would not have issued the policy had it been aware of Donisthorpe's misrepresentations. See Affidavit of Denise Butler ¶ 11, at 2 (taken Aug. 22, 2019), filed August 23, 2019 (Doc. 116-1). Accordingly, the Court concludes that Donisthorpe's misrepresentations were material to Evanston Insurance's decision to issue the Insurance Policy.

**D.      EVANSTON INSURANCE IS NOT ENTITLED TO SUMMARY JUDGMENT, BECAUSE IT DID NOT ADDRESS WHETHER ITS ATTEMPT TO SEEK RESCISSION WAS PROMPT OR IMMEDIATE.**

Evanston Insurance argues that parties may rescind contracts in New Mexico when material information to that contract is withheld or misrepresented. See MSJ at 14. It argues that, because Donisthorpe misrepresented information in the Application, the Insurance Policy is void ab initio and Evanston Insurance may be rescind it. See MSJ at 14-16. Ms. Bennett and the former Desert State clients counter that Evanston Insurance may not rescind the Insurance Policy, because Evanston Insurance did not promptly rescind. See Client Response at 13-16; Bennett Response at 14-16. The Court concludes that Evanston Insurance is not entitled to summary judgment on this issue, because the facts suggest that its decision to seek rescission was neither prompt nor immediate.

Under New Mexico law, rescission for fraud "is allowed where there has been a misrepresentation of a material fact, the misrepresentation was made to be relied on, and has in fact been relied on." Prudential Ins. Co. of Am. v. Anaya, 1967-NMSC-132, ¶ 8, 428 P.2d at 643 (1967). Rescission "may be allowed in certain cases of non-fraudulent, but material,

nondisclosure." <u>McElhannon v. Ford</u>, 2003-NMCA-091, ¶ 15, 73 P.3d at 832. Importantly here, a party seeking to rescind a contract for fraud "must immediately, upon discovering the fraud, restore, or offer to restore, all that he has received under the contract, as a condition precedent to his right to rescind the same." <u>Putney v. Schmidt</u>, 1911-NMSC-043, ¶ 10, 120 P. at 723. In a previous Order, the Court concluded that "were Evanston Insurance to have had knowledge of Donisthorpe's fraud at or around his November 27, 2017, plea agreement, its failure to return Desert State's premiums until more than six months later would constitute a waiver of its right to rescind." <u>Evanston Ins. Co. v. Desert State Life Mgmt., Inc.</u>, No. CIV 18-0654 JB\KK, Order, filed September 13, 2019 (Doc. 126).

The record reflects that Evanston Insurance first received notice of circumstances likely to give rise to claims triggering coverage in March, 2017, when Ms. Bennett reported that Donisthorpe had mismanaged and stolen funds belonging to the former Desert State clients. <u>See</u> Client Response ¶ 1, at 3. After Evanston Insurance received the notice of circumstances from Ms. Bennett, Evanston Insurance first considered rescinding the policy. <u>See</u> Client Response ¶ 2, at 3. Shortly after Evanston Insurance received Ms. Bennett's report, it received several claims from former Desert State's clients that corroborated Ms. Bennett's report. <u>See</u> Client Response ¶ 3, at 3. Approximately one month after it hired counsel to provide it with a coverage opinion, on July 24, 2017, Evanston Insurance sent Desert State a Notice of Nonrenewal of the Insurance Policy. Evanston Insurance took no action to rescind the Insurance Policy or to notify its insureds that it was considering rescinding the policy before June 4, 2018. <u>See</u> Client Response ¶ 8, at 4. On this date, Evanston Insurance offered to rescind the Insurance Policy based on the material misrepresentations made in the Application for the Insurance Policy. <u>See</u> MSJ ¶ 14, at 9. Evanston Insurance formally concluded that Donisthorpe made material misrepresentations on the

Application based on his statements at his plea hearing. See Client Response ¶ 12, at 4. Donisthorpe is the only insured under the policy that Evanston Insurance believes made any material misrepresentations. See Client Response ¶ 16, at 4. Despite these facts, and New Mexico law suggesting that parties must immediately rescind contracts upon discovering fraud, Evanston Insurance's MSJ does not address timeliness in its argument. Accordingly, the Court concludes that Evanston Insurance is not entitled to summary judgment on this issue.

### E. EVANSTON INSURANCE MAY NOT RESCIND THE INSURANCE POLICY FOR INNOCENT INSUREDS.

Ms. Bennett also adopts the former Desert State clients' arguments that rescission is not appropriate for "innocent insureds" such as her. Bennett Response at 7 (incorporating arguments from the Client MSJ). The Client MSJ argues that, in New Mexico, an insured's fraudulent acts "do not cancel coverage of other, innocent insureds who were not responsible for the fraud." Client MSJ at 9 (citing Delph, 1980-NMSC-140, ¶ 14, 620 P.2d at 1285). The Court concludes that, based on New Mexico's law and public policy, the Supreme Court of New Mexico would both recognize the innocent insured exception in insurance contracts and apply it to this case.

#### 1. The Supreme Court of New Mexico Would Adopt the Innocent Insured Exception.

Caselaw suggests that the Supreme Court of New Mexico would adopt the innocent insured exception and prevent total rescission based only on an applicant's misrepresentations. In Delph, as discussed earlier, a recently divorced husband intentionally set fire to the family home. See Delph, 1980-NMSC-140, ¶ 3, 620 P.2d at 1283. The insurance agency refused to pay the wife when she demanded to recover under the insurance policy, alleging that the arson was "'fraud' by the 'insured.'" Delph, at 1980-NMSC-140, ¶ 4, 620 P.2d at 1283. The Supreme Court of New Mexico stated that the "responsibility for the fraud is several and separate rather than that of the

community," and "the fraud of the co-insured husband does not void the policy as to plaintiff." 1980-NMSC-140, ¶ 14, 620 P.2d at 1285. While this case concerns fire insurance, not a professional liability policy, the doctrine is generally the same across other contexts. See Couch on Insurance § 149:48 ("Observation: The issue is not unique to arson, nor to fire insurance, of course, but tends to arise most frequently in that context because fire insurance is so pervasive and because almost any adult person has the knowledge and materials needed to burn property."); Couch on Insurance § 148:64 ("Readers interested in imputation of the fault of various parties to an innocent insured should consult the detailed discussion of this point in the context of fire insurance."). Delph supports the conclusion that New Mexico recognizes the innocent insured exception, even though the Supreme Court of New Mexico's analysis is deeply rooted in New Mexico's community property system, see 1980-NMSC-140, ¶ 14, 620 P.2d at 1285, and Evanston Insurance does not cite any cases suggesting New Mexico would reject the exception, see Reply to Ms. Bennett at 5-12; Combined Reply at 6-13.

In fact, the Supreme Court of New Mexico strongly suggested that it supports the exception when it debated insurance policy rescission in Prudential Insurance Co. of America v. Anaya, 1967-NMSC-132, 428 P.2d 640 ("Prudential"). In that case, a husband made misrepresentations on a family insurance application concerning his wife's health. 1967-NMSC-132, ¶ 3, 428 P.2d at 642. Prudential sued to rescind the policy, and the trial court ordered rescission for the entire policy. 1967-NMSC-132, ¶ 3, 428 P.2d at 642. On appeal, the husband argued that the policy was severable and that "there must be a basis for rescission as to each of the persons covered under the policy." 1967-NMSC-132, ¶ 24, 428 P.2d at 644. The Supreme Court of New Mexico appears to have agreed, and noted "[t]he question under this point is whether all or part of the policy is to be rescinded." 1967-NMSC-132, ¶ 31, 428 P.2d at 645. It stated that the answer to this question

hinged on the policy's severability and that the "intent as to whether the coverage was severable is shown by the language used."  1967-NMSC-132, ¶ 28, 428 P.2d at 645.  The Supreme Court of New Mexico concluded that, on the facts before it, the policy did not express this intent:

> The application provides that no insurance is to take effect unless all answers given in the application are [true] as of the date of delivery of the policy. The policy states that it is issued in consideration of the application. There being false answers, the intent was that no insurance was to be effective. This intent was not limited to one or more of the defendants; it applied to all of them.

Prudential, 1967-NMSC-132, ¶ 28, 428 P.2d at 64.  See Hilbum v. Brodhead, 1968-NMSC-142, ¶ 11, 444 P.2d  971, 975 (employing partial rescission); Ford v. Norton, 1927-NMSC-067, ¶ 7, 260 P. 411, 412 (same).  But see Ill. State Bar Ass'n Mut. Ins. Co. v. Law Office of Tuzzolino and Terpinas, 27 N.E.3d 67, 73-74 (Ill. 2015)(stating that, because a misrepresentation affects the contract's overall validity, the innocent insured doctrine is inapplicable to rescission).  Cf. David L. Nersessian, Penalty by Proxy: Holding the Innocent Policyholder Liable for Fraud by Coinsureds, Claims Professionals, and Other Agents, 38 Tort Trial & Ins. Prac. L.J. 907, 924-25 (2003)("Courts permitting recovery for innocent coinsureds in these circumstances often focus upon the presence of 'severability' language in the policy rather than upon the fact that the policy, including the severability language therein, might never have issued in the first instance had the truth been disclosed.").

## 2. The Supreme Court of New Mexico Would Apply the Innocent Insured Exception to Prevent Rescission in This Case.

The Court concludes that the Supreme Court of New Mexico would rule that, even were rescission appropriate here, the remedy would not apply to the Insurance Policy's innocent insureds.  To begin, the Court notes that the Supreme Court of New Mexico has emphatically placed the burden of clearly drafting insurance policy limitations on insurers, and Evanston

Insurance has failed to include a provision overriding the innocent insured exception.  See § II.B.3; Rummel, 1997-NMSC-041, ¶ 49, 945 P.2d at 982 ("If the insurer urges an exclusion to coverage that the policy does not clearly express, 'the courts will not write an exception into it by construction, for the purpose of exempting the insurer from liability'" (quoting 2 Couch on Insurance 3d §22:30)).  Evanston Insurance has the capability to draft such provisions if it chooses to write such an exclusion.  Common Policy Condition L states that, "[i]f *any Insured* shall commit fraud in proffering any Claim, this insurance shall become void from the date such fraudulent Claim is proffered."  Insurance Policy at 10 (emphasis added).  The Insurance Policy's Representations section, on the other hand, does not create a similarly joint relationship.  It states that, "[b]y acceptance of this policy, *the Insureds* agree . . . [t]hat the information and statements contained in the application(s) are their representations."  Insurance Policy at 9, 15 (emphasis added).  The phrase "the insured," used here and throughout the Insurance Policy, expresses a contractual intent to create several -- rather than joint – obligations regarding any one insured's statement on the Application.  Insurance Policy at 9, 19, 20.  See Axis Reinsurance Co. v. Bennett, 2008 WL 2485388, at *15.  In the absence of express contractual language to the contrary, "the 'innocent coinsured' rule is generally applicable only where interests are several."  Fleet Bus. Credit L.L.C. v. Glob. Aerospace Underwriting Managers Ltd., 646 F. Supp. 2d 473, 478 (S.D.N.Y. 2009)(Jones, J.).

Evanston Insurance points to one Application question that Donisthorpe answered in the negative as evidence of his fraud, see MSJ at 15, but his answer does not extend to the other insureds such that rescission is a proper remedy for them.  The question asks whether the applicant is "aware of any fact, circumstance, situation, incident or allegation of negligence or wrongdoing, which might afford grounds for any claim as would fall under the proposed insurance?"

Application at 3. Evanston Insurance cannot argue solely that, by answering "no," the other insureds made a false statement; the undisputed facts reflect that Evanston Insurance does not have any evidence or basis to believe that any insureds, aside from Donisthorpe, committed fraud or participated in his scheme. See Client Response at ¶¶ 14, 16, at 4 (citing Fischer Depo. at 23:12-18; 50:2-11; 103:20-104:14). The Court also has already concluded that Donisthorpe's knowledge is not imputed to innocent insureds. See § I.C. Not rescinding the Insurance Policy for innocent insureds makes sense here, because the innocent insureds did not make any misrepresentations in the Application, and the Insurance Policy's language does not impute Donisthorpe's misrepresentation to every insured. See Amick v. State Farm Fire and Cas. Co., 862 F.2d 704 (8th Cir. 1988)(holding that an innocent insured exception is not void as against public policy under Missouri law); Evanston Ins. Co. v. Agape Senior Primary Care, Inc., 636 F. App'x at 876 (affirming an application of the innocent insured exception, partly because the insurance policy did not include such language); Evanston Ins. Co. v. Watts, 52 F. Supp. 3d 761, 769 (D.S.C. 2014)(Anderson, Jr., J.)("While Evanston points to a provision in the policy which informs the insureds that each applicant's representations made in their respective application become part of the policy, there is no explicit language barring coverage for all insureds based on the fraud or misrepresentation of a co-insured. The Court is not permitted to rewrite the policy and create a limitation on coverage that does not exist.").

The Client MSJ cites Evanston Insurance Co. v. Agape Senior Primary Care, Inc., 636 F. App'x 871 ("Agape"), as further support to argue that rescission for innocent insureds is not appropriate here. See Client MSJ at 9. That case concerns Agape Senior Primary Care, which hired a man who had stolen the identity of a board-certified doctor. See 636 F. App'x at 872. The man also misrepresented his background and credentials in a separate application to Evanston

Insurance and was added to Agape Care's professional liability policy.  See 636 F. App'x at 873.

South Carolina law at the time recognized only the innocent insured doctrine in the context of

arson.  See 636 F. App'x at 874 (citing McCracken v. Gov't Emps. Ins. Co., 325 S.E.2d 62, 64

(S.C. 1985)).  The Fourth Circuit concluded that rescinding a South Carolina professional liability

insurance policy for innocent insureds is not appropriate for three reasons: "(1) as the insurer and

drafter, Evanston could have included forfeiture language in the policy; (2) neither Agape nor any

of its employees had any knowledge of Addo's fraud, rendering them 'innocent' under South

Carolina law; and, (3) the public interest would not be served through rescission."  636 F. App'x

at 875.

The Court already has discussed the lack of forfeiture language in the Insurance Policy and

the other insureds' uncontroverted innocent status," but Agape's third justification -- public policy

-- also suggests that the Supreme Court of New Mexico would apply the innocent insured

exception to these facts.  The Fourth Circuit applied the innocent insured exception in Agape,

because, in part, "rescission would leave the public essentially unprotected on matters of medical

malpractice brought against every other Agape employee."  636 F. App'x at 876.  This case is

similar to Agape on that factor.  Donisthorpe was the only insured who committed fraud, and

rescinding the entire Insurance Policy would leave Desert State's clients entirely exposed to the

organization's negligent acts and omissions.  In addition, rescission is an equitable remedy.  See

Ledbetter v. Webb, 1985-NMSC-112, ¶ 15, 711 P.2d at 877-78.  When a New Mexico court applies

an equitable remedy, it "may avail itself of those broad and flexible powers which are capable of

being expanded to deal with novel cases and conditions."  Plaza Nat'l Bank v. Valdez, 1987-

NMSC-105, ¶ 16, 745 P.2d 372, 375.  The Supreme Court of New Mexico has said that "'[e]quity

supplements the common law; its rules do not contradict the common law; rather, they aim at

securing substantial justice when the strict rule of common law might work hardship.'" State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 33, 329 P.3d 658, 670-71 (quoting Larry A. DiMatteo, The History of Natural Law Theory: Transforming Embedded Influences into a Fuller Understanding of Modern Contract Law, 60 U. Pitt. L. Rev. 839, 890 (1999)).  New Mexico courts have already adopted numerous presumptions favoring expansive coverage for insureds; for example, ambiguities in policies are construed in the insured's favor, see Morton v. Great Am. Ins. Co., 1966-NMSC-206, ¶ 9, 419 P.2d at 242; exclusionary clauses are narrowly construed against insurers, Knowles v. United States Auto. Ass'n, 1992-NMSC-030, ¶ 7, 832 P.2d at 396; and coverage provisions are construed broadly, Sanchez v. Herrera, 1989-NMSC-073, ¶ 22, 783 P.2d at 469.  Given the Supreme Court of New Mexico's holding in Delph and Prudential, equitable remedies' flexible nature, and New Mexico courts' general presumptions in favor of insurance coverage, the Court concludes that the Supreme Court of New Mexico would find rescission inappropriate for the Insurance Policy's innocent insureds.

IT IS ORDERED that the Plaintiff's Motion for Summary Judgment, filed July 25, 2019 (Doc. 89), is denied.  The Defendants have satisfied all conditions precedent for coverage, Exclusion P in the Insurance Policy, (undated) filed July 25, 2017 (Doc. 89-5), does not exclude coverage for the claims plead in Graham v. Desert State Life Management, No. D-202-cv-2018-04655, Second Judicial District Court, County of Bernalillo, State of New Mexico (filed in state court December 17, 2018), filed in federal court July 25, 2019 (Doc. 89-4), and Evanston Insurance is not entitled to rescission on the facts before the Court.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Ann Maloney Conway
Elisabeth Anne Millich
Sheehan & Sheehan, P.A.
Albuquerque, New Mexico

--and--

Joseph Borders
McJessy, Ching & Thompson, LLC
Chicago, Illinois

    *Attorneys for the Plaintiff*

Maureen Sanders
Sanders & Westbrook, P.C.
Albuquerque, New Mexico

    *Attorney for Defendant Helen Bennett*

Paul J. Kennedy
Kennedy, Hernandez & Associates, P.C.
Albuquerque, New Mexico

    *Attorney for Defendant Liane Kerr*

Kevin Arthur Graham
Daniel Ross Rubin
New Mexico Regulation and Licensing Department
Santa Fe, New Mexico

    *Attorneys for Defendant Christopher Moya*

Joseph Goldberg
H. Jesse Jacobus, III
Frank T. Davis, Jr.
Freedman Boyd Hollander Goldberg Urias & Ward P.A.
Albuquerque, New Mexico

    *Attorneys for Defendants Cameron Graham, Joseph Perez, Christine Gallegos, Scott Atkinson, and Charles Reynolds*

John C. Anderson
   United States Attorney
Brandon Fyffe
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the United States of America*