**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

EVANSTON INSURANCE COMPANY,

       Plaintiff,

vs.                                     No. CIV 18-0654 JB\KK

DESERT STATE LIFE MANAGEMENT;
CHRISTOPHER MOYA, in his capacity as
Receiver for the receivership estate of DESERT
STATE LIFE MANAGEMENT; PAUL A.
DONISTHORPE; L. HELEN BENNETT;
LIANE KERR; AYUDANDO GUARDIANS,
INC., a New Mexico Nonprofit Corporation, on
behalf of seven protected persons; JOSEPH
PEREZ; CHRISTINE GALLEGOS,
individually and as Guardian of VICTOR
BALDIZAN, an incapacitated adult; SCOTT K.
ATKINSON, as Guardian Ad Litem for
VINCENT ESQUIBEL, JR., an Incapacitated
Person; and CHARLES REYNOLDS, as
Conservator for J.W., an Incapacitated Person,
and CAMERON GRAHAM, as trustee for
ANDREW GRAHAM, CHRISTOPHER
MOYA; ASCENDING HOPE, LLC; CNRAG,
INC.; and DECADES, LLC,

       Defendants.

**MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW**

**THIS MATTER** comes before the Court on: (i) the bench trial held on October 7-9, 2019;

(ii) the Motion to Strike Affidavits, Expert Report and to Exclude Expert Testimony of Christopher

Moya at 1, filed September 30, 2019 (Doc. 133)("Expert Motion"); (iii) Plaintiff's Motion to

Admit Certain Evidence Pursuant to Federal Rule of Evidence 402, filed October 6, 2019 (Doc.

144)("402 MIL"); (iv) Evanston's Motion in Limine to Allow Defendant Donisthorpe to Testify

From Prison By Audio Teleconference at 1, filed October 6, 2019 (Doc. 141)("Telephone MIL");

(v) Plaintiff's Motion to Take Judicial Notice of and Admit Certain Evidence Pursuant to Federal Rules of Evidence 201(c)(2) and 902(1), filed October 6, 2019 (Doc. 142)("Exhibit MIL"); and Paul Donisthorpe's Motion to Set Aside Clerk's Entry of Default and Memorandum in Support Thereof, filed December 2, 2019 (Doc. 164)("Set Aside Motion").  The primary issues are: (i) whether, and to what extent, Defendants Christopher Moya, Paul Donisthorpe, Helen Bennett and Liane Kerr have coverage under the Declarations, Policy Form and Endorsements to Specified Professions Professional Liability Insurance Policy No. EO865165 issued by Evanston Insurance Company to Desert State Life Management (undated), admitted October 7, 2020, at trial as Evanston Insurance's Ex. 1 ("Insurance Policy"); (ii) whether the Court should permit Donisthorpe to testify via telephone at trial from prison; (iii) whether the Court should permit Moya to testify as an expert at trial; (iv) whether the Court should admit the Insurance Policy and the June 4 Rescission Letter at trial; (v) whether the Court may take judicial notice of certain exhibits related to Donisthorpe's criminal proceedings; and (vi) whether the Court should set aside Donisthorpe's entry of default.  The Court concludes that: (i) Evanston Insurance's case against Ms. Kerr is stayed, Moya and Ms. Bennett have insurance under the Insurance Policy for claims alleging negligence, and Donisthorpe does not have coverage, because he does not satisfy the Insurance Policy's condition precedent; (ii) Donisthorpe may testify by telephone at trial; (iii) Moya's proposed expert testimony concerns legal issues, and the Court will not permit this testimony; (iv) the Court will admit the Insurance Policy and the June 4 Rescission Letter; (v) while Court will admit many of the documents related to Donisthorpe's criminal proceedings, it will not admit will Donisthorpe's criminal information, his sentencing hearing transcript, or his plea agreements for their truth.  for their truth; and (vi) the Court will set aside Donisthorpe's entry of default.

# FINDINGS OF FACT

All parties have submitted proposed findings of fact.  See Christopher Moya's Proposed Findings of Fact and Conclusions of Law, filed December 2, 2019 (Doc. 162)("Moya Brief"); Paul A. Donisthorpe's Proposed Findings of Fact and Conclusions of Law, filed December 2, 2019 (Doc. 165)("Donisthorpe Brief"); Former Clients of DSLM's Proposed Findings of Fact and Conclusions of Law, filed December 2, 2019 (Doc. 166)("Client Brief"); Defendant L. Helen Bennett's Proposed Findings of Fact and Conclusions of Law, filed December 2, 2019 (Doc. 167)("Bennett Brief"); Plaintiff's Proposed Findings of Fact and Conclusions of Law, filed December 2, 2019 (Doc. 168)("Evanston Insurance Brief").  The Court has carefully considered all five sets of proposed findings and accepts some of the findings, rejects some, and finds some facts that no party brought to its attention.  The Court sets forth its findings below.

## 1.    General Background.

1.    Desert State Life Management is a non-profit trust corporation that acts as a trustee for disabled individuals.  See Trial Transcript at 522:12 (taken Oct. 8, 2019), filed October 22, 2019 (Doc. 159)("Oct. 8 Tr.")(Donisthorpe); id. at 521:22-24 (Conway).[1]

---

[1]Evanston Insurance filed a motion in limine to permit Donisthorpe to testify from prison. See Telephone MIL at 1.  In the Telephone MIL, Evanston Insurance states that it wishes to call Donisthorpe, but that he is incarcerated in Federal Correctional Institute Englewood in Englewood, Colorado.  See Telephone MIL at 2.  It states that FCI Englewood "does not have the capability for any method of transmission other than audio."  Telephone MIL at 2.  It also states that it is not possible for a court reporter or videographer to enter Englewood FCI.  See Telephone MIL at 2. Evanston Insurance therefore states that "good cause exists" to allow Donisthorpe to testify via audio teleconference.  Telephone MIL at 2.

The former clients responded to the Telephone MIL.  See The Former DSLM Clients' Response in Opposition of Evanston's Motion in Limine to Allow Defendant Donisthorpe to Testify From Prison by Audio Teleconference at 1, filed October 6, 2019 (Doc. 145)("MIL Response").  The former clients state that "'[t]he credibility of any witness who takes the stand is always an issue at trial.'"  MIL Response at 2 (quoting Montoya v. Sheldon, 898 F. Supp. 3d 1259, 1275 (D.N.M. 2012)(Browning, J.)).  They assert that live testimony is always more effective for

credibility and demeanor determinations, and audio testimony will not help the Court make these determinations. See MIL Response at 2-3. Further, they argue that Evanston Insurance has not shown good cause for its motion. See MIL Response at 3. They contend that Evanston Insurance could have issued a habeas subpoena and obtained a writ of habeas corpus, which would have allowed the parties to examine him and put documents before him. See MIL Response at 3. The former clients argue that this failure to obtain a writ of habeas corpus does not constitute good cause. See MIL Response at 3. Before trial, the Court took the Donsithorpe MIL under advisement. See Oct. 7 Tr. at 20:14-16 (Court). The Court stated that it would allow Donisthorpe to testify but not rule on the testimony's admissibility until it prepared its findings of fact and conclusions of law from the trial. See Oct. 7 Tr. at 19:4-8 (Court).

Rule 43 of the Federal Rules of Civil Procedure provides that witness testimony "must be taken in open court unless a federal statute, the Federal Rules of Evidence, the [Federal Rules of Civil Procedure], or other rules adopted by the Supreme Court provide otherwise." Fed. R. Civ. P. 43(a). If a party shows good cause in compelling circumstances, the court "may permit testimony in open court by contemporaneous transmission from a different location." Fed. R. Civ. P. 43(a). "Transmission cannot be justified merely by showing that it is inconvenient for the witness to attend the trial." Fed. R. Civ. P. 43 advisory committee notes to 1996 amendment. See Legacy Church, Inc. v. Kunkel, No. CV 20-0327 JB\SCY, _ F. Supp. 3d _, 2020 WL 3963764, at *72 (D.N.M. July 13, 2020)(Browning, J.)(permitting a witness to testify telephonically at a preliminary injunction evidentiary hearing because of her concerns over COVID-19). A court's decision on permitting remote testimony is reviewed for abuse of discretion, see Eller v. Trans Union, LLC, 739 F.3d 467, 477 (10th Cir. 2013), and "the question of whether good cause and compelling circumstances exist such that remote testimony should be permitted is a case-specific question," In re RFC & ResCap Liquidating Tr. Action, 444 F. Supp. 3d 967 (D. Minn. 2020)(Nelson, J.).

Good cause is harder to prove where parties could have foreseen witness unavailability. The advisory committee notes to rule 43 remark that "[t]he most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but remains able to testify from a different place." Fed. R. Civ. P. 43, Notes of Advisory Committee on Rules -- 1996 Amendment. There was no unexpected reason in this case for Donisthorpe's inability to appear in court. The Court sentenced Donisthorpe to 144 months in prison on February 22, 2019, over seven months before the trial in this case. See FOF ¶ 103, at 30. No unforeseeable case development required Evanston Insurance to scramble late in the case to secure Donisthorpe's testimony where it did not need to do things to secure the testimony earlier. See Plaintiff Evanston's Witness List at 2, filed September 6, 2019 (Doc. 122)(identifying Donisthorpe as a witness for Evanston Insurance one month before the Telephone MIL); Fed. R. Civ. P. 43, Notes of Advisory Committee on Rules -- 1996 Amendment ("An unforeseen need for the testimony of a remote witness that arises during trial, however, may establish good cause and compelling circumstances"). Without pointing to unforeseen circumstances, the advisory committee notes to rule 43 say that the party seeking telephonic testimony -- here, Evanston Insurance -- should have "special difficulty in showing good cause and the compelling nature of the circumstances." Fed. R. Civ. P. 43, Notes of Advisory Committee on Rules -- 1996 Amendment. See Alcala v. Hernandez, No. 4:14-CV-04176-RBH, 2015 WL 1893291, at *2 (D.S.C. April 27, 2015)(Harwell, J.)(permitting remote testimony where the

2.       For all relevant times, Paul A. Donisthorpe served as Desert State's Chief Executive

Officer, including the time period from 2008 to the end of March, 2017.  See Oct. 8 tr. at 519:5-

---

witness would likely be unable to obtain a visa to enter the country); Avalanche Equip., LLC v. Williams-S. Co., LLC, No. 13-CV-2827-BNB-MJW, 2014 WL 12676225, at *2 (D. Colo. Oct. 28, 2014)(Boland, M.J.)(concluding that good cause did not exist where witness testimony was expected, their distant location was not a surprise, and there was no reason why they were not deposed).  It is within a Court's discretion to deny remote testimony for foreseen but extraordinary inconveniences.  See Eller v. Trans Union, LLC, 739 F.3d at 478-79 (concluding that it was not an abuse of discretion to prevent a witness from testifying when that witness was required to attend a court-martial proceeding in Turkey during trial, because the court-martial proceeding was scheduled in advance and the plaintiff could have arranged alternative arrangements for testimony).

The Court will grant the Telephone MIL and exercise its discretion to admit Donisthorpe's remote testimony.  The good cause shown here, that the federal prison in which Donisthorpe is housed does not permit Evanston Insurance to relay Donisthorpe's testimony via a videoconference system, is a strong reason, because while this difficulty is a foreseeable problem when calling federal prisoners as witnesses, it is a particularly rigid problem.  Several additional factors also convince the Court to admit Donisthorpe's testimony.  First, the case was tried before the bench and not to a jury.  The Court oversaw Donisthorpe's criminal case and sentencing through which it gained considerable familiarity with Donisthorpe.  It therefore adequately can make any credibility determinations by hearing, rather than seeing, Donisthorpe's live testimony. Further, Donisthorpe's testimony was largely rote affirmation of statements he had made previously before this and other courts in the District of New Mexico.[1]  See Oct. 8 Tr. 518:15-522:12 (Conway, Donisthorpe); id. at 522:15-20 (Jacobus)(objecting to Donisthorpe's testimony as cumulative); id at 523:1-526:9 (Conway, Donisthorpe); id. at 527:18-532:12 (Conway, Donisthorpe).  See also Fed. R. Civ. P. 43, Notes of Advisory Committee on Rules -- 1996 Amendment ("Audio transmission without video images may be sufficient in some circumstances, particularly as to less important testimony.").  Further, Donisthorpe presented his testimony under oath, see Oct. 8 Tr. at 518:1-3, and he was subject to cross-examination, see Oct. 8 Tr. at 539:10. Because of Donisthorpe's confinement, the Court is unconcerned about "influence by persons present with the witness" and accurately identifying him.  Fed. R. Civ. P. 43, Notes of Advisory Committee on Rules -- 1996 Amendment.  Although "video transmission ordinarily should be preferred" where a party requests the ability to present remote testimony, Garza-Castillo v. Guajardo-Ochoa, No. 2:10-CV-00359-LDG, 2012 WL 15220, at *2 (D. Nev. Jan. 4, 2012)(George, J.), FCI Englewood currently does not have this capability, and the rules permit telephonic testimony, see Donisthorpe MIL at 2.  See also Fed. R. Civ. P. 43, Notes of Advisory Committee on Rules -- 1996 Amendment ("No attempt is made to specify the means of transmission that may be used.").  Although it might reach a different conclusion if this was a jury trial and Donisthorpe's testimony was more impactful, the Court will grant the Telephone MIL and admit Donisthorpe's trial testimony.

24 (Conway, Donisthorpe); id. at 378:9-20 (Moya); id. at 378:23-379:1 (Moya).[2]

3.     In his capacity as CEO, Donisthorpe was entrusted to provide trustee services and representative payee services to more than seventy-five Desert State clients.  See Oct. 8 Tr. at 521:24-522:1 (Conway); id. at 522:12 (Donisthorpe).

4.     Beginning in 2009 or earlier, and continuing through 2016, Donisthorpe engaged in a scheme in which he knowingly and intentionally misappropriated, and converted, Desert State

---

[2]After the parties filed for summary judgment, Evanston Insurance filed a motion to strike an affidavit that Moya attaches to the Moya MSJ and to limit Moya's testimony at trial.  See Expert Motion at 1.  In the Expert Motion, Evanston Insurance argues that Moya's affidavit and expert reports, as well as his proposed testimony are irrelevant.  See Expert Motion at 7-8.  It argues further that Moya's proposed testimony that, but for the non-intentional acts of Desert State's directors, Desert State clients would not have lost money is improper, because "opinions on these matters will not assist the jury or factfinder."  Expert Motion at 11.  Moya stated at the pre-trial conference that he would testify to the fiduciary obligation of directors and officers and whether this standard was followed.  See Oct. 3 Tr. at 30:1-4 (Rubin).  At the pretrial conference, the Court stated:

> I don't see much that Mr. Moya can say from an expert standpoint.  I think he's a fact witness here.  And if he wants to testify as to what he did, and his mental process as to why he did what he did.  But as far as coming in and saying -- you know, offering substantive testimony about Kerr and Bennett being negligent, . . . I don't think he can come in and offer expert opinion on that.  I think that's for the Court to decide.

> Certainly, in closing arguments, I think, you know, Mr. Moya is free to argue what he wants about the negligence of Kerr and Bennett, and other things.  But, as a general matter, I didn't see a whole lot that he could offer as far as an expert witness.

Oct. 3 Tr. at 28:3-12 (Court).  It reiterated that, while it would not exclude Moya as a witness in the case, it would not permit testimony on whether certain parties were negligent.  See Oct. 3 Tr. at 40:18-41:22 (Court).  It stated that it would grant the Expert Motion, and the Expert Motion is now granted.  See Oct. 3 Tr. at 41:23-42:6 (Court).  Moya intends to make legal arguments about the standards that should apply to trust company employees.  Whether someone is negligent or breached a duty are areas comfortably within the Court's own expertise.  It does not require an expert for the Court to make these determinations. Moya may, however, testify as an ordinary fact witness.

client funds for his own personal use.  <u>See</u> Oct. 8 Tr. at 523:18-524:11 (Conway, Donisthorpe); Trial Transcript at 132:4-23 (taken Oct. 7, 2019), filed October 22, 2019 (Doc. 160)("Oct. 7 Tr.")(Moya).

5.     Donisthorpe's scheme involved transferring client funds from individual client investment accounts at various financial institutions, including the Vanguard Group and the Charles Schwab Corporation, to pooled Desert State accounts in which the individual client's fund were commingled with other monies entrusted to Desert State.  <u>See</u> Oct. 8 Tr. at 523:23-524:11 (Conway, Donisthorpe); Oct. 7 Tr. at 124:17-20 (Moya); <u>id.</u> at 132:8-23 (Moya).

6.      Donisthorpe then transferred the commingled client funds into non-Desert State accounts that he controlled.  <u>See</u> Oct. 8 Tr. at 523:23-524:11 (Conway, Donisthorpe); Oct. 7 Tr. at 124:17-20 (Moya); <u>id.</u> at 132:8-23 (Moya).

7.     Donisthorpe then diverted the client funds from the non-Desert State accounts to other bank accounts, credit card accounts and mortgages, none of which were associated with Desert State.  <u>See</u> Oct. 8 Tr. at 523:23-524:11 (Conway, Donisthorpe); Oct. 7 Tr. at 124:17-20 (Moya); <u>id.</u> at 132:8-23 (Moya).

8.     Donisthorpe spent the money from his Desert State scheme to purchase cattle and a ranch in Texas, a vacation home, vehicles, and a custom horse trailer, a trip to the World Series, and to pay off personal debts.  <u>See</u> Oct. 7 Tr. at 134:21-135:10 (Conway, Moya); Oct. 8 Tr. at 524:4-11 (Donisthorpe).

9.     Donisthorpe also transferred funds between Desert State client accounts.  <u>See</u> Oct. 7 Tr. at 137:10-17 (Moya)(testifying that Donisthorpe's transfers were occasionally done to "rob[] Peter to pay Paul, if you will, in DSLM").

10.     Donisthorpe was the only one who had access to Desert State's investment accounts

until March, 2107.  See Oct. 7 Tr. at 225:25-226:11 (Moya).

11.     Between March or April of 2017 and August, 2017, Scott Kominiak had access to Desert State's investment accounts.  See Oct. 7 Tr. at 228:2-4 (Moya).

12.     Through his scheme, Donisthorpe misappropriated and converted over $4.9 million in Desert State client funds for his own personal use.  See Oct. 8 Tr. at 382:8-15 (Borders, Moya).

13.     $4,933,626.58 in funds from Desert State client accounts was unlawfully taken. See Financial Institutions Division v. Desert State Life Mgmt., et al., Receiver's January, 2018, Monthly Report at 1-2, No. D-202-CV-2017-03838, (Bernalillo Cty., 2d Jud. Dist., N.M.), filed January 5, 2018, admitted October 7, 2019, at trial as Moya Ex. V ("Moya V"); Oct. 8 Tr. at 382:8-15 (Borders, Moya).

14.     From at least 2009 through 2016, Donisthorpe knowingly transferred client funds from individual client investment accounts to Desert State accounts that he controlled and then converted those client funds to his own use.  See Oct. 8 Tr. at 523:18-524:11 (Conway, Donisthorpe).

15.     Donisthorpe made the fraudulent transfers knowing that he was not entitled to the funds, knowing that the clients were not informed of the transfers, and knowing that the clients would not have approved of the transfers if they had been informed.  See Oct. 8 Tr. at 530:20-531:7 (Conway, Donisthorpe).

16.     Donisthorpe presented false and fraudulent investment and disbursement reports to the Desert State board of directors, and presenting materially false and fraudulent documents to the Financial Institutions Division of the New Mexico Regulation and Licensing Department ("FID") to conceal that he had fraudulently obtained client funds.  See Oct. 8 Tr. at 531:8-24 (Conway, Donisthorpe); id. at 530:8-14 (Conway, Donisthorpe); Oct. 7 Tr. at 328:18-329:11

(Moya, Sanders).

## 2.     The Application.

17.     On October 10, 2016, Donisthorpe, in his capacity as Desert State's CEO, submitted an application for professional liability insurance coverage to Evanston Insurance.  See Policy Application at 4, admitted October 7, 2019 at trial as Evanston Insurance's Ex. 14 ("Application"); Oct. 7 Tr. at 39:1-5.

18.     Evanston Insurance uses the same application form for both renewals and new applications, see Application at 1, and its procedures for initially issuing a policy and renewing a policy are very similar, see Oct. 7 Tr. at 92:2-17 (Butler, Rubin).

Donisthorpe did not submit the Application directly to Evanston Insurance; rather, he forwarded it to Desert State's insurance broker, Western Assurance, via email.  See Trial Transcript at 670:17-18 (taken Oct. 9, 2019), filed October 22, 2019 (Doc. 161)("Oct. 9 Tr.")(Young); id. at 672:17-22 (Young); id. at 685:21-22 (Young).

19.     Donisthorpe did not mail the original of the Application to Western Assurance.  See Oct. 9 Tr. at 685:23-686:5 (Borders, Young).

20.     Western Assurance retained a legible copy of the Application that it received from Donisthorpe in its files.  See Oct. 9 Tr. at 679:14-15 (Young); id. at 687:14 (Young).

21.     Western Assurance also did not forward the Application directly to Evanston Insurance; rather, it forwarded it to ADCO General Corporation, a surplus lines insurance broker[3]

---

[3]Surplus lines brokers are insurance brokers who match insurers who are not admitted to do business in a state with those inside the state who need the coverage the non-admitted insurer provides.  See N.M. Stat. Ann. § 59A-14-2 (defining surplus line insurance terms); Surplus Lines Broker, IRMI, https://www.irmi.com/term/insurance-definitions/surplus-lines-broker (last accessed September 1, 2020).

to secure a quote for a policy.  See Oct. 9 Tr. at 672:14-19 (Young); Oct. 7 Tr. at 26:15-19 (Butler);

id. at 34:12-16 (Butler).

22.    Donisthorpe, when he submitted the Application, answered "no" to the following

question:

> Is the applicant any principal, partner, owner, officer, director, employee, manager or managing member of the Applicant or any person or organization proposed for this insurance aware of any fact, circumstance, situation, incident, or allegation of negligence or wrongdoing, which might afford grounds for any claim such as would fall under the proposed insurance?

Application at 3.

23.    The Application also included the following notice:

**NOTICE TO THE APPLICANT -- PLEASE READ CAREFULLY**

> No fact, circumstance or situation indicating the probability of a claim or action for which coverage may be afforded by the proposed insurance is now known by any person(s) or entity(ies) proposed for this insurance other than that which is disclosed in this application.  It is agreed by all concerned that if there be knowledge of any such fact, circumstance or situation, any claim subsequently emanating therefrom shall be excluded from coverage under the proposed.

> * * *

> This application, information submitted with this application and all previous applications and material changes thereto of which the underwriting manager, Company and/or affiliates thereof receives notice is on file with the underwriting manager, Company and/or affiliates thereof and is considered physically attached to and part of the policy if used.  The underwriting manager, Company and/or affiliates thereof will have relied upon this application and all such attachments in issuing the policy.

> * * *

**WARRANTY**

> I/We warrant to the Company, that I/We understand and accept the notice stated above and that the information contained herein is true and that it shall be the basis of the policy Band deemed incorporated therein, should the Company evidence its acceptance of this application by issuance of a policy.  I/We authorize the release of claim information from any prior insurer to the underwriting manager, Company and/or affiliates thereof.

- 10 -

Application at 4.

24.     Paul Donisthorpe signed the Application.  See Application at 5.

25.     At the time Donisthorpe completed the Application, he knew that his scheme to misappropriate and convert over $4.9 million in Desert State client funds exposed Desert State to lawsuits.  See Oct. 8 Tr. at 537:8-17 (Conway, Donisthorpe)

26.     Based on the representations and warranties that Donisthorpe made in the application, Evanston Insurance issued the Insurance Policy to Desert State.  See Oct. 7 Tr. at 37:12-13; 43:14-20 (Butler); Insurance Policy at 1.[4]

27.     Had Evanston Insurance been aware of Donisthorpe's commingling, misappropriation, and conversion of Desert State client funds, or even if funds were simply missing from Desert State client accounts, it would not have issued the Insurance Policy.  See Oct. 7 Tr. at 42:18-43:5; id. at 44:6-12 (Butler).

28.     Evanston Insurance did not investigate the representations that Donisthorpe made in the Application before renewing the Insurance Policy.  See Oct. 8 Tr. at 499:5-500:2 (Fischer, Sanders).

**3.     Attachment.**

29.     Evanston Insurance relied on ADCO General and Western Assurance to deliver the Insurance Policy to the insureds.  See Oct. 7 Tr. at 61:6-24 (Borders, Butler); id. at 72:17-25 (Butler, Jacobus); id. at 81:17-82:7 (Butler, Jacobus).

---

[4]Evanston Insurance filed a motion in limine to admit evidence under rule 402 of the Federal Rules of Evidence.  See 402 MIL at 1.  The 402 MIL requests admission of the Insurance Policy and of the June 4 Rescission Letter.  The Defendants did not oppose the 402 MIL.  See Oct. 7 Tr. at 16:13-15 (Davis); id. at 16:23 (Davis).  Both the Insurance Policy and the June 4 Rescission Letter are important, relevant pieces of evidence, there are no objections to admission of either document, and so the Court grants the 402 MIL.

30.     Western Assurance received an illegible copy of Desert State's Application from ADCO General.  See Oct. 9 Tr. at 686:12-21 (Borders, Young).

31.     Because Western Assurance received an illegible copy of the Application, Western Assurance did not attach or endorse any copy of the application for the Insurance Policy when it mailed the Insurance Policy to Desert State, and the Application was not otherwise attached or endorsed to the Insurance Policy.  See Oct. 9 Tr. at 686:12-687:22 (Borders, Young).

32.     Once the Insurance Policy was issued, Evanston Insurance transmitted the Insurance Policy, which included the Application, to ADCO General.  See Email from Markel Policy Issuance Department to Stacy Beakes at ADCO (dated Nov. 8, 2016), admitted October 7, 2019, at trial as Evanston Insurance Ex. 20 ("Policy transmission email").

33.      ADCO General then forwarded the Insurance Policy, which included the Application, to Desert State's insurance agent, Western Assurance, via email.  See Oct. 9 tr. at 680:23-681:3 (Borders, Young).

34.     Western Assurance printed out a copy of the Insurance Policy and the Application, which was transmitted as a separate document, and determined that the Application it printed was illegible.  See Oct. 9 Tr. at 689:10-20 (Graham, Young); id. at 686:17-18 (Young).

35.     Western Assurance did not ask Evanston Insurance or ADCO General for a legible copy of the Application, because it already had a legible copy in its files.  See Oct. 9 Tr. at 686:12-687:3 (Borders, Young).

36.     Western Assurance then mailed the Insurance Policy without the Application to Desert State.  See Oct. 9 Tr. at 689:21-24 (Graham, Young).

37.     Western Assurance, without any instruction from Evanston Insurance or ADCO General, decided to omit the Application from the Insurance Policy it transmitted to Desert State,

because the copy of the Application that it had printed was illegible, and because it was aware that Desert State had previously emailed the Application and presumably retained a copy.  See Oct. 9 Tr. at 689:21-690:5 (Graham, Young)

      **4.**     **The Insurance Policy.**

     38.     Evanston Insurance insured Desert State against certain claims of third parties against Desert State through either Policy No. EO865156 or through an insurance policy issued before the Insurance Policy that is identical to the Insurance Policy in all ways material to the issues in this case.  See Insurance Policy at 15;[5] Oct. 7 Tr. at 27:2-29:6 (Borders, Butler).

     39.     The Insurance Policy insures Desert State from November 1, 2016, to November 1, 2017.  See Insurance Policy at 15; Oct. 7 Tr. at 27:23-28:15 (Borders, Butler).

     40.     The Insurance Policy is a renewal policy to insure risks of Desert State and its employees, officers, and directors that Evanston Insurance had insured in previous years.  See Oct. 7 Tr. at 29:2-21 (Borders, Butler); Insurance Policy at 3.

     41.     The Insurance Policy is a claims-made insurance policy, which means that the claim must occur and be reported during the policy period.  See Oct. 7 Tr. at 28:13-18 (Borders, Butler).

     42.     The Insurance Policy is a surplus lines policy.  See Oct. 7 Tr. at 26:10 (Butler)

     43.     The Insurance Policy does not contain any language or declaration regarding its status as a surplus lines policy in type-written 10-point font.  See Policy 1-48.

     44.     The Insurance Policy provides that "[t]he Declarations, Common Policy Conditions, Coverage Part(s), and any written endorsements and any application(s) shall be

---

[5]The Insurance Policy was the only insurance policy that the Court admitted into evidence.  See Clerk's Minutes at 7-9, filed October 7, 2019 (Doc. 155).

deemed to be a single unitary contract." Insurance Policy at 9.

45. The Common Policy Provisions of the Insurance Policy include the following language:

> REPRESENTATIONS
>
> By acceptance of this policy, the Insureds agree as follows:
>
> 1. That the information and statements contained in the application(s) are the basis of this policy and are to be considered as incorporated into and constituting a part of this policy; and
>
> 2. That the information and statements contained in the application(s) are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the Company under this policy, and that this policy is issued in reliance upon the truth of such representations.

Insurance Policy at 9.

46. The Insurance Policy provides:

The unqualified word "Insured," either in the singular or plural, means:

1. The Named Insured herein defined as the person(s) or organization(s) stated in Item 1. of the Declarations;

2. Any past or current principal, partner, officer, director, trustee or shareholder of the Named Insured stated in Item 1. of the Declarations solely while acting on behalf of the Named Insured and within the scope of their duties as such;

3. Any past or current employee, including a leased employee, of the Named Insured stated in Item 1. of the Declarations solely while acting on behalf of the Named Insured and within the scope of their duties as such;

4. Any natural person who is an independent contractor of the Named Insured solely while acting within their professional capacity on behalf of the Named Insured;

5. If the Named Insured stated in Item 1. of the Declarations is a limited liability company, the limited liability company so stated, any past or current manager thereof, solely while acting on behalf of the Named Insured and within the scope of their duties as manager of such limited liability company and any past or

current member thereof, solely while acting on behalf of the Named Insured and within the scope of their duties as a member of such limited liability company;

6.      The heirs, executors, administrators, assigns and legal representatives of each Insured in Items A.1.-5. above in the event of death, incapacity or bankruptcy of each such Insured but only for each such Insured's liability as is otherwise covered herein;

7.      The lawful spouse or Domestic Partner of each Insured in Item A.2. above, but only for each such Insured's liability as is otherwise covered herein.

Insurance Policy at 14.

47.        The Insurance Policy identifies the "Named Insured" as Desert State.

Insurance Policy at 3.

48.     The Insurance Policy defines the term "Claim" as follows:

Claim means the Insured's receipt of:

1.      A written demand for money damages or remedial Specified Professional Services involving this Coverage Part, including a written demand that the Insured toll or waive a statute of limitations; or

2.       The service of suit or the institution of arbitration proceedings against the Insured;

Provided, however, Claim shall not include Disciplinary Proceeding.

Insurance Policy at 16.

49.     The Insurance Policy defines the term "Specified Professional Services" as "those services stated in Item 4 of the Declarations rendered for others for a fee."  Insurance Policy at 18.

50.      Item 4 of the Insurance Policy Declarations described the Specified Professional Services of Desert State as "Financial Case Management Services to Trust Accounts and Conservatorships."  Insurance Policy at 4.

51.     The Insurance Policy defines the term "Wrongful Act" as "a negligent act, error or omission in Specified Professional Services."  Insurance Policy at 19.

- 15 -

52.     The Insurance Policy's Insuring Agreement, Coverage A -- Professional Liability

Coverage provides:

Coverage A -- Professional Liability Coverage -- Claims Made Coverage:

The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 5.A. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to the Section Claims A., Claims Reporting provision,

By reason of:

1.      A Wrongful Act; or

2.      A Personal Injury;

In the Performance of Specified Professional Services rendered or that should have been rendered by the Insured or by any person for whose Wrongful Act or Personal Injury the Insured is legally responsible,

Provided:

a.      The entirety of such Wrongful Act(s) or Personal Injury(ies) happens during the Policy Period or on or after the applicable Retroactive Date stated in Item 5.A. of the Declarations and before the end of the Policy Period; and

b.      Prior to the effective date of this Coverage Part the Insured had no knowledge of such Wrongful Act(s) or Personal Injury(ies) or any fact, circumstance, situation or incident, which may have led a reasonable person in the Insured's position to conclude that a Claim was likely.

Insurance Policy at 15.

53.     The Insurance Policy's Multiple Insureds, Claims and Claimants provision states:

The inclusion herein of more than one Insured in any Claim or the making of Claims by more than one person or organization shall not operate to increase the Limits of Liability stated in Item 5.A of the Declarations.  More than one Claim arising out of a single Wrongful Act, Personal Injury or offense or a series of related Wrongful Acts, Personal Injuries or offenses shall be considered a single Claim.  Such single

Claim, whenever made, shall be treated as a single Claim. Such single Claim, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such Wrongful Act, Personal Injury or offense is made.

Insurance Policy at 22.

54.    The Insurance Policy defines "Personal Injury" as:

1.    Libel, slander or defamation;

2.    Invasion of or infringement of the right of privacy or publicity;

3.    Malicious prosecution or abuse of process; or

4.    Humiliation or infliction of emotional distress;

Committed in the performance of Specified Professional Services."

Insurance Policy at 18.

55.    Exclusion J of the Insurance Policy provides:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any Claim or Supplementary Payment . . .

J.    Based upon, arising out of, or in any way involving:

1.    Conduct of the Insured or at the Insured's direction that is intentional, willful, dishonest or fraudulent or that constitutes a willful violation of any statute or regulation; provided, however, this exclusion shall not apply to:

a.    The strictly vicarious liability of any Insured for the intentional, willful, dishonest or fraudulent conduct of another Insured that constitutes a willful violation of any statute or regulation; or

b.    Claim Expenses incurred until an allegation is adjudicated through a finding by a trier-of-fact to be intentional, willful, dishonest or fraudulent or a willful violation of any statute or regulation . . . .

Insurance Policy at 20.

56.    The Insurance Policy's Exclusion M provides that the Insurance Policy does not

cover any claim or supplementary payment "[b]ased upon or arising out of any conversion,

misappropriation, commingling or defalcation of funds or property."  Insurance Policy at 20.

57.    Evanston Insurance did not send the Insurance Policy directly to Desert State or to any of the other insureds.  See Oct. 7 Tr. at 61:6-24 (Borders, Butler).

**5.    The State Complaint.**

58.    The Desert State former clients filed an Amended Class Action Complaint on December 17, 2017, in a case styled Cameron Graham as Trustee for Andrew Graham et al., v. DSLM, case no. D-202-CV-2018-04655 (County of Bernalillo, 2d Judicial District Court, N.M.), alleging, among other things, claims for negligence and gross negligence against Desert State, Donisthorpe, and Ms. Bennett; breach of fiduciary duty against Desert State, Donisthrope, and Ms. Bennett; conversion against Desert State and Donisthorpe; violations of the New Mexico Uniform Trust Code, N.M. Stat. Ann. § 46A, against Desert State, Donisthorpe, and Ms. Bennett; violation of the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 to -24, against Desert State and Donisthorpe; professional negligence against Kominiak; and unjust enrichment against Ms. Kerr.  See Amended Class Action Complaint at 22-31 (dated December 17, 2018), admitted October 9, 2019, at trial as Evanston Insurance's Ex. 2 ("State Complaint").[6]

---

[6]Evanston Insurance filed a motion in limine to admit evidence under rules 201(c)(2) and 902(1) of the Federal Rules of Evidence.  See Exhibit MIL at 1.  It filed separately a brief in support of this motion.  See Memorandum in Support of Plaintiff's Motion to Take Judicial Notice of and Admit Certain Evidence Pursuant to Federal Rules of Evidence 201(c)(2) and 902(1), filed October 6, 2019 (Doc.143)("MIL Brief").  Evanston Insurance seeks the admission of Exhibits 2, 4-10.  See Exhibit MIL at 2-3.  These are: (i) a certified copy of the State Complaint; (ii) a certified copy of the criminal information in United States v. Donisthorpe; (iii) a certified copy of the waiver of an indictment in United States v. Donisthorpe; (iv) the plea agreement in United States v. Donisthorpe; (v) the amended plea agreement in United States v. Donisthorpe; (vi) the clerk's minutes for Donisthorpe's plea hearing; (vii) the transcript of Donisthorpe's sentencing hearing; and (viii) Donisthorpe's Judgment in a Criminal Case.  See Exhibit MIL at 2-3.  Evanston Insurance's argument in favor of admission is that these exhibits "provide the Court with judicial notice of an adjudicative fact pursuant to Fed. R. Evid. 201 and are self-authenticating documents." Exhibit MIL at 3.  The defendants have not responded to the Exhibit MIL.

At trial, the Court admitted: (i) a certified copy of the State Complaint, see Oct. 7 Tr. at 7:11-12 (Court); (ii) Donisthorpe's Judgment in a Criminal Case, see Oct. 9 Tr. at 810:13-18 (Court); (iii) the certified copy of the waiver of an indictment in United States v. Donisthorpe, see Oct. 9 Tr. at 811:20-22 (Court); (iv) the clerk's minutes for Donisthorpe's plea hearing, see Oct. 9 Tr. at 812:5-7 (Court); and (v) Donisthorpe's Judgment in a Criminal Case, see Oct. 7 Tr. at 14:9 (Court). The Court admitted the following documents into evidence while taking the truth of their statements under advisement: (i) the Information, filed November 27, 2017 (Doc. 1), in United States v. Donisthorpe, No. CR 17-3311, see Oct. 9 Tr. at 811:11-16 (Court); Oct. 7 Tr. at 10:5-9 (Court); (ii) the Plea Agreement in United States v. Donisthorpe, see Oct. 7 Tr. at 11:3-11 (Court); (iii) the Amended Plea Agreement in United States v. Donisthorpe, see Oct. 7 Tr. at 13:11-13 (Court); (iv) the transcript of Donisthorpe's sentencing hearing, see Oct. 7 Tr. at 14:2-4 (Court). The Court concludes that it will not admit the criminal information, the transcript from Donisthorpe's sentencing hearing, or Donisthorpe's plea agreements for their truth. It therefore grants in part and denies in part the Exhibit MIL.

Donisthorpe's criminal information is admissible, but not for the truth of the matter stated in it. The criminal information represents the United States' allegations of Donisthorpe's misconduct, and not an adjudication or acceptance of his guilt. See Levinson v. Westport Nat. Bank, No. 3:09-CV-1955 VLB, 2013 WL 2181042, at *1-2 (D. Conn. May 20, 2013)(Bryant, J.); Benavides v. City of Arvin, No. F CV 12-0405 LJO GSA, 2012 WL 1910259, at *3 (E.D. Cal. May 25, 2012)(O'Neill, J.)("[T]he allegedly indisputable facts contained in . . . the criminal information . . . are subject to hearsay objections, and do not rise to the 'high degree of indisputability' required for judicial notice for their truth."). The Court made no finding concerning these allegations and so the Court will not label the criminal information's statements as "adjudicative" facts appropriate for judicial notice. Fed. R. Evid. 201, Notes of Advisory Committee on Proposed Rules. While the criminal information is admissible for the fact that the United States charged Donisthorpe with these crimes for the reasons stated in the criminal information, it is not admissible for the fact that Donisthorpe committed the acts alleged.

The transcript of Donisthorpe's sentencing hearing is also hearsay without exception. See United States v. Williford, 764 F.2d 1493, 1503 (11th Cir. 1985); Ladson v. Ulltra East Parking Corp., 878 F. Supp. 25, 29 (S.D.N.Y. 1995)(Kaplan, J.). At the sentencing hearing, the United States and Moya spoke at length about Donisthorpe's misconduct. See Draft Transcript of Sentencing Hearing at 7:23-25:7 (taken Feb. 22, 2019)(Court, Moya, Pena)("Sentencing Tr.").[6] Next, the Court heard from Donisthorpe's victims. See Sentencing Tr. at 25:15-60:18. Donisthorpe spoke briefly before the Court imposed the sentence. See Sentencing Tr. at 70:20-71:21 (Donisthorpe); id. at 72:5-13 (Donisthorpe); id. at 72:25-73:8 (Donisthorpe). Sentencing proceedings are emotional affairs, particularly in a case such as Donisthorpe's where so many victims were affected. Victims may exaggerate their harms and the defendants' counsel and the defendant may minimize any bad conduct. A lot is going on at a sentencing, and posturing is often the norm. They do not always represent reliable sources of fact such that the Court will take judicial notice of the statements made there.

The Court will not take judicial notice of any facts at these proceedings. Rule 201 of the Federal Rules of Evidence allows a court to take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f).  See Leon v. Fedex Ground Package Sys., Inc., 163 F. Supp. 3d 1050, 1066 (D.N.M. 2016)(Browning, J.).  "Adjudicative facts are simply the facts of the particular case."  United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201); Simon v. Taylor, 252 F. Supp. 3d 1196, 1238 (D.N.M. 2017)(Browning, J.)).  Neither of these factual categories applies to Donisthorpe's sentencing hearing.  The Court does not accept as true all statements at sentencing hearings, such that statements from victims, defendants, and counsel become facts "generally known within the territorial jurisdiction of the trial court."  Fed. R. Evid. 201(b)(1).  This is precisely because the accuracy of such statements can "reasonably be questioned."  Fed. R. Evid. 201(b)(2).

Finally, the Court will not admit those sections of either Donisthorpe's plea agreement or his amended plea agreement that contain Donisthorpe's admissions for their truth.  Evanston Insurance argues that these documents "fall squarely within" rule 803(22) of the Federal Rules of Evidence.  See MIL Brief at 9.  It argues that "[f]ederal courts across the country have found exception 22 applicable when considering documents similar to those at issue here and admitted those documents in evidence against parties other than the person against whom the judgment of conviction was entered."  MIL Brief at 10 (citing First Nat'l Bank of Louisville v. Lustig, 96 F.3d 1554, 1574 (5th Cir. 1996); Scholes v. Lehmann, 56 F.3d 750, 762 (7th Cir. 1995); RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 403 (8th Cir. 1995); Rozier v. Ford Motor Co., 573 F.2d 1332, 1347 (5th Cir. 1978); Semler v. Psychiatric Inst. of Washington, D.C., 538 F.2d 121, 127 (4th Cir. 1976); Schwartz v. United States, 582 F. Supp. 224, 227-28 (D. Md. 1984)(Young, J.); Warren v. Applebaum, 526 F. Supp. 586, 587-88 (E.D.N.Y. 1981)(Weinstein, C.J.)).

The Court has a narrower view of rule 803(22).  Rule 803(22)'s text states that the rule against hearsay does not exclude "[e]vidence of a final judgment of conviction" if:

> (A)   the judgment was entered after a trial or guilty plea, but not a nolo contendere plea;
>
> (B)   the conviction was for a crime punishable by death or by imprisonment for more than a year;
>
> (C)   the evidence is admitted to prove any fact essential to the judgment; and
>
> (D)   when offered by the prosecutor in a criminal case for a purpose other than impeachment, the judgment was against the defendant.

Fed. R. Evid. 803(22).  That the admissible evidence must "prove any fact essential to the judgment" appears to limit rule 803(22) to proving elements of the offense to which Donisthorpe pled guilty.  Fed. R. Evid. 803(22)(C).  The rule's title, "Judgment of a Previous Conviction" and its explicit limitation of the hearsay exception to "[e]vidence of a final judgment of conviction," suggest there is little room for a court to admit documents other than a Judgment in a Criminal Case.  See Fed. R. Evid. 803(22).  See also Fed. R. Evid. 803(22)(A) (forbidding evidence of a final conviction if the final conviction was entered after a nolo contendere plea).

The Court sees no reason to freely allow other documents in under this rule. Donisthorpe's Judgment in a Criminal Case contains, as every Judgment does, the crimes of which the defendant is adjudicated guilty. See Judgment in a Criminal Case at 1-2. Thus, Donisthorpe's Judgment in a Criminal Case is admissible, non-hearsay evidence to prove the elements that Donisthorpe committed wire fraud and money laundering, as 18 U.S.C. §§ 1343 and 1957 prohibit. By contrast, Donisthorpe's plea agreements contain a section titled "Defendant's Admission of Facts," which is inadmissible under rule 803(22). Plea Agreement at 5; Amended Plea Agreement at 5. In this section, Donisthorpe admits several facts, including, for example that he "concealed [his] theft from the clients by causing my accounting staff to falsely record the clients' balances in DSLM accounting records." Plea Agreement at 6; Amended Plea Agreement at 6. This evidence concerning Donisthorpe's false representations elaborates on an element of wire fraud: that a defendant use "false or fraudulent pretenses, representations, or promises" to defraud victims. 18 U.S.C. § 1343. The particular means with which Donisthorpe defrauded his clients is not "essential" to his conviction. Fed. R. Evid. 803(22)(C). Donisthorpe's violation of the wire fraud and money laundering statutes subjected him to criminal penalties, and he had great incentive to not plead guilty to these crimes if he did not meet each element. He had less incentive to accurately state why he met each statutory element, at least where the sentencing ramifications under the Sentencing Guidelines were minor. See Fed. R. Evid. 803, Notes of Advisory Committee on Proposed Rules (stating that convictions of minor offenses are not admissible, because "motivation to defend at this level is often minimal or non-existent"). Plea agreements between the United States and defendants do not represent judicial findings of fact. They are, rather, contracts between the parties, and their wording is "carefully weighed and negotiated." United Stats v. Jim, 839 F. Supp. 2d 1157, 1176 (D.N.M. 2012)(Browning, J.). Those plea agreement sections that represent the "contract" between the parties are not hearsay, while the part of a contract that represents a defendant's "version of events" is hearsay. Although Donisthorpe's plea agreements are admissible against him as a statement of party opponent under rule 801(d)(2), the Court will not admit his version of events contained in the plea agreement against any other party. Cf. U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc., 608 F.3d 871, 892 (D.C. Cir. 2010)(upholding the admission of certain facts from a plea agreement that proved elements of a crime and the redaction of other, non-essential facts).

The cases that Evanston Insurance cites in support of its position that plea agreements fall within rule 803(22)'s heartland are not convincing. Schwartz v. United States and Warren v. Applebaum, for example, does not address or even mention rule 803(22). See Schwartz v. United States, 582 F. Supp. at 227-28; Warren v. Applebaum, 526 F. Supp. at 587-88. Semler v. Psychiatric Institute of Washington, D.C. notes only that a murder confession was admitted into evidence without objection and that the court could assign whatever weight it chose to it. See Semler v. Psychiatric Inst. of Washington, D.C., 538 F.2d at 127. RSBI Aerospace, Inc. v. Affiliated FM Insurance Co., 49 F.3d at 403, discusses plea admissibility generally and not in the context of rule 803(22). Finally, Rozier v. Ford Motor Co., states, without discussion, that a guilty plea was admissible under rule 803(22), see Rozier v. Ford Motor Co., 573 F.2d at 1347, and the United States Court of Appeals for the Seventh Circuit's opinion in Scholes v. Lehmann makes a similarly conclusory statement concerning rule 803(22)'s scope without citing any cases directly in support of its proposition, see Scholes v. Lehmann, 56 F.3d at 762. The Tenth Circuit, as far as

the Court can tell, has not ruled on rule 803(22)'s limits.  Accordingly, the Court will not admit the Plea Agreement and the Amended Plea Agreement under rule 803(22).

The practical consequence of the Court's ruling is not substantial.  At trial, Evanston Insurance read all relevant factual admission in the Amended Plea Agreement to Donisthorpe and asked if he affirmed the truth of those statements.  See Oct. 8 Tr. at 521:9-524:11 (Conway, Donisthorpe); id. at 530:15-532:12 (Conway, Donisthorpe).  Donisthorpe also confirmed that his actions satisfied all the elements of the crimes for which he was charged.  See Oct. 8 Tr. at 519:15-521:8 (Conway, Donisthorpe).  As the Court has concluded that it will exercise its discretion to admit Donisthorpe's testimony, admitting the Donisthorpe's plea agreements makes no practical difference.

The Court notes that, at the summary judgment stage, the Court considered Donisthorpe's plea agreements to reach its determination.  See Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d 1051, 1062 n.9 (D.N.M. 2020).  Moya raised a general objection the plea agreement without specifically invoking evidentiary hearsay rules.  See 434 F. Supp. 3d at 1062 n.9.  The Court concluded that: "To the extent Moya raises a hearsay objection, the Tenth Circuit admits plea agreements at the summary judgment stage under rule 807 of the Federal Rules of Evidence." 434 F. Supp. 3d at 1062 n.9 (citing Thomas v. Durastanti, 607 F.3d 655, 665 n.8 (10th Cir. 2010)).  In Thomas v. Durastanti, the Tenth Circuit addressed a party's hearsay objection to considering a plea agreement in a footnote at summary judgment.  See Thomas v. Durastanti, 607 F.3d at 665 n.8.  It concluded that, so long as the evidence was introduced to prove the intent to which the defendant admitted in the plea agreement, the evidence could be admissible under the residual hearsay exception.  See Thomas v. Durastanti, 607 F.3d at 665 n.8.  The Tenth Circuit cited In re Slatkin, 525 F.3d 808, 811 (9th Cir. 2008), an opinion from the United States Court of Appeals for the Ninth Circuit which admitted a plea agreement to prove a defendant's mens rea.  The Tenth Circuit noted that the objecting party "argues that plea agreements are notoriously unreliable" but declined to consider the argument because it was "not developed with facts."  Thomas v. Durastanti, 607 F.3d at 665 n.8.

While the Tenth Circuit will admit this evidence at the summary judgment stage under rule 807, at trial, the Court is uncomfortable admitting all parts of plea agreements under the residual clause.  In the Court's opinion, the residual clause should be rarely used.  Drafters of rule 807 of the Federal Rules of Evidence cite Dallas County v. Commercial Union Assurance Co., 286 F.2d 388 (5th Cir. 1961)(Wisdom, J.), as support for including the residual hearsay exception in the Federal Rules of Evidence.  See Paul C. Gianelli, Understanding Evidence 557 (4th ed. 2013).  In Judge Wisdom's case, the plaintiffs presented testimony that a lightning strike caused a clock tower on a county courthouse to collapse.  See 286 F.2d at 390.  As evidence, the plaintiffs pointed to charcoal and charred timbers found in the debris.  See 286 F.2d at 390.  The United States Court of Appeals for the Fifth Circuit upheld the admissibility of a newspaper article written in 1901 that described a contemporaneous fire in the courthouse's dome while the courthouse was still under construction.  See Dallas Cty. v. Commercial Union Assur. Co., 286 F.2d at 390-91.  Judge Wisdom wrote:

We hold, that in matters of local interest, when the fact in question is of such a public nature it would be generally known throughout the community, and when the questioned fact occurred so long ago that the testimony of an eye-witness

59.     The State Complaint's allegations mirror the admissions from Donisthorpe's guilty plea:

> From at least 2009 through 2016, Donisthorpe engaged in a scheme in which he knowingly, intentionally, and improperly diverted client funds into accounts and assets that he owned and controlled.
>
> In furtherance of this scheme, Donisthorpe diverted client funds from individual client investment accounts held by broker dealers, including Charles Schwab, to general DSLM accounts and, then, transferred the client funds from DSLM accounts to other non-DSLM accounts the Donisthorpe controlled. These funds were inappropriately used for Donisthorpe's purposes and not for purposes that served the putative class members.

State Complaint ¶¶ 30-31, at 5.

60.     The State Complaint alleges that Desert State and Donisthorpe diverted at least $4,900,000.00 from Desert State Clients. See Criminal Judgment at 8; State Complaint ¶ 48, at 7.

---

> would probably be less trustworthy than a contemporary newspaper account, a federal court, under Rule 43(a), may relax the exclusionary rules to the extent of admitting the newspaper article in evidence. We do not characterize this newspaper as a 'business record', nor as an 'ancient document', nor as any other readily identifiable and happily tagged species of hearsay exception. It is admissible because it is necessary and trustworthy, relevant and material, and its admission is within the trial judge's exercise of discretion in holding the hearing within reasonable bounds.

Dallas Cty. v. Commercial Union Assur. Co., 286 F.2d at 397-98. In the Court's opinion, the residual hearsay exception should be reserved for situations such as this: where the credibility of the evidence is entirely beyond dispute even though all other hearsay rules prevent the evidence's admission. Plea agreements, as noted above, are not as inherently trustworthy as the newspaper article admitted in Dallas County v. Commercial Union Assurance Co..

Finally, plea agreements are common in the American justice system. Out of 76,538 criminal judgments entered for criminal defendants in 2019, there were plea agreements in 52,553 of these cases. See 2019 Annual Report and Sourcebook of Federal Sentencing Statistics at 37, United States Sentencing Commission, https://www.ussc.gov/research/sourcebook-2019. That parties will attempt to use these documents as evidence in future or parallel proceedings is foreseeable. Where these documents are nearly as common as criminal judgments, and often contain much more information, the Court concludes that, if the Federal Rules of Evidence meant to permit these agreements, they would explicitly allow them, just as they do for final criminal judgments.

61.     The lawsuit filed by the former Desert State clients is a "claim" as the Insurance Policy defines that term.  Insurance Policy at 16 ("Claim means the Insureds' receipt of . . . [t]he service of suit or institution of arbitration proceedings . . .").

**6.     The Insureds.**

62.     Ms. Kerr, Donisthorpe's spouse, is an insured as the Insurance Policy defines that term.  See Oct. 7 Tr. at 181:22-23 (Moya).

63.     Ms. Bennett and Mr. Rutherford were Desert State board members, although Rutherford left the board in the spring of 2016.  See Oct. 7 Tr. at 159:25-160:26 (Graham, Moya).

64.     Judy Mahar was a Desert State trust officer.  See Oct. 7 Tr. at 230:15-16 (Moya); id. at 40:24-41:7 (Borders, Butler).

65.     After March, 2017, Scott Kominiak became acting CEO of Desert State.  See Oct. 7 Tr. at 234:17-19 (Moya).

66.     Ms. Bennett was a member of Desert State's Board of Directors from about 2007 or 2008, until about April, 2017 when she submitted her resignation to Desert State's receiver.  See Oct. 8 Tr. at 407:21-25 (Bennett).

67.     While a Desert State board member, Bennett was not involved in the insurance application process.  See Oct. 8 Tr. at 590:23 (Bennett).

68.     Evanston Insurance did not communicate directly with the insureds during the underwriting process for the Insurance Policy.  See Oct. 7 Tr. at 35:14-18 (Borders, Butler).

69.     Ms. Bennett personally paid some of Desert State's insurance premiums in March, 2017.  See Oct. 8 Tr. at 606:12-607:5 (Bennett); Oct. 7 Tr. at 324:10 (Moya).

70.     Ms. Bennett did not personally receive any financial benefit from Donisthorpe's conduct related to his criminal and intentional activity.  See Oct. 8 Tr. at 611:14 (Bennett).

71.     As of October 10, 2016, Ms. Bennett had no knowledge of any wrongful acts, or any fact, circumstance, situation or incident, which may have led a reasonable person in her position to conclude that a claim against her or Desert State was likely.  See Oct. 8 Tr. at 610:14 (Bennett).

72.     Evanston Insurance has no sound basis for believing Ms. Bennett had any awareness of any fact which might afford grounds for any claims against Desert State in October, 2016.  See Oct. 8 Tr. at 498:15 (Fischer).

73.     Ms. Bennett was not involved in Donisthorpe's wrongdoing regarding the Desert State client funds, and she did not engage in any conversion, misappropriation, commingling or defalcation of Desert State funds or property, or of its former clients' funds or property.  See Oct. 7 Tr. at 331:13-15 (Moya); Oct. 8 Tr. 609:21-610:9 (Bennett, Sanders); id. at 420:14-17 (Fischer).

74.     No other Desert State employee or director,[7] other than Donisthorpe, participated in or knew of any theft, commingling, defalcation or misappropriation.  See Oct. 8 Tr. at 486:11-487:11 (Fischer).

---

[7]The former clients propose that "Evanston has admitted that it has no evidence that any insured, other than Donisthorpe, participated in or knew of any theft, commingling, defalcation, or misappropriation."  Client Brief ¶ 33, at 5.  The Court will make this finding only for Desert State's employees and not for Ms. Kerr, Donisthorpe's wife.  Ms. Bennett testified that prior to finding out about the diversion of funds, she did not have any reason to think Ms. Kerr was involved in any wrongdoing.  After this event, however, Ms. Bennett testified that Ms. Kerr "engaged in behavior that indicated that she was not devoted to the compensation of the former clients."  Oct. 8 Tr. at 613:14-18.

Moya proposes that there is no evidence that any insured, "including Mr. Donisthorpe," was aware of any 'wrongful act or personal injury' or a 'fact, circumstance, situation or incident' as stated in the policy."  Moya Brief ¶ D7, at 9.  The Court will not make this finding concerning Donisthorpe, because he admitted at trial that he "engaged in a scheme in which [he] knowingly and intentionally obtained money and property by means of materially false and fraudulent pretenses and representations."  Oct. 8 Tr. at 523:19-22 (Conway); id. at 524:11 (Donisthorpe). See Moya Brief ¶ C6, at 5.

- 25 -

7.     __The FID Investigation__.

75.     In December, 2016, FID initiated an examination of Desert State.  <u>See</u> Oct. 7 Tr. at 106:20-107:7 (Moya).

76.     Before December, 2016, FID had not examined Desert State since 2008.  <u>See</u> Oct.7 Tr. at 106:4-5 (Moya).

77.     FID began its examination in March, 2017, after Ms. Kerr informed FID that Donisthorpe was in the hospital and that Kominiak would assist Desert State in the examination process.  <u>See</u> Oct. 7 Tr. at 108:6-17 (Moya).

78.     In late March, 2017, upon being informed by Kominiak of Desert State's financial irregularities, Ms. Bennett notified FID that Kominiak, who she thought was a certified public accountant, had told her that he was aware that Donisthorpe appeared to have diverted $500,000.00 to $700,000.00 from Desert State client accounts.  <u>See</u> Oct. 7 Tr. at 116:12-23 (Moya); Oct. 8 Tr. at 409:3-411:1 (Bennett, Borders); <u>id.</u> at 598:4-9 (Bennett).

79.     Ms. Bennett agreed to give FID access to Desert State files, and the right to secure Desert State files and documents.  <u>See</u> Oct. 7 Tr. at 117:19-118:5 (Moya); Oct. 8 Tr. at 603:12-19 (Bennett).

80.     FID, with Ms. Bennett's assistance, physically took the Desert State files on March 28, 2018.  <u>See</u> Oct. 7 Tr. at 118:14-20 (Moya); Oct. 8 Tr. at 603:24-604:20 (Bennett).

81.     On March 28, 2017, FID issued an order finding Desert State to be financially unsafe and unsound.  <u>See</u> Oct. 7 Tr. at 121:18 (Moya).

82.     Moya was appointed receiver for the Desert State receivership estate on August 4, 2017.  <u>See</u> Oct. 7 Tr. at 128:1-3 (Moya).

83.     Moya was, and is, director of the FID   <u>See</u> Oct. 7 Tr. at 104:7-8 (Moya); <u>id.</u> at

105:6-7 (Moya).

84.     Moya, as Desert State receiver, filed a timely request with Evanston Insurance to provide a defense of Desert State, and indemnification of Desert State, for claims made against Desert State, including claims that former Desert State clients make in Cameron Graham as Trustee for Andrew Graham et al., v. DSLM.  See Oct. 7 Tr. at 146:12-147:19 (Conway, Moya).

### 8.     Evanston Insurance's Decision to Rescind.

85.     Bennett gave notice of what she knew to Evanston in March, 2017.  See Oct. 8 Tr. at 415:13-16 (Fischer); id. at 493:2-4 (Fischer); id. at 599:10-20 (Bennett).

86.     Evanston Insurance first considered rescission on March 29, 2017.  See Claim-E0400944-Note27 at 1 (dated March 29, 2017), admitted October 9, 2019, at trial as Former Client's Ex. B.

87.     Markel Services, Inc., the claims service manager for Evanston Insurance, began an investigation after receiving Ms. Bennett's notice in March, 2017.  See Oct. 8 Tr. at 413:19-414:2 (Fischer); id. at 415:11-416:3 (Fischer).[8]

88.     Denise Butler, an underwriter on the Desert State account at Markel Insurance West, the underwriting agent for Evanston Insurance, participated in a discussion about possible rescission of the Insurance Policy around the time the non-renewal decision regarding Insurance Policy was made in July, 2017, and the letter cancelling the Insurance Policy was sent.  See Oct. 7 Tr. at 89:21-91:4 (Butler, Jacobus); id. at 93:3-20 (Butler, Sanders); id. at 24:7-14 (Borders,

---

[8]The former clients propose: "Evanston had ample opportunity to investigate the acts and omissions alleged by the Former Clients of DSLM in the state court matter."  Client Brief ¶ 32, at 4.  This proposed finding of fact is a subjective characterization of Markel Services' and Evanston Insurance's investigation rather than a fact.  The Court will leave such characterizations for this Memorandum Opinion and Order's Conclusions of Law section.

Butler).

89.     The conversations at Markel Insurance regarding non-renewal included the fact that Donisthorpe was embezzling.  See Oct. 7 Tr. at 93:18-20 (Butler, Sanders); id. at 95:5-21 (Butler, Sanders).

90.     In July, 2017, Butler knew that Donisthorpe had engaged in embezzlement.  See Oct. 7 Tr. at 93:18-20 (Butler, Sanders); id. at 95:5-21 (Butler, Sanders).

91.     Donisthorpe's embezzlement contributed to Evanston Insurance's decision to issue a letter of non-renewal in July, 2017.  See Oct. 7 Tr. at 94:23-95:21 (Butler, Sanders).

92.     In the initial stages of the investigation until November, 2017, Markel Services learned that Donisthorpe had taken money from Desert State trust accounts, that he had tried to kill himself, and that he was incapacitated.  See Oct. 8 Tr. at 418:1-7 (Fischer).

93.     On January 5, 2018, Evanston Insurance issued a reservation of rights letter to Moya, Desert States' acting receiver, agreeing to provide a defense for the Underlying Claim under a complete and full reservation of rights.  See Letter from James H. Johansen to Christopher Moya (dated Jan. 5, 2018), admitted October 7, 2019, at trial as Evanston Insurance's Ex. 28-C ("ROR Letter").

94.     In the ROR Letter, Evanston Insurance specifically reserves the right to rescind the Insurance Policy based upon material misrepresentations in Desert State's Application for the Insurance Policy.  See ROR Letter at 12.

95.     Evanston Insurance also reserves its rights to deny coverage for the Underlying Claim based upon the Insured's knowledge of "Wrongful Acts, facts, circumstances, or incidents that would lead a reasonable person to conclude that a Claim was likely."  ROR Letter at 11.

96.     In its ROR Letter, Evanston Insurance also reserves the right to deny coverage

based on various Insurance Policy exclusions, including Exclusion P.  See ROR Letter at 11.

97.     On June 4, 2018, Evanston Insurance issued a letter to Moya, Desert State's acting receiver, attempting to rescind the Insurance Policy.  See Letter from James H. Johansen to Desert State's acting receiver (dated June 4, 2018), admitted October 7, 2019, at trial as Evanston Insurance's Ex. 3 ("Rescission Letter"); Oct. 7 Tr. at 16:25-17:1.

98.     The reason for Evanston Insurance's rescission decision is Donisthorpe's misrepresentation in the Application.  See Oct. 8 Tr. at 438:17 (Fischer)(agreeing that Evanston Insurance sought rescission based on Donisthorpe's misrepresentation in the Application); id. at 444:16-20 (Fischer)("But as far as what we relied on in terms of issuing this rescission letter that we've been talking about, it was really just his knowledge of his own defalcations and thefts.").

99.     Included with the Rescission Letter was a $9,328.00 check, refunding the premium that Desert State paid for the Insurance Policy plus interest.  See Rescission Letter at 2; Oct. 8 Tr. at 426:12-16 (Fischer).

**9.     Donisthorpe's Criminal Case.**

100.    On November 17, 2017, Donisthorpe pled guilty to a two-count federal felony information charging him with wire fraud and money laundering.  See United States v. Donisthorpe, No. CR 17-3311, Criminal Information (D.N.M., filed Nov. 27, 2017, (Doc. 1 in No. CR 17-3311)), admitted October 7, 2019, at trial as Evanston Insurance's Ex. 4 ("Criminal Information"); Oct. 7 Tr. at 13:11-13.

101.    Evanston Insurance learned that Donisthorpe pled guilty to wire fraud and money laundering by no later than the first half of December, 2017.  See Oct. 8 Tr. at 481:11 (Fischer)(agreeing that Evanston Insurance learned of Donisthorpe's guilty plea in either late November or early December, 2017).

102.    On February 21, 2019, the Honorable Laura Fashing, United States Magistrate Judge for United States District Court for the District of New Mexico, found Donisthorpe competent, that sufficient evidence supports his guilty plea, and the plea to be knowing and voluntary; she thereby adjudged Donisthorpe guilty of wire fraud and money laundering.  See United States v. Donisthorpe, No. CR 17-3311, Plea Minute Sheet at 1 (D.N.M.), filed Feb. 21, 2019, admitted October 7, 2019, at trial as Evanston Insurance's Ex. 8 ("Plea Minute Sheet"); Oct. 7 Tr. at 13:14-21.

103.    On June 27, 2019, the Court sentenced Donsithorpe to 144 months in prison and imposed a money judgment against Donisthorpe in the amount of $4,812,857.00, which the Court described as a "portion of the net profit of the defendant derived from the offense charged in Counts 1 and 2."  United States v. Donisthorpe, No. CR 17-3311, Judgment at 3, 8 (D.N.M.), filed June 27, 2019, admitted October 7, 2019, at trial as Evanston Insurance's Ex. 10 ("Criminal Judgment"); Oct. 7 Tr. at 14:6-9.

## CONCLUSIONS OF LAW

1.    The Court will now state its conclusions of law.  The Court will begin by summarizing the case's relevant procedural history.  It will then set out the law regarding issues relevant to its analysis.  The Court will then present that analysis

## PROCEDURAL HISTORY

2.    Moya and the former clients filed motions to dismiss Evanston Insurance's complaint.  See Motion by the Former Clients of Desert State Life Management to Dismiss Plaintiff's Second Amended Complaint for Rescission and Declaratory Judgment, filed November 26, 2018 (Doc. 20)("Former Client MTD"); Receiver for Desert State Life Management Joins in the Motion to Dismiss Plaintiff's Second Amended Complaint for Rescission and Declaratory

Judgment, filed November 26, 2018 (Doc. 21)("Moya MTD").  While these motions were pending, Evanston Insurance, the former clients, and Moya filed for summary judgment.  <u>See</u> Plaintiff's Motion for Summary Judgment, filed July 25, 2019 (Doc. 89)("Evanston MSJ"); Motion for Summary Judgment, filed July 26, 2019 (Doc. 91)("Moya MSJ"); Former Clients of Desert State Life Management's Motion for Summary Judgment on Evanston's Claims for Rescission and Declaratory Judgment and Memorandum in Support Thereof, filed July 26, 2019 (Doc. 92)("Former Client MSJ").  The Court issued an Order denying the Former Client MTD and the Moya MTD shortly before trial.  <u>See</u> Order, filed September 13, 2019 (Doc. 126)("Sept. 13 Order").  The Court held a three-day bench trial in this case from October 7-9, 2019.  <u>See</u> Clerk's Minutes at 1, filed October 7, 2019 (Doc. 155).  It issued a Memorandum Opinion and Order denying the Evanston MSJ in January, 2020.  <u>See</u> Memorandum Opinion and Order, filed January 16, 2020 (Doc. 174)("MOO").  The Court issued an Order granting in part and denying in part the Moya MSJ and the Former Client MSJ in March, 2020.  <u>See</u> Order, filed March 23, 2020 (Doc. 180)("March 23 Order").  The Court now makes its Findings of Facts and Conclusions of Law from the October 7-9, 2019, bench trial.  Before providing its Conclusions of Law, the Court provides more background information on the case's procedural posture.

      **1.**      **<u>The Complaint.</u>**

      3.      Evanston Insurance filed its third amended complaint in February, 2019.  <u>See</u> Third Amended Complaint For Rescission and Declaratory Judgment, filed February 15, 2019 (Doc. 44)("Complaint").  In the Complaint, Evanston Insurance first requests that the Court declare the Insurance Policy void ab initio because of Donisthorpe's misrepresentations, and rescind the contract between Evanston Insurance and Donisthorpe.  <u>See</u> Complaint ¶ 54, at 11.  In Count II, Evanston Insurance requests that the Court declare that Evanston Insurance has no duty

to defend or indemnify Desert State, Moya, Donisthorpe, Ms. Bennett, Ms. Kerr, Joseph Perez, Christine Gallegos, Scott Atkinson, Charles Reynolds, Cameron Graham, Ascending Hope LLC, CNRAG Inc., and Decades LLC, based on the Insurance Policy's coverage provision.  See Complaint ¶ 59, at 12-13.

> ### 2.    The Sept. 13, 2020, Order.

4.    In the Order denying the Former Client MTD and the Moya MTD, the Court concluded that the Complaint states a claim for rescission under rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Sept. 13 Order at 8-10.  It noted that, "[w]hile the gap between when Donisthorpe's misdeeds came to light and when Evanston Insurance returned its premiums is lengthy, the Court is wary of imposing a requirement on insurance companies to proactively monitor their insured."  Sept. 13 Order at 9.  The Court also concluded that "New Mexico public policy does not allow rescission as to innocent co-insured parties who did not engage in any misrepresentations, . . . and that the Evanston Insurance policy's language does not bar innocent co-insured parties from obtaining coverage."  Sept. 13 Order at 10.  Further, the Court concluded that, under the factors the Tenth Circuit provides in State Farm Fire & Casualty Co. v. Mhoon, 31 F.3d 979, 983 (10th Cir. 1994), the Court would exercise its discretion to hear the case.  See Sept. 13 Order at 10-11.

> ### 3.    The MOO.

5.    The Court resolved many of the issues the parties litigated in the motions for summary judgment and at trial in the MOO, which denied the Evanston MSJ.  The Court first concluded that the Insurance Policy provision stating, "[p]rior to the effective date of this Coverage Part the Insured had no knowledge of such Wrongful Act(s) or Personal Injury(ies) or any fact, circumstance, situation or incident, which may have led a reasonable person in the Insured's

position to conclude that a Claim was likely," Insurance Policy at 15, is a condition precedent to coverage rather than a coverage exclusion, and that, under this language, Donisthorpe's knowledge of his misconduct is not imputed to other insureds, see Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1097-99.  Next, the Court concluded that the Supreme Court of New Mexico would rule that Insurance Policy's Exclusion P, which excludes coverage for claims "based upon or arising out of any conversion, misappropriation, commingling of or defalcation of funds or property," Insurance Policy at 20, does not exclude coverage for negligence claims like negligent supervision, see Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1112. Third, the Court concluded that Evanston Insurance did not violate N.M. Stat. Ann. § 59A-18-11(A).  See Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1112-19.  Next, the Court concluded that the Supreme Court of New Mexico would conclude that Donisthorpe was acting adversely to Desert State when he filled out the Application and that the adverse interest exception in agency law would prevent Evanston Insurance from imputing his knowledge to other insureds.  See Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1118-19.   The Court also noted that Evanston Insurance had not addressed the timeliness of its rescission attempt, and so it was not entitled to summary judgment on its rescission claim.  See Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1120-21.  Finally, the Court concluded that New Mexico public policy bar Evanston Insurance's attempts to rescind the Insurance Policy for innocent insureds.  See Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1121-24.

### 4.      **The March 23 Order**.

6.      The Court addressed the Moya MSJ and the Former Client MSJ in the March 23 Order.  See March 23 Order at 1.  The Court noted that the MOO fully addressed the Moya MSJ's arguments.  See March 23 Order at 3-4.  The Former Client MSJ presented two new issues for the

Court to address which it did not address either in the Sept. 13 Order or in the MOO: (i) whether Evanston Insurance's delay bars its right to rescind the Insurance Policy; and (ii) Ms. Kerr's entitlement to coverage under the Insurance Policy.  See March 23 Order at 4-10.

7.      In the March 23 Order, the Court concluded that, because Evanston Insurance did not act "'immediately'" to rescind the Insurance Policy, it was not entitled to this remedy.  March 23 Order at 6-7 (quoting Putney v. Schmidt, 1911-NMSC-043, ¶ 10, 120 P. 720, 723).  Regarding Ms. Kerr's status as an innocent insured, the Court reviewed the parties' arguments and concluded that Ms. Kerr was not entitled to coverage based on claims arising out of Donisthorpe's misappropriation, but she is entitled to coverage "to the extent that underlying claims seek covered activity."  March 23 Order at 10.  The Court did not rule on whether the State Complaint's claims against Ms. Kerr entitled her to coverage, because it concluded that a genuine dispute of material fact exists whether Ms. Kerr is an innocent insured.  See March 23 Order at 10.

**5.      Motions for Judgment As a Matter of Law and Closing Arguments.**

8.      The former clients moved for judgment as a matter of law at the conclusion of trial.  See Oct. 9 Tr. at 692:24-693:1 (Jacobus).  The former clients argued that N.M. Stat. Ann. § 59A-18-11(A)[9] required Evanston Insurance to attach a copy of the Insurance Policy to the

---

[9]N.M. Stat. Ann. § 59A-18-11(A) states:

The insured shall not be bound by any statement made in an application for a policy unless a copy of such application is attached to or endorsed on the policy when issued as a part thereof. If any such policy delivered or issued for delivery to any person in this state shall be reinstated or renewed and the insured or the beneficiary or assignee of such policy shall make written request to the insurance company for a copy of the application, if any, for such reinstatement or renewal, the insurance company shall within fifteen days after the receipts of such request at its home office or any branch office of the insurance company, deliver or mail to the person making such request, a copy of such application. If such copy shall not be so delivered or mailed, the insurance company shall be precluded from

renewal application for the Insurance Policy to be admissible evidence.  See Oct. 9 Tr. at 693:2-694:9 (Jacobus); id. at 694:23-695:11 (Jacobus).  They argued that the evidence shows that Western Assurance did not attach the Insurance Policy, because it was illegible, but that these reasons are irrelevant under the statute.  See Oct. 9 Tr. at 694:5-22 (Jacobus).  The Court asked if New Mexico could tell federal courts what evidence is admissible in federal court proceedings. See Oct. 9 Tr. at 696:1-10 (Court).  The former clients argued that the rule is a substantive state rule rather than a procedural rule.  See Oct. 9 Tr. at 696:22-697:2 (Jacobus); id. at 698:7-699:1 (Jacobus).  They argued that Evanston Insurance cannot show that it followed § 59A-18-11, because Evanston Insurance relies on Western Assurance and ADCO General to do this work for them.  See Oct. 9 Tr. at 698:22-699:1 (Jacobus).  It noted that this agent relationship has existed between Evanston Insurance and ADCO General for at least twenty-five years.  See Oct. 9 Tr. at 699:6-700:3 (Jacobus)(citing Barth v. Coleman, 1994-NMSC-0067, ¶ 24, 878 P.2 319, 326).

9.     Moya joined the former clients' motion for judgment as a matter of law.  See Oct. 9 Tr. at 700:7-15 (Graham).  The Court asked what the purpose of the attachment requirement is. See Oct. 9 Tr. at 701:1-2 (Court); id. at 702:9-12 (Court).  Moya responded that the statute guarantees that Desert State officers and employees the ability to see what is contained in the Insurance Policy.  See Oct. 9 Tr. at 702:20-703:8 (Graham).

10.     Ms. Bennett also joined in the motion for judgment as a matter of law.  See Oct. 9 Tr. at 703:12-22 (Sanders).  She noted that there is no New Mexico law interpreting this statute. See Oct. 9 Tr. at 703:12-22 (Sanders).  She argued that the statute is clear "that the application must be attached to the policy."  Oct. 9 Tr. at 704:7-8 (Sanders).  She said that the attachment's

_____

introducing such application as evidence in any action or proceeding based upon or involving such policy or its reinstatement or renewal.

purpose "is to make sure that all the documents are in one place and the insured understands what has been said in the application." Oct. 9 Tr. at 704:18-21 (Sanders). She also argued that the statute is not a rule of evidence, because it begins: "The Insured shall not be bound by any statement made in an application for a policy unless the application is attached," and this is a substantive command. Oct. 9 Tr. at 705:6-8 (Sanders). She added that attachment requirements force insurance companies to be transparent with insureds and to know for what coverage the insured applied. See Oct. 9 Tr. at 706:22-707:15 (Sanders).

11. Evanston Insurance responded. See Tr. at 709:7-10 (Borders). It argued that New Mexico would not want the Court to rely on hyper-technicalities. See Oct. 9 Tr. at 710:2-16 (Borders). It also suggested that the attachment evidence was unclear, because Young printed the document without looking at the attachment, and so nobody knows if the problem was with the application or with Young's printer. See Oct. 9 Tr. at 710:17-711:3 (Borders). The Court asked Evanston Insurance whether the Supreme Court of New Mexico would distinguish between these attachment requirements and the attachment requirements for motor insurance. See Oct. 9 Tr. at 711:14-712:1 (Court). Evanston Insurance turned to the statute's text and argued that "the statute specifically says, for purposes of a renewal policy . . . you don't need to attach the application." Oct. 9 Tr. at 712:10-13 (Borders). It said that, because this is a renewal application, Evanston Insurance complied with the statute. See Oct. 9 Tr. at 712:20-21 (Borders). It also noted that the failure to attach was due to ADCO General, who was acting as Desert State's agent. See Oct. 9 Tr. at 712:22-713:8 (Borders).

12. Ms. Bennett responded. See Oct. 9 Tr. at 714:1 (Sanders). She noted that it is Evanston Insurance's burden to make sure that any application is attached to the Insurance Policy. See Oct. 9 Tr. at 714:1-8 (Sanders)(citing N.M. Stat. Ann. § 59A-18-11). She also stated that,

regardless whose agent made the mistake, it was Evanston Insurance's obligation to make sure the application was attached.  See Oct. 9 Tr. at 714:9-19 (Sanders).  She added that the attachment requirement could help an insured know whether there was any alternations or amendments to the application after it was submitted.  See Oct. 9 Tr. at 714:23-715:10 (Sanders).  Moya then added that it is only fair to hold Evanston Insurance to New Mexico's strict insurance requirments, because it chose to do business in this state.  See Oct. 9 Tr. at 715:15-716:4 (Graham).

13.     The former clients then spoke again on their motion.  See Oct. 9 Tr. at 716:8 (Jacobus).  They reiterated that § 59A-18-11 is a substantive rule.  See Oct. 9 Tr. at 716:24-717:12 (Jacobus).  They added that the statute's purpose is so that it is "crystal clear what the policy consists of."  Oct. 9 Tr. at 717:13-22 (Jacobus).  It concluded by noting that the evidence shows that the "application and policy never got to the insured."  Oct. 9 Tr. at 717:24-25 (Jacobus).

14.     Evanston Insurance then spoke again.  See Oct. 9 Tr. at 718:18 (Borders).  It argued that, at most, it violated the statute in a technical way, but not in a substantive way.  See Oct. 9 Tr. at 718:18-719:14 (Borders).  It also highlighted § 59A-18-11's second sentence, which it argued distinguishes renewals and initial applications and requires attachment only for the latter  See Oct. 9 Tr. at 719:17-720:1 (Borders); id. at 722:5-18 (Borders).  It also reiterated that the trial's evidence is insufficient to determine what was sent to ADCO General.  See Oct. 9 Tr. at 720:11-721:3 (Borders).  Evanston Insurance said that it had met its burden to prove that the Application was attached to the Insurance Policy and that the Defendants had not met their own countervailing burden.  See Tr. at 721:19-722:4 (Borders).  It also said that motorist insurance is different, because consumers can default into coverage, and so "there are specific reasons why that has to go back and forth that don't apply here."  Oct. 9 Tr. at 723:2-4 (Borders).  Evanston Insurance then returned to its argument that, because this statute is an affirmative defense, the defendants had to prove it,

and their reliance on testimony regarding scanned and printed pdf attachments were not enough proof given the context.  See Oct. 9 Tr. at 723:9-725:11 (Borders).

15.     The former clients responded to Evanston Insurance' s comments.  See Oct. 9 Tr. at 726:14 (Jacobus).  They said that § 59A-18-11(A)'s second sentence does not apply, because "there is no evidence in this case that the insured asked for a copy of the Insurance and Evanston didn't send it."  Oct. 9 Tr. at 727:5-7 (Jacobus).  It stated that each of the statute's three sentences are independent from each other.  See Oct. 9 Tr. at 728:14-23 (Jacobus).  After Evanston Insurance read the statute for the Court, see Oct. 9 Tr. at 730:2-731:7 (Borders), the Court noted that, even if the statute's second and third sentences are linked, the first sentence appears to stand alone, see Oct. 9 Tr. at 731:8-15 (Court).  Evanston Insurance responded that if this were true, the second and third sentences would be surplusage, "because if the application wasn't attached, it's not admissible because it's not part of the policy."  Oct. 9 Tr. at 731:19-22 (Borders).

16.     The former clients then made a second motion for judgment as a matter of law based on N.M. Stat. Ann. § 59A-14-5.[10]  See Oct. 9 Tr. at 735:22 (Jacobus).  The former clients said that Evanston Insurance fails to show that it complied with this statute, because there is no

---

[10]This statute provides:

Every insurance contract procured and delivered as surplus lines insurance pursuant to Chapter 59A, Article 14 NMSA 1978 shall bear the name, address and signature of the surplus lines broker who procured it and have stamped, printed or otherwise displayed prominently in boldface ten-point or larger type either upon its declarations page or by attachment of an endorsement, the form of which may be promulgated by the superintendent, the following: "This policy provides surplus lines insurance by an insurer not otherwise authorized to transact business in New Mexico. This policy is not subject to supervision, review or approval by the superintendent of insurance. The insurance so provided is not within the protection of any guaranty fund law of New Mexico designed to protect the public in the event of the insurer's insolvency.

N.M. Stat. Ann. § 59A-14-5.

stamp on the Insurance Policy.  See Oct. 9 Tr. at 737:7-10 (Jacobus).  They said that Evanston Insurance is invoking the Court's equitable powers with "unclean hands," because it has not complied with New Mexico law.  Oct. 9 Tr. at 737:15-16 (Jacobus).  The former clients said that Evanston Insurance has not done the discovery to prove that it complied with this law.  See Oct. 9 Tr. at 738:14-739:7 (Jacobus).

17.    Evanston Insurance then responded.  See Oct. 9 Tr. at 741:7 (Borders); id. at 742:23 (Borders).  It asserted that the former clients just alleged a new affirmative defense for the first time, and the former clients have still not filed an answer to the case's Complaint, so "I don't even know what I'm responding to."  Oct. 9 Tr. at 743:5-6 (Borders).  Next, Evanston Insurance stated that N.M. Stat. Ann. § 59A-15-4 does not say what happens when a company fails to comply with it or who is responsible for making sure a policy is stamped.  See Oct. 9 Tr. at 743:10-20 (Borders).  It said that it would address this issue in its proposed findings of facts motion and that it otherwise was not prepared to discuss in detail a statute that was never mentioned before today.  See Oct. 9 Tr. at 743:21-744:12 (Borders).  It added that the former client's motion was "inherently unfair," Oct. 9 Tr. at 745:18 (Borders), and that it only agreed to delay requiring the parties' answers as a courtesy in preparation of trial.  Evanston Insurance said that the former clients had "[lain] in wait" throughout the trial to spring this at the end and asked that the Court strike this affirmative defense.  Oct. 9 Tr. at 746:15-16 (Borders).  It added that, at least in Illinois, it is the surplus lines broker's obligation to stamp policies.  See Oct. 9 Tr. at 747:5-18 (Borders).  It said that, had it known about this argument, it would have had a rebuttal expert testify.  See Oct. 9 Tr. at 748:13-17 (Borders).

18.    The Court suggested that the former clients' argument was not an affirmative defense, but instead just another argument in the equity analysis.  See Oct. 9 Tr. at 750:2-10 (Court).  Evanston Insurance noted that this characterization might be accurate, but it said that,

even so, the trial had seen two witnesses who could have testified to this issue and the former clients did not raise this issue then.  See Oct. 9 Tr. at 750:18-751:13 (Borders).  Evanston Insurance asked that the Court strike the argument, "or at a minimum take it under advisement moving forward."  Oct. 9 Tr. at 752:23-24 (Borders).

19.     The former clients then stated that "Evanston has not followed the law" as N.M. Stat. Ann. § 59A requires.  Oct. 9 Tr. at 753:12-13 (Jacobous).  See id. at 753:18-20 (Jacobus).  They argued that it was "not our job to certainly tell them that they must do their jobs and . . . admit evidence of a policy that complies with New Mexico law."  Oct. 9 Tr. at 754:3-6 (Jacobus).  The former clients said that the remedy for a § 59A-14-5 violation is in N.M. Stat. Ann. § 59-14-15, and they read the statute.[11]  See Oct. 9 Tr. at 754:18-755:20 (Jacobus).  The former clients said that this statute does not make the Insurance Policy void ab initio, but "we've had a full trial, [and] Evanston has not shown that it complied with the law."  Oct. 9 Tr. at 755:24-25 (Jacobus).  The former clients then stated that the Court gave it until the day after trial to file an answer, and that it would be inappropriate to re-open evidence.  See Oct. 9 Tr. at 756:13-757:9.  Evanston Insurance

---

[11]N.M. Stat. Ann. § 59A-14-15 provides:

A.     As to a risk assumed by an unauthorized insurer under Chapter 59A, Article 14 NMSA 1978, and if the premium thereon has been received by the producing broker or the surplus lines broker who placed the insurance, in all questions thereafter arising under the coverage between the insurer and the insured the insurer shall be deemed to have received the premium due it for the coverage; and the insurer shall be liable to the insured for losses covered by the insurance and for unearned premiums that may become payable to the insured upon cancellation of the insurance, whether or not in fact the surplus lines broker is indebted to the insurer as to the insurance or for any other cause.

B.     Each unauthorized insurer assuming a surplus lines risk under Chapter 59A, Article 14 NMSA 1978 shall be deemed thereby to have subjected itself to the terms of this section.

responded that answers were not due the day after trial but by the end of the trial, which means that answers are due the same day the trial finishes. See Oct. 9 Tr. at 757:14-25 (Borders). It reiterated its request that it be able to respond to the former clients' new affirmative defense under N.M. Stat. Ann. § 59A-14-5. See Oct. 9 Tr. at 759:1-18 (Borders).

      **6.**     **Moya's Closing Argument.**

     20.     Moya then presented his closing statements. See Oct 9 Tr. at 772:3 (Graham). He stated that he believed that Evanston Insurance is not entitled to rescission or declaratory judgment. See Oct. 9 Tr. at 772:8-14 (Graham). He argued that Evanston Insurance "has clearly acknowledged that they received notice of the potential claims from Helen Bennett on or before March 27th of 2017." Oct. 9 Tr. at 773:3-5 (Graham). He noted that Evanston Insurance attempted to rescind the letter fourteen months after it had reasonable notice of Donisthorpe's misdeeds. See Oct. 9 Tr. at 774:20-775:6 (Graham). Moya asserted that, "[t]o argue that Evanston was making some sort of reasonable efforts there is practically ridiculous," and its behavior was "as far from prompt and immediate, as required by the law, as it gets." Oct. 9 Tr. at 775:7-10 (Graham). He argued that Evanston Insurance engaged in the behavior that the New Mexico Legislature intends to prevent, because it waited on this claim so it could make an informed economic decision. See Oct. 9 Tr. at 776:7-18 (Graham).

     21.     Next, Moya asserted that all the trial's evidence shows that Donisthorpe acted alone, and everyone else at Desert State is therefore an innocent insured under the Insurance Policy. See Oct. 9 Tr. at 775:19-776:9 (Graham). He stated that these innocent insureds relied on the Evanston Insurance coverage to protect Desert State clients, not themselves, and they are now seeking coverage "to guarantee that those clients are able to be made as whole as possible." Oct. 9 Tr. at 776:10-21 (Graham). Moya contended that the Insurance Policy covers Desert State

Employees' negligent acts, and the evidence from trial shows that the Desert State directors were negligent in not discovering Donisthorpe's misconduct. See Oct. 9 Tr. at 776:22-777:24 (Graham).

       **7.**      **Ms. Bennett's Closing Argument.**

22.     Ms. Bennett then presented her closing argument. See Oct. 9 Tr. at 778:16 (Sanders). She stated that Evanston Insurance cannot rescind the Insurance Policy's coverage of her. See Oct. 9 Tr. at 779:3-4 (Sanders). It noted that the Court has already concluded that New Mexico public policy does not permit rescission for innocent co-insured parties, and trial testimony shows that Donisthorpe prepared the Application alone and Ms. Bennett had no knowledge of his wrongful acts. See Oct. 9 Tr. at 779:5-23 (Sanders). As for Evanston Insurance's delay, Ms. Bennett again noted that the Court had concluded that New Mexico requires rescinding parties to act immediately, and Evanston Insurance's delay was far from immediate in this case. See Oct. 9 Tr. at 780:1-16 (Sanders). She argued that Evanston Insurance had all the information it needed to rescind by November, 2017. See Oct. 9 Tr. at 780:17-23 (Sanders).

23.     Ms. Bennett then discussed the Insurance Policy's exclusions. See Oct. 9 Tr. at 781:5-10 (Sanders). She argued that Evanston Insurance admitted at trial that Ms. Bennett's conduct did not implicate Exclusion J. See Oct. 9 Tr. at 781:11-18. She added that Evanston Insurance made the same admission about Exclusion P. See Oct. 9 Tr. at 781:19-782:6 (Sanders). Ms. Bennett noted that Donisthorpe testified that he provided false information to Desert State's board, and that the Court has already concluded that the Insurance Policy does not bar innocent co-insured parties from obtaining coverage. See Oct. 9 Tr. at 782:7-19 (Sanders).

       **8.**      **The Former Client's Closing Arguments.**

24.     The former Desert State clients then presented their closing argument. See Oct. 9 Tr. at 783:19 (Davis). The former clients first discussed Donisthorpe's disabled victims whom the

trial will impact.  <u>See</u> Oct. 9 Tr. at 783:19-784:15 (Davis).  The former clients then argued that the Court should deny Evanston Insurance's rescission argument, because "Evanston comes to the Court seeking equitable relief yet it has unclean hands" for violating two statutes, §§ 59A-14-5 and 59A-18-11.  Oct. 9 Tr. at 785:10-12 (Davis).  It argued that there is no evidence that Evanston Insurance stamped its surplus lines policy as § 59A-14-5 requires.  <u>See</u> Oct. 9 Tr. at 785:16-25 (Davis).  This omission, the former clients argue, is evidence that the Court should weigh in determining whether to use its equitable powers to allow Evanston Insurance to rescind the Insurance Policy.  <u>See</u> Oct. 9 Tr. at 786:1-4 (Davis).  They also argued that Evanston Insurance had unclean hands, because it "changed its position" during the litigation "as to what type of policy is before the Court."  Oct. 9 Tr. at 787:22-25 (Davis).  The former clients next discussed § 59A-18-11.  <u>See</u> Oct. 9 Tr. at 788:8 (Davis).  They reiterated their arguments on the issue they first made when discussing their oral motion for judgment as a matter of law.  <u>See</u> Oct. 9 Tr. at 788:8-791:24 (Davis).

25.     The former clients also argued that Evanston Insurance delayed too long before rescinding the Insurance Policy.  <u>See</u> Oct. 9 Tr. at 791:25-792:8 (Davis).  They gave the timeline of Evanston Insurance's actions between receiving Ms. Bennett's March, 2017, report and officially rescinding the Insurance Policy on June 4, 2018.  <u>See</u> Oct. 9 Tr. at 792:9-793:20 (Davis).  Having reviewed this history, the former clients assert that Evanston Insurance's action "was neither prompt nor immediate," as New Mexico law requires.  Oct. 9 Tr. at 793:21-23 (Davis).  <u>See id.</u> at 793:23-794:8 (Davis).  The former clients then made the argument that the Insurance Policy's definition of "insured" creates a "reasonable dispute over who is included in this term of insured, and it must be resolved in favor of Evanston's insureds and in favor of coverage under New Mexico law."  Oct. 9 Tr. at 794:23-795:1 (Davis).

26.     Next, the former clients discussed the Insurance Policy's exclusions.  See Oct. 9 Tr. at 795:2 (Davis).  They noted that the Insurance Policy's exclusions only apply to claims as the Insurance Policy defines that term.  See Oct. 9 Tr. at 795:2-15 (Davis).  It then addressed Exclusion I, the business exclusion for antitrust and Unfair Practices Act claims.  See Oct. 9 Tr. at 795:16 (Davis).  The former clients noted that they have alleged negligent conduct, and that their allegations have "nothing to do with any sort of statutory claim that we might have or business-related claim that we might have."  Oct. 9 Tr. at 795:25-796:2 (Davis).  Regarding Exclusion J, the exclusion for wrongful or intentional conduct, the former clients argued that it "can quickly be dealt with," because they are suing Desert State and its officers in the underlying state case for vicarious liability.  See Oct. 9 Tr. at 796:4-19 (Davis).  Finally, regarding Exclusion P, the clause excluding coverage for conduct arising out of financial misconduct, the former clients asserted that it does not apply, because they assert negligence and negligent supervision claims in the underlying State Complaint.  See Oct. 9 Tr. at 796:20-797:11 (Davis).  They argued that the trial shows that Desert State clients were put into accounts that had lower rates of return then they otherwise would have in other accounts, and they have therefore "proven claims of negligence that have nothing at all to do with Mr. Donisthorpe stealing any money from DSLM."  Oct. 9 Tr. at 797:19-21 (Davis).  They also noted that they would amend the State Complaint to bring in new defendants and claims, and if the Court found against them now, it would preclude the state jury from determining whether Desert State failed in its duty as a trustee.  See Oct. 9 Tr. at 798:1-14 (Davis).

**9.     Evanston Insurance's Rebuttal.**

27.     Evanston Insurance then offered a brief rebuttal to the defendant's closing statements.  See Oct. 9 Tr. at 799:1 (Borders).  It first discussed some of opposing counsel's misstatements.  See Oct. 9 Tr. at 799:9-15 (Borders).  It said that, contrary to Moya's contentions,

volunteers are not insured under the Insurance Policy.  See Oct. 9 Tr. at 799:9-15 (Borders).  It also clarified that Butler testified that the Insurance Policy was not renewed because of allegations of theft, not because Evanston Insurance knew that Donisthorpe had stolen funds.  See Oct. 9 Tr. at 799:16-22 (Borders).  It said that, contrary to Ms. Bennett's statements, there are several matters still open in this case.  See Oct. 9 Tr. at 799:23-800:6 (Borders).  Evanston Insurance then discussed Fischer's trial testimony.  See Oct. 9 Tr. at 800:15 (Borders).  It noted that Fischer analyzes insurance policy claims for a living, and, when he was asked about the State Complaint's claims, he attempted to be precise.  See Oct. 9 Tr. at 800:15-801:3 (Borders).  Evanston Insurance said that his testimony's essence is that "[a]ll of [the State Complaint's] causes of action incorporated the factual basis for the complaint." Oct. 9 Tr. at 801:6-7 (Borders).  It concluded by emphasizing that the former clients are suing, because of Donsithorpe's theft, and that any mismanagement is entirely incidental to his misappropriation.  See Oct. 9 Tr. at 801:12-802:14 (Borders).  Evanston Insurance stated that, despite the tragedy of the situation, the errors and omission policy does not cover claims related to Donisthorpe's actions.  See Oct. 9 Tr. at 802:20-803:6 (Borders).

### 10.   **Evanston Insurance's Closing Argument.**

28.   Evanston Insurance filed its closing argument contemporaneously with the Evanston Insurance Brief.  See Plaintiff's Closing Argument, filed December 2, 2019 (Doc. 169)("Closing Brief").  Evanston Insurance states that it "will use this opporuntity to highlight the testimony at trial that makes clear that Graham v. Desert State Life Mgmt., . . . is not covered by the professional liability policy issued by Evanston to Desert State Life Management."  Closing Brief at 2 (emphasis in original).  After reviewing the timeline of Donisthorpe's scheme and its eventual unraveling, see Closing Brief at 2-4, Evanston Insurance discusses Moya's testimony, see

Closing Brief at 4.  It asserts that Moya "repeatedly testified that Donisthorpe carried out his embezzlement scheme by first commingling individual client funds in pooled accounts, misappropriating those funds and then converting them for his own personal use."  Closing Brief at 4.  See id. at 4-6 (citing Oct. 7 Tr. at 123:9-124:20 (Moya); id. at 136:10-16 (Moya); id. at 256:20-24 (Moya); id. at 383:8-14 (Moya)).  Evanston Insurance also notes that Donisthorpe confirmed the accuracy of his original and amended plea agreements at trial.  See Closing Brief at 6 (citing Oct. 8 Tr. at 523:19-524:6 (Donisthorpe)).   Evanston Insurance argues that, in light of this evidence, because the $4.9 million that the former clients seek to recover are the same funds which Moya and the FID determined that Donisthorpe misappropriated, "the Policy's Commingling/Misappropriation of Funds Exclusion bars coverage for the Underlying Claim."  Closing Brief at 7.

29.     Next, Evanston Insurance argues that allowing Ms. Bennett to benefit from the "innocent insured" doctrine would "violate New Mexico Law and rewrite the Policy."  Closing Brief at 7.  They cite numerous cases rejecting an insured's request to impose an innocent insured exception to a commingling/misappropriation of funds exclusion.  See Closing Brief at 7-8 (citing Bethel v. Darwin Select Ins. Co., 735 F.3d 1035, 1042 (8th Cir. 2013); Northland Ins. Co. v. Stewart Title & Guar. Co., 327 F.3d 448, 457 (6th Cir. 2003); Phila. Indem. Ins. Co. v. Stazak Mgmt., No. 3:16-cv-00369, 2018 U.S. Dist. LEXIS 92567, at *34-35 (M.D. Fla. May 31, 2018)(Howard, J.); Nelson v. XL Am., Inc., No. 2:16-cv-00060, 2019 U.S. Dist. LEXIS 154103, 2017 WL 4185461, at *9 (D. Nev., Sep. 21, 2017)(Dorsey, J.); PNA, L.L.C. v. Interstate Ins. Grp., No. Civ. A. 02-1130, 2003 U.S. Dist. LEXIS 11431, at *4 (E.D. La. June 20, 2003)(Englehardt, J.); Bankers Multiple Line Ins. Co. v. Pierce, 20 F. Supp. 2d 1004, 1008 (S.D. Miss. 1998)(Guirola, M.J.); Fid. Nat'l Title Ins. Co. v. OHIC Ins. Co., 619 S.E.2d 704, 707 (Ga. Ct. App. 2005)).   It

adds that the evidence shows that Donisthorpe's financial misconduct occurred before the Insurance Policy's November 1, 2016, inception date. See Closing Brief at 8-9 (citing Oct. 7 Tr. at 136:10-16 (Moya); Oct. 8 Tr. at 523:19-524:6 (Donisthorpe)). Evanston Insurance says that, in light of this evidence, and because Donisthorpe acknowledged at trial that he was aware his conduct was exposing Desert State to claims, and the Insurance Policy's condition precedent for coverage[12] was not met. See Closing Brief at 9 (citing Oct. 8 Tr. at 538:6-17 (Donisthorpe). It also argues that the Court must apply this condition precedent to coverage for Ms. Bennett under New Mexico law, because Donisthorpe's knowledge is imputed to her. See Closing Brief at 10. In conclusion, Evanston Insurance asks that the Court enter judgment in its favor, and declare that it has no duty to pay any money in defense or indemnity related to the underlying state case. See Closing Brief at 10-11.

### LAW REGARDING DIVERSITY JURISDICTION AND ERIE

30.     Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just

---

[12]Evanston Insurance argues that the Insurance Policy contains a condition precedent requiring that "[p]rior to the effective date of this Coverage Part the Insured had no knowledge of such Wrongful Act(s) or Personal Injury(ies) or any fact, circumstance, situation or incident, which may have led a reasonable person in the Insured's position to conclude that a Claim was likely." Closing Brief at 9 (citing Insurance Policy at 15).

as a court engaging in statutory interpretation must always begin with the statute's text, a court

formulating an Erie prediction should look first to the words of the state supreme court." Peña v.

Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[13]  If the Court finds only an

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will

consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by

the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court

decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that

where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal

district court sitting in this district, is to predict what the Supreme Court of New Mexico would do

if the case were presented to it"  (citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir.

---

[13]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.).  Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts.  The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a state supreme court case that a federal court predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt

to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance

from decisions rendered by lower courts in the relevant state"))).[14]  The Court may also rely on

_____

[14]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
> . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
>
> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Tr. v. WPX Energy

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[15]  Ultimately, "the Court's task is to predict what the

_____

state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions."  (emphasis and title case omitted)).

[15]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit caselaw, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

        The Court must decide how to weigh Tenth Circuit caselaw against more recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening caselaw directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-

filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law.  Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are.  More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do.  As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one state.  It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is $x$.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become

a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue."  <u>Moore's Federal Practice</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  (citation and internal quotation marks omitted))).  This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, <u>see</u> <u>Abbott Labs. v. Granite State Ins.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  <u>See</u> <u>Allstate Ins. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the <u>Erie</u> analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The <u>Erie</u> doctrine results in federal cases that interpret state law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme

Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on <u>Erie</u>, of course, mean little if the Tenth Circuit does not agree. In <u>Wankier v. Crown Equipment Corp.</u>, 353 F.3d 862 (10th Cir. 2003)(McConnell, J.) the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866. From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." <u>The American Heritage Dictionary of the English Language</u> 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866 -- might additionally compel the determination that any intervening caselaw must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, former United States Circuit Judge for the Tenth Circuit, limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even <u>Koch v. Koch Industries, Inc.</u>, 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which <u>Wankier v. Crown Equipment Corp.</u> relies, uses the more inclusive definition. In fact, <u>Wankier v. Crown Equipment Corp.</u> quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d at 1231.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In <u>Kokins v. Teleflex, Inc.</u>, the Tenth Circuit, quoting <u>Wankier v. Crown Equipment Corp.</u>, refused to consider an opinion

state supreme court would do." Wade v. EMCASCO Ins., 483 F.3d at 666.  Accord Mosley v.

Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174,

1188-89 (D.N.M. 2008)(Browning, J.).

### LAW REGARDING INSURANCE CONTRACT INTERPRETATION

31.     Under New Mexico Law, "insurance contracts are construed by the same principles

which govern the interpretation of all contracts." Rummel v. Lexington Ins. Co., 1997-NMSC-

041, ¶ 18, 945 P.2d 970, 976 (quotation marks omitted).  In interpreting insurance policies, courts

must consider the policy as a whole. See Weldon v. Commercial Union Assur. Co., 1985-NMSC-

118, ¶ 9, 710 P.2d 89, 91.  "The clauses in the policy must be construed as intended to be a complete

and harmonious instrument designed to accomplish a reasonable end."  Safeco Ins. Co. of Am.,

Inc. v. McKenna, 1977-NMSC-053, ¶ 18, 565 P.2d 1033, 1037.  "If any provisions appear

questionable or ambiguous, we will first look to whether their meaning and intent is explained by

other parts of the policy."  Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 20, 945 P.2d at 977.

When insurance contracts are unambiguous, courts must construe them "in their usual and ordinary

sense," Slack v. Robinson, 2003-NMSC-083, ¶ 7, 71 P.3d 514, 517, and "enforce [them] as

written," Truck Ins. Exch. v. Gagnon, 2001-NMCA-092, ¶ 7, 33 P.3d 901, 903.

---

from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'"  (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).
      The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior caselaw.  Moore's Federal Practice lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive."  Moore's Federal Practice § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

32.     When interpreting contracts, "courts should not 'create ambiguity where none

exists.'"   United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 10, 285 P.3d at 647

(quoting City of Santa Rosa v. Twin City Fire Ins. Co., 2006-NMCA-118, ¶ 7, 143 P.3d 196, 198).

Policy terms are only deemed ambiguous when they are "reasonably and fairly susceptible of

different constructions."   Knowles v. United Servs. Auto Ass'n, 1992-NMSC-030, ¶ 9, 832 P.2d

at 396.   Ambiguous terms must be construed against the drafter; they are "given the strongest

interpretation against the insurer which they will reasonably bear."   Rummel v. Lexington Ins. Co.,

1997-NMSC-041, ¶ 22, 945 P.2d at 977.   See United Nuclear Corp. v. Allstate Ins. Co., 2012-

NMSC-032, ¶ 10,  285 P.3d at 648.

33.     In construing an insurance policy, the distinction between an exclusion and a

provision of coverage is very important, because it affects which party bears the burden of proof.

See Miller v. Monumental Life Ins. Co., 761 F. Supp. 2d at 1147.   The insured party initially bears

the burden to show that coverage is established under a provision of coverage.   See Battishill v.

Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 6, 127 P.3d 1111, 1113 The insurer then bears the

burden of proving the policy excludes coverage.   See Battishill v. Farmers Alliance Ins. Co., 2006-

NMSC-004, ¶ 6, 127 P.3d at 1113 (citing Eric Mills Holmes & Mark S. Rhodes, Holmes's

Appleman on Insurance, § 1.10, at 43 (2d ed. 1996)("That the insurer has the burden of proof to

prove no coverage under an all-risks policy is the American rule in all states, with the possible

exception of Texas")); Lopez v. N.M. Pub. Schs. Ins. Auth., 1994-NMSC-017, ¶ 13, 870 P.2d 745,

749.

34.     Insurance policy terms are frequently litigated, and courts have established

consensus interpretations to many of the most common phrases.   For example, "'unlike the phrase

'the insured,' the phrase 'any insured' unambiguously expresses a contractual intent to create joint

obligations and to prohibit recovery by an innocent insured.'"  Axis Reinsurance Co. v. Bennett, 2008 WL 2485388, at *15 (S.D.N.Y. June 19, 2008)(Lynch, J.)(quoting Sales v. State Farm Fire & Cas. Co., 849 F.2d 1383, 1385 (11th Cir. 1988)).  See also Am. Nat'l Prop & Cas. Co. v. Clendenen, 238 W. Va. at 264 n.12 (collecting cases); Stettin v. Nat. Union Fire Ins. Co. of Pittsburgh, Pa., 861 F.3d at 1337.  Similarly, the Court of Appeals of New Mexico has defined "arising out of" broadly, stating that the term is "ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.'"  Krieger v. Wilson Corp., 2006-NMCA-034, ¶ 14, 131 P.3d 661, 666 (quoting Baca v. New Mexico State Highway Dep't, 1971-NMCA-087, ¶ 14, 486 P.2d 625, 628).  In analyzing the term in an insurance contract exclusion, the Tenth Circuit surveyed New Mexico caselaw and concluded that "we have every reason to suppose that New Mexico law applies the same broad definition of arising out of in the exclusion context as in the coverage context."  Am. Nat'l Prop. & Cas. Co. v. United Specialty Ins. Co., 592 F. App'x 730, 742 (10th Cir. 2014).[16]

---

[16]American National Property & Casualty Co. v. United Specialty Insurance Co. is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent. . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that American National Property & Casualty Co. v. United Specialty Insurance Co. and Mount Vernon Fire Ins. Co. v. Okmulgee Inn Venture, LLC, 451 F. App'x 745, 749 (10th Cir. 2011), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

## LAW REGARDING THE ADVERSE INTEREST EXCEPTION AND
## INSURANCE POLICY APPLICATIONS

35.     Generally, "an agent's knowledge of matters within the scope of his authority is knowledge of his principal." U.S. Fid. & Guar. Co. v. State of Okla. ex rel Sebring, 383 F.2d 417, 419 (10th Cir. 1967).   An agent's knowledge is not always imputed to the principal.   See Restatement (Third) of Agency § 5.04 (2006); Restatement (Second) of Agency §§ 280, 282 (1958).  "If an agent has done an unauthorized act or intends to do one, the principal is not affected by the agent's knowledge that he has done or intends to do the act."  Restatement (Second) of Agency § 280.  In addition, with a few exceptions, "[a] principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes."   Restatement (Second) of Agency § 282.   See BancInsure, Inc. v. U.K. Bancorporation Inc./United Ky. Bank of Pendleton Cty. Inc., 830 F. Supp. 2d 294, 302 (E.D. Ky. 2011)(Bunning, J.)("BancInsure"); Restatement (Third) of Agency § 5.04 (2006).

36.     Section 280, comment c, of the Restatement (Second) of Agency -- titled Agent's Knowledge of His Own Unauthorized Acts -- discusses a related circumstance where an agent's knowledge is not imputed to the principal.

> If, in order to protect himself against the embezzlement or other wrongdoing of an agent, the principal obtains a contract of indemnity which states that the signer has no knowledge of any prior wrongdoing by the agent, the knowledge of his own embezzlement by the agent who signs the contract is not imputed to the principal. The risk of embezzlement by dishonest agents is the risk insured against and it would defeat the purpose of the contract to bind the principal by the knowledge of such agents.

Restatement (Second) of Agency § 280 cmt. c (1958). See Restatement (Third) of Agency § 5.03 cmt. (b) ("[I]f a principal makes a claim under a fidelity bond covering an employee's dishonesty,

the issuer of the bond may not decline to pay on the basis that the employee's knowledge of the employee's own wrongdoing is imputed to the principal."). In accordance with § 280(c) and § 282, courts generally do not impute a wrongdoer's knowledge to the principal when the agent has misrepresented his or her embezzlement on a fidelity bond application. See Nat'l Credit Union Bd. v. CUMIS Ins. Soc'y, Inc., 241 F. Supp. 3d 934, 941 (D. Minn. 2017)(Frank, J.)("CUMIS").

37.     Courts have inconsistently applied Restatement (Second) of Agency § 282, the adverse interest exception, to misrepresentations on an application for insurance. The Second Circuit has suggested, without deciding, that a corporation's president acted on the corporation's behalf when procuring an insurance policy, even though he made misrepresentations in the application. See Pereira v. Aetna Cas. & Sur. Co., 186 F.3d at 208 (citing Gordon v. Cont'l Cas. Co., 181 A. 574, 576 (Pa. 1935); In re Maxwell Newspapers, Inc., 151 B.R. 63, 69 (Bankr. S.D.N.Y. 1993)(Brozman, J.); Restatement (Second) of Agency § 282 cmt. c (1958)). The Second Circuit noted in support that "a principal may not disavow an act of an agent while simultaneously taking advantage of the benefits of the fraudulently procured bargain." Pereira v. Aetna Cas. & Sur. Co., 186 F.3d at 208 (citing Restatement (Second) of Agency § 282 cmt. h ("[A] principal may not disclaim knowledge of the agent's fraud and yet attempt to retain a benefit obtained by the fraud; this is a restitution principle preventing the unjust enrichment of the principal.")). Further, the Tenth Circuit has held that, under Oklahoma law, an investment firm's treasurer "acted adversely to his principal in embezzling its funds and in [its] behalf in submitting the [fidelity bond] applications." Md. Cas. Co. v. Tulsa Indus. Loan & Inv. Co., 83 F.2d 14, 17 (10th Cir. 1936). The Supreme Court of Pennsylvania has likewise stated that, although "there would seem to be some confusion of thought," Gordon v. Cont'l Cas. Co., 181 A. at 576, over whether an embezzling agent acts in the principal's interest in lying to obtain a fidelity bond, in arranging for

the bond, such agents do not act adversely.  See Gordon v. Cont'l Cas. Co., 181 A. at 576.  The

Supreme Court of Pennsylvania stated that

> the rule that knowledge of a corporate officer is knowledge of the corporation, applies only where a third person seeks to enforce some demand against the corporation . . . , but the [adverse interest] exception has no application where the corporation seeks to enforce the benefit of a fraud perpetrated by its officer on a third person; that the exception to the rule of imputed knowledge is not a vehicle for the consummation of fraud.

Gordon v. Cont'l Cas. Co., 181 A. at 576.  It also asserted that this rule accorded with §§ 261 and

282 of the Restatement (Second) of Agency.  See Gordon v. Cont'l Cas. Co., 181 A. at 576-77.

  38. On the other hand, several courts have applied the adverse interest exception to

misrepresentations on an insurance application.  In CUMIS, the Honorable Donovan Frank, United

States District Judge for the District of Minnesota, held that, because the "*only* reason that Cofell

did not disclose the existence of her theft was for her own benefit and to the detriment of the

company," CUMIS, 241 F. Supp. 3d at 940 (emphasis in original), the adverse interest exception

applied to her misrepresentation on the insurance application, see CUMIS, 241 F. Supp. 3d at 941.

Judge Frank emphasized that others should not read the opinion broadly:

> But the Court reiterates the narrowness of its holding: it is only when an employee who acting adversely to her employer by embezzling from the company misrepresents her knowledge of that embezzlement on an application for fidelity insurance that the employee's knowledge will not be imputed to the company to allow the insurer to rescind the fidelity insurance.

CUMIS, 241 F. Supp. 3d at 941.  In BancInsure, the Honorable David Bunning, United States

District Judge for the Eastern District of Kentucky, held that an embezzling CEO acted on her

own behalf and against her principal's interests when she lied on an insurance policy renewal

application:

> Wood was acting adverse to [the bank's] interests when she lied on the renewal application.  Had she been honest in completing the applications, [the bank] would have been able to submit a timely claim . . . .  Thus, by lying on the application,

[the bank] did not benefit in any way.  For approximately eight years, Wood had been involved in [a] large scale fraudulent scheme which culminated in an embezzlement of over 2.2 million dollars from [the bank].  It is clear that she would not communicate this fact to [the bank] because it would necessarily prevent the consummation of the fraudulent scheme which she was engaged in perpetrating.  If Wood answered [the question] on the renewal application truthfully, her fraud would have been revealed, and she would not have been able to continue embezzling funds from [the bank].  Therefore, since Wood's interests in concealing her fraudulent activity [were] adverse to [the bank's] interests, her knowledge of her embezzlement will not be imputed to [the bank].

BancInsure, 830 F. Supp. 2d at 304.  See Everest Nat'l Ins. Co. v. Tri-State Bancshares, Inc., 2016 WL 5062155, at *10 (quoting this passage and noting that its "reasoning applies with equal force in this case").  Finally, the Court of Appeals of Washington also concluded that it would not impute a bank director's knowledge to the bank, because he "acted adversely both as to his defalcations and as to his concealment of them on the bond application.  His motive to conceal continued through the period in question, and he was not the sole representative of the bank."  Puget Sound Nat. Bank v. St. Paul Fire and Marine Ins. Co., 645 P.2d at 1128.

39.     Courts that do not impute an embezzling agent's knowledge to the principal rely on arguments based on allocation of risk.  See CUMIS, 241 F. Supp. 3d at 941 (discussing cases).  In Everest Nat'l Ins. Co. v. Tri-State Bancshares, Inc., 2016 WL 5062155, for example, the court called § 280 comment c a "persuasive and prudent" explanation why insurers should bear the risk that an applicant dishonestly applies for fidelity insurance rather than the applicant's employer.  Everest Nat'l Ins. Co. v. Tri-State Bancshares, Inc., 2016 WL 5062155, at *12.  The court reasoned that, while some principles of agency law suggest that courts should protect third parties when an agent fraudulently contracts with them on a principal's behalf, § 280 comment c suggests that the risks inherent in fidelity insurance belongs with the insurers or coverage would be rendered illusory.  See Everest Nat'l Ins. Co. v. Tri-State Bancshares, Inc., 2016 WL 5062155, at *12.  Judge

Bunning also noted that, if an agent's knowledge was imputed to the principal for purposes of a fidelity bond application, organizations would be unable to protect themselves against the risk of dishonest employees.  See BancInsure, 830 F. Supp. 2d at 305.

40.     Although New Mexico courts have not cited either § 280 or § 282 of the Restatement (Second) of Agency, they are widely adopted in courts throughout the country.  See Amelia Toy Rudolph et al., *Invoking in Pari Delicto to Bar Accountant Liability Actions Brought by Trustees and Receivers*, ST004 ALI-ABA 75, 92-94 (2011)(collecting cases adopting the adverse interest exception); Bogda M.B. Clarke et al., *Fraud in the Inducement as a Defense to Fidelity and Surety Claims,* 42 Tort Trial & Ins. Practice L. J. 181, 193 (2007)("the majority of courts endorse the position taken by section 280").  Further, the Court of Appeals of New Mexico has recognized two similar exceptions to the general rule that an agent's knowledge is imputed to the principal.  See Lihosit v. I & W, Inc., 1996-NMCA-033, ¶¶ 19-20, 913 P.2d 262, 267 (citing Restatement (Second) of Agency §§ 268 cmt. d, and 275 cmt. b).  In light of the overwhelming acceptance of these agency principles, the Court concludes that the Supreme Court of New Mexico would recognize the adverse interest exception and the § 280 exception to the usual imputation of an agent's knowledge.

## LAW REGARDING RESCISSION OF CONTRACTS FOR MATERIAL MISREPRESENTATIONS

41.     Rescission is an equitable remedy that voids a contract entered through mistake, fraud, or duress.  See Branch v. Chamisa Dev. Corp., 2009-NMCA-131, ¶ 21, 223 P.3d 942, 946.  "Rescission is an equitable remedy which seeks to restore the status quo ante," and "[t]he defrauded party must return or offer to return that which has been received under the contract as a condition precedent to maintaining a suit for rescission."  Ledbetter v. Webb, 1985-NMSC-112,

¶ 15, 711 P.2d 874, 877-78.  Under New Mexico law, rescission for fraud "is allowed where there has been a misrepresentation of a material fact, the misrepresentation was made to be relied on, and has in fact been relied on."  Prudential Ins. Co. of Am. v. Anaya, 1967-NMSC-132, ¶ 8, 428 P.2d 640, 643.  Rescission "may be allowed in certain cases of non-fraudulent, but material, nondisclosure."  McElhannon v. Ford, 2003-NMCA-091, ¶ 15, 73 P.3d 827, 832; City of Raton v. Ark. River Power Auth., 611 F. Supp. 2d 1190, 1198 (D.N.M. 2008)(Browning, J.).[17]  Rescission's test of materiality is "whether plaintiff, as a reasonably prudent insurer, would have rejected the risk if it had known the true facts."  Prudential Ins. Co. of Am. v. Anaya, 1967-NMSC-132, ¶ 17, 428 P.2d at 644.  If the Court deems either the withheld information or the misrepresentations material, then rescission is available "in the absence of waiver or estoppel."  Modisette v. Found. Reserve Ins. Co., 1967-NMSC-094, ¶ 19, 427 P.2d 21, 26.  The parties' good faith to the contract is immaterial -- "it makes no difference whether the party acted fraudulently, negligently, or innocently."  Modisette v. Found. Reserve Ins. Co., 1967-NMSC-094, ¶ 17, 427 P.2d at 25.

42.    Parties who seek rescission may be estopped from asserting it and may also waive the right to rescind.  Modisette v. Found. Reserve Ins. Co., 1967-NMSC-094, ¶ 19, 427 P.2d at 26. If rescission for fraud is sought, the party

> must immediately, upon discovering the fraud, restore, or offer to restore, all that he has received under the contract, as a condition precedent to his right to rescind the same. If he fails to do this, or if, after discovering the fraud, he takes any steps

---

[17]In making its ruling under Erie, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision."  Mosley v. Titus, 762 F. Supp. 2d at 1332.  As support for its conclusion that, "rescission may be allowed in certain cases of non-fraudulent, but material, nondisclosure," the Court of Appeals cites the Restatement (Second) of Contracts §§ 161, cmt. b, and 164(1) cmt. b.  Given the similarity between these provisions and Prudential Ins. Co. of Am. v. Anaya, 1967-NMSC-132, the Court concludes that the Supreme Court of New Mexico would concur with McElhannon v. Ford, 2003-NMCA-091, ¶ 15, 73 P.3d at 832.

in affirmance of the contract, he will be held to have elected to affirm the same and will not thereafter be granted relief in equity from the burdens of the contract. Putney v. Schmidt, 1911-NMSC-043, ¶ 10, 120 P. 720, 723.  In New Mexico, "[b]efore an insurer can be held to have waived, or be estopped from asserting a right of forfeiture, it must have had knowledge of the facts."  Modisette v. Found. Reserve Ins. Co., 1967-NMSC-094, ¶ 28, 427 P.2d at 27.  Rescission based on misrepresentation is a remedy that "sounds partly in tort."  City of Raton v. Ark. River Power Auth., 611 F. Supp. 2d at 1207.

### NEW MEXICO LAW REGARDING THE DUTY TO DEFEND AND THE DUTY TO INDEMNIFY

43.     The "duty to indemnify is distinct from [the] duty to defend," and resolution whether a party has a duty to defend does not "necessarily depend on there being a duty to indemnify." City of Albuquerque v. BPLW Architects & Eng'rs, Inc., 2009-NMCA-081, ¶ 31, 726, 213 P.3d 1146, 1155 (Ct. App. 2009)(citing Ins. Co. of N. Am. v. Wylie Corp., 1987-NMSC-011, 733 P.2d 854, 857 (1987)).  In disputes stemming from insurance contracts, the "duty to defend arises out of the nature of the allegations in the complaint," Miller v. Triad Adoption & Counseling Servs., Inc., 2003-NMCA-055, ¶ 9, 65 P.3d 1099, 1103 (citing Bernalillo Cty. Deputy Sheriff's Ass'n v. Cty. of Bernalillo, 1992-NMSC-065, ¶ 4, 845 P.2d 789, 791), and is determined "by comparing the factual allegations in the complaint with the insurance policy," Lopez v. N.M. Pub. Sch. Ins. Auth., 1994-NMSC-017 at ¶ 8, 870 P.2d at 747. If a complaint "states facts that bring the case within the coverage of the policy," then the duty to defend will be triggered. Bernalillo Cty. Deputy Sheriffs Ass'n v. Cty. of Bernalillo, 1992-NMSC-065, ¶ 8, 845 P.2d at 791. Generally, an insurer's "duty to defend arises out of a potentially covered claim and lasts until the conclusion of the underlying lawsuit, or until it has been shown that there is no potential for coverage," and, when there are multiple causes of action, "the duty continues until every covered

claim is eliminated." Guest v. Allstate Ins. Co., 2010-NMSC-047, ¶ 33, 244 P.3d 342, 348 (2010)(citing S. Plitt et al., Insurer's Duty to Defend: Nature, Commencement, and Termination, 14 Couch on Insurance 3d, § 200:47 (Supp. 2007)). Known, but unpled facts, may bring a claim within the coverage of the policy at the beginning of the litigation or at a later stage. See Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co., 1990-NMSC-094, ¶ 11, 799 P.2d 1113, 1116. "If the allegations of the complaint or the alleged facts tend to show that an occurrence comes within the coverage of the policy, the insurer has a duty to defend regardless of the ultimate liability of the insured." Miller v. Triad Adoption & Counseling Servs., Inc., 2003-NMCA-055, ¶ 9, 65 P.3d at 1103 (citing Found. Reserve Ins. Co., Inc. v. Mullenix, 1982-NMSC-038, ¶ 6, 642 P.2d 604, 605). With respect to the duty to indemnify, New Mexico courts have held that "[i]f the allegations of the federal complaint clearly fall outside the provisions of [the] liability insurance policies, indemnity by the insurer is not required." N.M. Physicians Mut. Liab. Co. v. LaMure, 1993-NMSC-048, ¶ 8, 860 P.2d 734, 737 (1993). A court will "leave[ ] for later" determination whether the insurer must indemnify the insured, because that "ultimate determination is based on whether the insurer became legally obligated to pay damages because of a bodily injury or property damage that does, in fact, fall under the policy coverage." 12 Couch on Insurance § 172:2 (Supp. 2011). The Tenth Circuit has held that the "duty to indemnify relates to liability actually imposed on the insured for claims falling within the scope of coverage." Mount Vernon Fire Ins. Co. v. Okmulgee Inn Venture, LLC, 451 F. App'x 745, 749 (10th Cir. 2011)(addressing duty to indemnify in Oklahoma and applying Tenth Circuit case law from Colorado)(citing United Fire & Cas. Co. v. Boulder Plaza Residential, LLC, 633 F.3d 951, 956-57 (10th Cir. 2011)). See Valley Imp. Ass'n v. U.S. Fid. & Guar. Corp., 129 F.3d 1108, 1126 (10th Cir. 1997)(concluding that, under New Mexico law, a judgment regarding the duty to indemnify would be "premature," because "the duty

to indemnify must be determined based on the facts as ultimately determined in the litigation against the insured").

44.     In Hartford Fire Insurance Co. v. Gandy Dancer, LLC, 864 F. Supp. 2d 1157 (D.N.M. 2012)(Browning, J.), defendant Mercer LLC argued that it was entitled to Hartford Fire Insurance coverage for a negligent misrepresentation claim that it claimed caused property damage.  See 864 F. Supp. 2d at 1199.  The Court concluded that negligent misrepresentation could constitute an "occurrence" or "accident" -- which are events covered by the insurance policy. 864 F. Supp. 2d at 1199.  The allegations were "sufficient to trigger coverage, because an insurer's 'duty to defend arises out of a *potentially* covered claim.'"  864 F. Supp. 2d at 1200 (quoting Guest v. Allstate Ins. Co., 2010-NMSC-047, ¶ 33, 244 P.3d at 348 (emphasis in Hartford Fire Ins. Co. v. Gandy Dancer, LLC)).  The Court concluded that the duty to defend was not triggered by this allegation, because the policy excluded claims for property damage that arose out of the insureds' work.   See 864 F. Supp. 2d at 1200.  The plaintiff had a duty to defend, however, because the defendants' claims for trespass and nuisance "arguably give rise to coverage."  864 F. Supp. 2d at 1202.

## LAW REGARDING JUDGMENT AS A MATTER OF LAW

45.     Rule 50(a) of the Federal Rules of Civil Procedure provides for judgment as a matter of law.  The rule states:

> **(1) *In General.*** If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> > **(A)** resolve the issue against the party; and
> >
> > **(B)** grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

**(2)** *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

Fed. R. Civ. P. 50(a).

46.     Judgment as a matter of law is proper where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). This standard for a directed verdict mirrors the standard for summary judgment. See Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986)(concluding "that this [Rule 56] standard mirrors the standard for directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.")(internal citation omitted); Wiles v. Michelin No. America, Inc., 173 F.3d 1297, 1303 (10th Cir. 1999)("We review the district court's ruling on a motion for JMOL under a standard that is essentially identical to the 'genuine issue' requirement in the summary judgment context.")(internal citation omitted). A court may grant judgment as a matter of law, however, even though it has denied summary judgment, because the parties have been able to address all relevant, available evidence. See Lee v. Glassing, 51 F. App'x 31, 32 (2d Cir. 2002).

47.     In determining whether to grant judgment as a matter of law, a court may not weigh the evidence or make its own credibility determination, see Shaw v. AAA Eng'g. & Drafting, 213 F.3d 519, 529 (10th Cir. 2000), and must draw all reasonable inferences in favor of the nonmoving party, see Thompson v. State Farm Fire & Cas. Co., 34 F.3d 932, 941 (10th Cir. 1994). Such a judgment is warranted if the evidence permits only one rational conclusion. See Crumpacker v. Kan. Dep't of Human Res., 474 F.3d 747, 751 (10th Cir. 2007). In other words, "'[t]he question

is not whether there is literally no evidence supporting the [nonmoving] party . . . but whether there is evidence upon which the jury could properly find [for that party].'" <u>Century 21 Real Estate Corp. v. Merj Int'l Inv. Corp.</u>, 315 F.3d 1271, 1278 (10th Cir. 2003)(alterations in original)(quoting <u>Hurd v. Am. Hoist & Derrick Co.</u>, 734 F.2d 495, 499 (10th Cir. 1984)).

## **LAW REGARDING IMPLIED STATUTORY PRIVATE RIGHTS OF ACTION**

48.     When a party seeks to enforce a statute that provides no express mechanism for its enforcement, a court must examine whether a cause of action may be implied through the common law.  See <u>Starko, Inc. v. Presbyterian Health Plan, Inc.</u>, 2012-NMCA-053, ¶ 33, 276 P.3d 252, 264-65.  In <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001), the Supreme Court of the United States held: "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."  532 U.S. at 286 (citation omitted).  The Supreme Court explained: "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  <u>Alexander v. Sandoval</u>, 532 U.S. at 286 (citation omitted).  "Statutory intent on this latter point is determinative," and "[w]ithout it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."  <u>Alexander v. Sandoval</u>, 532 U.S. at 286-87 (citations omitted).

49.     The federal test for determining whether legislative intent exists is set forth in <u>Cort v. Ash</u>, 422 U.S. 66, 78 (1975).  See <u>Alexander v. Sandoval</u>, 532 U.S. at 287.  In <u>Cort v. Ash</u>, the Supreme Court set forth the test for determining whether to recognize an implied private cause of action:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted -- that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to

create such a remedy or to deny one?  Third, is it consistent with the underlying
purposes of the legislative scheme to imply such a remedy for the plaintiff?

Cort v. Ash, 422 U.S. at 78 (internal quotation marks and citations omitted).  See also Nat'l Trust
for Historical Pres. v. City of Albuquerque, 1994-NMCA-057, 874 P.2d 798, 801 (citing Cort. v.
Ash, 422 U.S. at 78).

50.    The Supreme Court has recognized, however, that the standard for discerning
whether state statutes create private rights of action is less stringent than the federal standard:
"Raising up causes of action where a statute has not created them may be a proper function for
common-law courts, but not for federal tribunals."  Alexander v. Sandoval, 532 U.S. at 287.  In
recognition of this distinction between federal and state statutes, the Court of Appeals of New
Mexico in National Trust for Historical Preservation v. City of Albuquerque rejected the argument
that the federal test articulated in Cort v. Ash exclusively applies to determine whether an implied
private right of action under a state statute exists.  See 1994-NMCA-057, ¶¶ 6-10, 874 P.2d at 801.
The Court of Appeals of New Mexico applied a less stringent standard for implying a private right
of action from a state statute.  See 1994-NMCA-057, ¶¶ 11-12, 874 P.2d at 801.  In adopting this
standard, the Court of Appeals of New Mexico explained that a "state court, because it possesses
common-law authority, has significantly greater power than a federal court to recognize a cause
of action not explicitly expressed in a statute."  1994-NMCA-057, ¶ 10, 874 P.2d at 801-02.  The
Court of Appeals of New Mexico rejected the notion that statutory intent alone is determinative
and instead held that a New Mexico court may "look beyond legislative intent in exercising
common-law authority to recognize a private cause of action."  1994-NMCA-057, ¶ 10, 874 P.2d
at 801.  The Court of Appeals of New Mexico explained that "a common-law court may utilize the
statute solely to demonstrate what is public policy," and the "public policy then forms the predicate

for a common-law cause of action."  1994-NMCA-057, ¶ 10, 874 P.2d at 801 (citations omitted).

The Supreme Court of New Mexico has advanced the proposition that a state court may imply a

private right of action based upon public policy, and not legislative intent, and has cited <u>National</u>

<u>Trust for Historical Preservation v. City of Albuquerque</u> in support of this proposition.  "[F]ederal

courts do not presume that Congress intended for the common law to apply when interpreting a

statute, . . . 'a state court, because it possesses common-law authority, has significantly greater

power than a federal court to recognize a cause of action not explicitly expressed in a statute' and

may do so in order to further public policy."  <u>See</u> <u>San Juan Agric. Water Users Ass'n v. KNME-</u>

<u>TV</u>, 2011-NMSC-011, ¶ 40, 257 P.3d 884, 893 (quoting <u>Nat'l Trust for Historical Pres. v. City of</u>

<u>Albuquerque</u>, 1994-NMCA-057, ¶ 10, 874 P.2d at 801-02).

     51.    The <u>National Trust for Historical Preservation v. City of Albuquerque</u> court held

that the federal legislative intent test articulated in <u>Cort v. Ash</u> did not control, because that test

"was developed to assist in the interpretation of federal statutes," and "[d]ifferent considerations

arise when state courts decide matters of state law."  1994-NMCA-057, ¶ 8, 874 P.2d at 801.  One

such consideration stems from the fact that "[f]ederal courts have very limited authority beyond

that conferred by statute or the Constitution.  As the United States Supreme Court has stated, 'The

instances where we have created federal common law are few and restricted.'"  1994-NMCA-057,

¶ 9, 874 P.2d at 801 (quoting <u>Wheeldin v. Wheeler</u>, 373 U.S. 647, 651 (1963)).  Thus, the <u>Cort v.</u>

<u>Ash</u> test essentially is a test to determine whether Congress intended to create, either expressly or

by implication, a private cause of action.  <u>See</u> <u>Nat'l Trust for Historical Pres. v. City of</u>

<u>Albuquerque</u>, 1994-NMCA-057, ¶¶ 7-11, 874 P.2d at 801 (citation omitted).  The Court of Appeals

of New Mexico explained that the <u>Cort v. Ash</u> factors are not irrelevant to the question whether a

private right of action exists under a state statute, but rather that they are not exclusive.  <u>See</u> <u>Nat'l</u>

Trust for Historical Pres. v. City of Albuquerque, 1994-NMCA-057, ¶¶ 7-11, 874 P.2d at 801

(citation omitted).  Instead, "a state's public policy, independent of the first three Cort v. Ash

factors, may be determinative in deciding whether to recognize a cause of action."  See Nat'l Trust

for Historical Pres. v. City of Albuquerque, 1994-NMCA-057, ¶ 11, 874 P.2d at 801 (citation

omitted).

## LAW REGARDING STAYS

52.     A court has broad discretion in managing its docket, which includes decisions

regarding issuing stays for all or part of a proceeding.  See Clinton v. Jones, 520 U.S. 681, 706

(1997)("The District Court has broad discretion to stay proceedings as an incident to its power to

control its own docket." (citing Landis v. N. Am. Co., 299 U.S. 248, 254 (1936))).

> [T]he power to stay proceedings is incidental to the power inherent in every court
> to control the disposition of the causes on its docket with economy of time and
> effort for itself, for counsel, and for litigants. How this can best be done calls for
> the exercise of judgment, which must weigh competing interests and maintain an
> even balance.

Landis v. N. Am. Co., 299 U.S. at 254-55. Recognizing that district courts must exercise

moderation in issuing stays, the Supreme Court has noted that there are no strict rules for the

district court to apply, because "[s]uch a formula ... is too mechanical and narrow." _____,   299

U.S. at 255.

53.     The party seeking a stay generally faces a difficult burden.  See Clinton v. Jones,

520 U.S. at 708 ("The proponent of a stay bears the burden of establishing its need."); S2

Automation LLC v. Micron Tech., Inc., No. CIV 11-0884 JB/WDS, 2012 WL 3150412, at *2

(D.N.M. July 23, 2012)(Browning, J.)(citing Commodity Futures Trading Comm'n v. Chilcott

Portfolio Mgmt., Inc., 713 F.2d 1477, 1484 (10th Cir. 1983) ).  "In particular, where a movant

seeks relief that would delay court proceedings by other litigants he must make a strong showing

of necessity because the relief would severely affect the rights of others." Commodity Futures

Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484. "The underlying principle

clearly is that 'the right to proceed in court should not be denied except under the most extreme

circumstances.'" Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713

F.2d at 1484 (alterations omitted)(quoting Klein v. Adams & Peck, 436 F.2d 337, 339 (2d Cir.

1971) ).

54.    The Tenth Circuit has acknowledged a district court's discretion in issuing

discovery stays. In Cole v. Ruidoso Municipal Schools, 43 F.3d 1373 (10th Cir. 1994), the

defendants argued "that they had an absolute right to a stay of discovery" after they filed a motion

for qualified immunity and appealed to the Tenth Circuit because the district court imposed

conditions on the stay. 43 F.3d at 1386. The Tenth Circuit rebuffed the strict rules that the

defendants suggested:

> As a general rule, discovery rulings are within the broad discretion of the
> trial court. The trial court's decision on discovery matters will not be disturbed
> unless the appellate court has a definite and firm conviction that the lower court
> made a clear error of judgment or exceeded the bounds of permissible choice in the
> circumstances.

Cole v. Ruidoso Mun. Sch., 43 F.3d at 1386 (citations and internal quotation marks omitted).

55.    Whether to issue a discovery stay depends greatly on each case's facts and

progress. The Court has noted that the "[d]efendants in civil cases face an uphill battle in putting

the brakes on discovery." Fabara v. GoFit, LLC, No. CIV 14-1146 JB/KK, 2015 WL 3544296, at

*11 (D.N.M. May 13, 2015)(Browning, J.).  Defendants particularly struggle "where there are a

relatively small number of factual issues, the plaintiff's discovery requests are not particularly

burdensome, and the defendant has not shown how it will suffer prejudice from them." Fabara v.

GoFit LLC, 2015 WL 3544296, at *11.  In S2 Automation LLC v. Micron Technology, the Court

granted in part and denied in part a motion to stay discovery, to extend pretrial deadlines, to vacate the trial setting, and to issue a protective order. See 2012 WL 3150412, at *1. The Court denied the motion to the extent that it requested a discovery stay, because, "[u]ltimately, a stay is unnecessary." 2012 WL 3150412, at *3. The parties had made "significant progress on the disputed matters," and the Court had "issued rulings on many of the motions that Micron Technology contended needed to be resolved before the case proceeded." 2012 WL 3150412, at *3. Instead of granting the discovery stay, the Court extended deadlines that it had previously set in the case based on the case's increasing complexity. See 2012 WL 3150412, at *3. In Walker v. THI of New Mexico at Hobbs Center, No. CIV 09-0060 JB/KBM, 2011 WL 2728326 (D.N.M. June 28, 2011)(Browning, J.), the Court evaluated whether to stay deposition discovery until thirty days after it ruled on the motions to dismiss two of the defendants, which would determine whether those defendants would remain in the suit and participate in discovery. See 2011 WL 2728326, at *1. The plaintiffs argued that the Court had already extended discovery deadlines and that issuing a stay would require rescheduling deadlines. See 2011 WL 2728326, at *1. The Court denied the motion to stay, because it did "not see a benefit to staying discovery." 2011 WL 2728326, at *2. The Court noted that counsel for the two defendants who were subject to the motions to dismiss had already indicated that they would not participate in deposition discovery. See 2011 WL 2728326, at *2. The Court stated: "There is thus no benefit to staying deposition discovery, and staying deposition discovery would further delay the case." 2011 WL 2728326, at *2. See Benavidez v. Sandia Nat'l Labs, No. CIV 15-0922 JB/LF, 2016 WL 6404798 (D.N.M. Sept. 27, 2016)(Browning, J.)(denying stay where "[t]here is no reason to put the Defendants to the trouble and expense of having to wait and file another motion -- largely regarding the same issues that are already before the Court in the pending Motion to Dismiss -- while the Plaintiffs get all of their

ducks in a row").

# ANALYSIS

56.     The Court has already ruled on Count 1 of Evanston Insurance's Complaint, which asks the Court to rescind the Insurance Policy between Evanston Insurance and Desert State.  The Court has concluded that Evanston Insurance waited too long before rescinding the Insurance Policy, in light of New Mexico law which requires a party seeking to rescind a contract to act "immediately, upon discovering the fraud."  Putney v. Schmidt, 1911-NMSC-043, 120 P. at 723. See Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1120-21; Evanston Ins. Co v. Desert State Life Mgmt., 2020 WL 3448253, at *2-3.  Because Evanston Insurance may not rescind the Insurance Policy, the question remaining is whether the Insurance Policy excludes coverage for some or all of the Defendants.  See Complaint ¶¶ 56-59, at 11-12.  In this Analysis section, the Court determines the extent of the Insurance Policy's coverage for the Defendants.

## I.     MS. BENNETT AND MOYA, DESERT STATE'S RECEIVER, ARE ENTITLED TO COVERAGE UNDER THE INSURANCE POLICY, BUT DONISTHORPE IS NOT ENTITLED TO COVERAGE.

57.     Although Evanston Insurance lists thirteen Defendants in its Complaint, the parties specifically dispute whether the Insurance Policy extends coverage to four Defendants: Christopher Moya, in his capacity as Desert State receiver, Donisthorpe, Ms. Kerr, and Ms. Bennett.  See generally Complaint ¶ 59, at 12; Evanston Insurance Brief ¶ 14-16, at 21-22. The Court stayed the proceeding for Ms. Kerr just before trial.  See Oct. 7 Tr. at 6:6 (Court).  The Court provides its conclusions regarding coverage for Moya, Donisthorpe, and Ms. Bennett below.

### A.     THE COURT STAYED TRIAL PROCEEDINGS FOR MS. KERR, AND IT THEREFORE WILL NOT MAKE RULINGS ON HER COVERAGE.

58.     On the evidence produced at the trial, the Court would conclude that Ms. Kerr, Donisthorpe's wife, was not entitled to coverage under the Insurance Policy.  Ms. Bennett testified

that before learning of Donisthorpe's fund diversion, she did not have any reason to think Ms. Kerr was involved in any wrongdoing.  After this event, however, Ms. Bennett testified that Ms. Kerr "engaged in behavior that indicated that she was not devoted to the compensation of the former clients."  Oct. 8 Tr. at 613:14-18.  Because the Insurance Policy's prior knowledge provision is a condition precedent to coverage, Ms. Kerr has the burden to prove that she did not have any knowledge of Donisthorpe's actions, and she did not meet this burden.  See Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1097.  After she filed her bankruptcy stay, see Notice of Automatic Bankruptcy Stay, filed October 4, 2019 (Doc. 140), however, the Court stayed Evanston Insurance's case against Ms. Kerr.  See Oct. 7 Tr. at 5:17-22 (Court).  The Court excused Ms. Kerr's counsel from the proceedings, and trial proceeded without her presence.  See Oct. 7 Tr. at 6:12-16; id. at 6:19-20 (Court).  Ms. Kerr did not have an opportunity to cross-examine witnesses, present witnesses to counter Ms. Bennett's testimony, or otherwise establish that she did not know about Donisthorpe's misconduct.  Accordingly, the Court will make no final conclusions concerning Evanston Insurance's case against Ms. Kerr.  On the evidence as it stands, however, the Court would conclude that Ms. Kerr is not entitled to coverage under the Insurance Policy.

**B.   THE INSURANCE POLICY'S PRIOR KNOWLEDGE PROVISION PRECLUDES COVERAGE FOR DONISTHORPE BUT NOT FOR OTHER PERSONS OR ENTITIES.**

59.   Evanston Insurance first proposes, as a Conclusion of Law, that "Desert State Life Management and DSLM directors Paul A. Donisthorpe and L. Helen Bennett cannot meet their burden to establish coverage for Graham v. Desert State Life Mngt.," because the Insurance Policy's condition precedent to coverage precludes coverage when any insured has knowledge that a claim likely accrued before the Insurance Policy's term of coverage began.  Evanston Insurance

Brief ¶ 9, at 18-19.  In the MOO, the Court first concluded that, contrary to the Defendants'
arguments, the Insurance Policy's prior knowledge provision[18] is a condition precedent to
coverage rather than an exclusion to coverage.  See Evanston Ins. Co. v. Desert State Life Mgmt.,
434 F. Supp. 3d at 1097-99.  This conclusion's effect is to place the burden on insureds to prove
they had no knowledge of Donisthorpe's misconduct.  See  Evanston Ins. Co. v. Desert State Life
Mgmt., 434 F. Supp. 3d at 1099.  The Court further concluded that, because this provision does
not "express a contractual intent to create joint obligation," Evanston Ins. Co. v. Desert State Life
Mgmt., 434 F. Supp. 3d at 1100, Donisthorpe's knowledge of his own misconduct was not imputed
to the other insureds.  Regarding Desert State's knowledge, the Court concluded that "the Supreme
Court of New Mexico would hold that he acted adversely to his principal, and would not impute
his knowledge to Desert State."  Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at
1119 (citing BancInsure, Inc. v. U.K. Bancorporation Inc./United Ky. Bank of Pendleton Cty.,
Inc., 830 F. Supp. 2d 294, 302 (E.D. Ky. 2011)(Bunning, J.)).  For others insured under the
Insurance Policy, the Court noted that "[t]he other insureds' knowledge of wrongful acts or facts,
circumstances, situations, or incidents that were reasonably likely to lead to a claim is a question
of fact."  Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1101.

---

[18]This provision states insureds are entitled to coverage provided that:

Prior to the effective date of this Coverage Part the Insured had no
knowledge of such Wrongful Act(s) or Personal Injury(ies) or any fact,
circumstance, situation or incident, which may have led a reasonable person in the
Insured's position to conclude that a Claim was likely.

Insurance Policy at 15; FOF ¶ 52, at 16.

60.   The trial resolved these questions of fact.  The trial showed, first, that Donisthorpe knowingly and intentionally misappropriated and converted Desert State client funds for his own personal use from at least 2009 until 2016.  See FOF ¶ 4, at 6-7.[19]  That the CEO of a trust company was misappropriating funds for his own use is conduct that would lead a reasonable person to conclude that a claim was likely to result against Desert State or against Donisthorpe under a professional services policy, as, in fact, several claims did result.  See Aztec Abstract & Title Ins., Inc. v. Maxum Specialty Grp., 302 F. Supp. 3d 1274, 1285 (D.N.M. 2018)(Gonzales, J.); FOF ¶¶ 58-61, at 18-24.  Donisthorpe therefore is not entitled to coverage under the Insurance Policy, because, even if Desert State could not rescind the Insurance Policy as to him,[20] Donisthorpe fails to show that he satisfies the Insurance Policy's condition precedent to coverage.

_____

[19]Based on this fact, the Court rejects Moya's proposed Conclusion of Law, proposing:

Thus, based upon a reasonable interpretation of the Policy, Evanston fails to submit any evidence that prior to the effective date of coverage under the Policy, any insured, including Mr. Donisthorpe, had knowledge of any "wrongful act or personal injury" or a "fact, circumstance, situation or incident" which might afford grounds for a valid claim under the Policy.

Moya Brief ¶ C2, at 12.  The evidence was unequivocal that Donisthorpe knowingly defrauded Desert State's clients, and it was therefore reasonable to foresee lawsuits against himself and Desert State.

[20]After trial, Donisthorpe filed a motion to set aside the Clerk's Entry of Default, filed October 10, 2019 (Doc. 156).  See Set Aside Motion at 1.  Donisthorpe argued that there was no evidence that Evanston Insurance had served the Complaint on him, and that Evanston Insurance would not suffer prejudice if his default was set aside, because he does not intend to raise any additional defenses.  See Set Aside Motion at 5-6.  Donisthorpe also argues that, like the other Defendants in the case, Evanston Insurance did not promptly seek rescission against him.  See Set Aside Motion at 6.  Evanston Insurance initially opposed the Set Aside Motion.  See Plaintiff's Response in Opposition to Paul Donisthorpe's Motion to Set Aside Clerk's Entry of Default at 1, filed December 16, 2019 (Doc. 170).

At a hearing on January 28, 2020, before Evanston Insurance responded to Donisthorpe's arguments, the Court asked Evanston Insurance why it should not set aside the clerk's entry of default when Evanston Insurance had not sought a default judgment in the two months between

61.     The trial also shows that Ms. Bennett was unaware of Donisthorpe's actions.  See FOF ¶¶ 71-74, at 25.  She had no knowledge of his fraud at the time he completed the Application. See FOF ¶ 68, at 15.   Ms. Bennett "did not engage in any conversion, misappropriation, commingling or defalcation of Desert State funds or property, or of its former clients' funds or property."  FOF ¶ 73, at 25.  Accordingly, Ms. Bennett satisfies the Insurance Policy's condition precedent to coverage.

### C.     EXCLUSION J AND EXCLUSION P DO NOT BAR COVERAGE FOR MOYA AND MS. BENNETT DEFENDING AGAINST CERTAIN CLAIMS IN THE STATE COMPLAINT.

62.     Because Donisthorpe is not entitled to coverage under the Insurance Policy for failing to satisfy the prior knowledge provision, the Court must next determine the extent of coverage for the Insurance Policy's remaining insureds in this case: Moya and Ms. Bennett. Evanston Insurance argues that two of the Insurance Policy's exclusions, Exclusion J and Exclusion P, preclude coverage for the remaining insureds.  Neither exclusion excludes coverage for Moya or Ms. Bennett in this case.

### 1.     Exclusion J Does Not Bar Coverage for Moya and Ms. Bennett.

63.     Evanston Insurance proposes

Because the plaintiffs in the Underlying Claim seek to hold Ms. Bennett liable for her own alleged conduct and not vicariously liable for Donisthorpe's conduct . . . , the Intentional/Criminal Acts Exclusion bars coverage for Bennett as

---

the clerk's entry of default and Donisthorpe's appearance in the case.  See Transcript of Hearing at 29:10-17 (taken Jan. 28, 2020), filed March, 13, 2020 (Doc. 177)("Jan. 28 Tr.")(Court). Evanston Insurance conceded that it does not oppose the Set Aside Motion, see Jan. 28 Tr. at 32:17, id. 30:20-21 (Conway)("I think [setting aside the entry of default] is probably the best way to go."), because it agreed with the Court that it would not suffer prejudice if Donisthorpe does not litigate Evanston Insurance's duty to defend in federal court and agrees to be bound by the Court's decisions in the underlying state case, see Jan. 28 Tr. at 32:9-16 (Court).  Because Donisthorpe seeks to set aside the entry of default in federal court only to not foreclose potential arguments in state court, there is no prejudice to Evanston Insurance; the Court therefore grants the Set Aside Motion.

> the carve out from the exclusion only applies to "[t]he strictly vicarious liability of
> any Insured for the Intentional, willful, dishonest or fraudulent conduct of another
> Insured that constitutes a willful violation of any statute or regulation."

Evanston Insurance Brief ¶ 15, at 21-22 (quoting Insurance Policy at 20).  The Insurance Policy's

Exclusion J excludes coverage for claims "based upon, arising out of, or in any way involving:

Conduct of the Insured or at the Insured's direction that is intentional, willful, dishonest, fraudulent

or that constitutes a willful violation of any statute or regulation."  Insurance Policy at 20.  As

Evanston Insurance notes in its proposed Conclusion of Law, Exclusion J does not exclude

coverage for "[t]he strictly vicarious liability of any Insured for the Intentional, willful, dishonest

or fraudulent conduct of another Insured that constitutes a willful violation of any statute or

regulation."  Insurance Policy at 20.  Evanston Insurance did not raise this issue at the summary

judgment stage, see generally Evanston MSJ at 9-17, and the Court has not addressed yet Exclusion

J's effect on the Insurance Policy's coverage, other than to conclude that Exclusion J does not

render the Insurance Policy ambiguous, see Evanston Ins. Co. v. Desert State Life Mgmt., 434 F.

Supp. 3d at 1103.

64.     This provision does not bar coverage for Ms. Bennett for any claims in the State

Complaint.  The Court has analyzed extensively the phrase "based upon or arising out of" in the

Insurance Policy.  See Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1105.  It

concluded that the Supreme Court of New Mexico likely would take the minority position and

hold that negligence claims against insureds do not necessarily 'arise out of' other insureds' related

and excluded acts."  Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1112 (citing

Insurance Policy at 20).  Although it reached this conclusion in the context of Exclusion P, and

exclusion for coverage based on commingling or misappropriation of assets, the cases on which it

largely relied for the minority position concern intentional acts exclusions like Exclusion J.  See

Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1105-08 (citing Watkins v. Glen Central Sch. Dist. v. Nat'l Union Fire Ins. Co., 286 A.D. 2d 48, 732 N.Y.S. 2d 70 (N.Y. App. Div. 2001); Bd. of Pub. Educ. of Sch. District of Pittsburgh v. National Union Fire Ins. Co. of Pittsburgh, Pa., 709 A.2d 910 (Pa. Super. Ct. 1998); Durham City Bd. of Educ. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 109 N.C. App. 152, 426 S.E. 2d 451 (1993)).  As with the commingling exclusion, the Court concludes that the Supreme Court of New Mexico would side with those courts that have imposed a higher burden on insurers to issue policies clearly denying coverage for innocent insureds based on their co-insureds misconduct.  See Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1112.

65.     Relatedly, Exclusion J does not preclude coverage for Moya.  Exclusion J includes an exception for vicarious liability for any conduct that Exclusion J otherwise covers.  See Insurance Policy at 20.  Under New Mexico law, exceptions to exclusionary clauses "act[] as a restoration of coverage under the conditions specified and therefore should be construed broadly in favor of the insured as if the exclusion did not exist."  United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 15, 285 P.3d 644, 649.  Here, the former clients have sued Desert State under a vicarious liability theory for Donisthorpe's actions.  See State Complaint ¶¶ 151-87, at 27-32; id. ¶ 154, at 27 ("DSLM is also vicariously liable for the wrongful conduct of its corporate principals, directors, employees, staff and agents, including Donisthorpe and Bennett").  This provision, therefore, does not prevent Moya, Desert State's receiver, from receiving coverage under the Insurance Policy.

### 2.     Exclusion P Does Not Bar Coverage for Moya and Ms. Bennett.

66.     Evanston Insurance also proposes that the Exclusion P prevents any insureds from receiving coverage under the Insurance Policy.  See Evanston Insurance Brief ¶ 13, at 20-21 (citing

Bethel v. Darwin Select Ins. Co., 735 F.3d 1035, 1042 (8th Cir. 2013); Northland Ins. Co. v.

Stewart Title & Guar. Co., 327 F.3d 448, 457 (6th Cir. 2003)); Closing Brief at 7 ("Accordingly,

the Policy's Commingling/Misappropriation of Funds Exclusion bars coverage for the Underlying

Claim."). The Court thoroughly discussed this issue in the MOO. See Evanston Ins. Co. v. Desert

State Life Mgmt., 434 F. Supp. 3d at 1105-12. In that opinion, the Court concluded:

> The Supreme Court of New Mexico has been clear that exclusions are interpreted narrowly, see Knowles v. United Servs. Auto. Ass'n, 1992-NMSC-030, ¶ 7, 113 N.M. 703, 832 P.2d 394; King v. Travelers Ins. Co., 1973-NMSC-013, ¶ 22, 84 N.M. 550, 505 P.2d 1226, 1232 (quoting Roach v. Churchman, 431 F.2d 849, 851 (8th Cir. 1970)), and it is firm that New Mexico courts not strain to find exclusions in vaguely written exclusionary provisions, see Rummel, 1997-NMSC-041, ¶¶ 33, 49-50, 123 N.M. 752, 945 P.2d at 979, 982. Exclusion P excludes coverage for any act "based upon or arising out of any conversion, misappropriation, commingling of or defalcation of funds or property." Insurance Policy at 20. With this exclusion, Evanston Insurance is relieved from defending claims against Donisthorpe based upon or arising out of his misappropriation of funds. The provision does not, however, clearly excuse Evanston Insurance from defending independent negligence claims against other insureds that relate -- in some way -- to the excluded conduct.[] The cases in the minority, Watkins, 286 A.D.2d 48, 732 N.Y.S. 2d 70, Pittsburgh, 709 A.2d 910, American Automobile Insurance Co. v. Security Income Planners & Co., 847 F. Supp. 2d 454, and Bistricer v. Federal Insurance Co., 2003 WL 22251290, are not new, and they continue to serve as fodder for arguing an issue that consumes the resources of courts and litigants. See First Mercury Ins. Co. v. Schwartz, CV 17-1763 (SJF)(AKT), 2019 WL 2053850, at *14 n.16; Phila. Indem. Ins. Co. v. Stazac Mgmt., Inc., 2018 WL 2445816, at *11. Evanston Insurance and other insurers could clarify the issue, if they wanted, with the stroke of a pen.

Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1112 (footnote omitted).

    67. The trial did not reveal any facts that motivate the Court to alter its earlier

conclusion. In the State Complaint, the former clients assert a negligence claim against Desert

State, Donisthorpe, and Ms. Bennett, see State Complaint at 26-27, and a breach-of-fiduciary-duty

claim against Desert State, Donisthorpe, and Ms. Bennett, see State Complaint at 27-28. These

claims are similar to those claims that other courts across the country have concluded do not

preclude coverage under commingling and misappropriation exclusions.  See Watkins Glen Cent.

Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 286 A.D.2d 48, 732 N.Y.S. 2d 70, Bd. of

Public Educ. of Sch. Dist. of Pittsburgh v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 709 A.2d

910 (Pa. Sup. Ct. 1998), Am. Automobile Ins. Co. v. Sec. Income Planners & Co., 847 F. Supp.

2d 454 (E.D.N.Y. 2012)(Bianco, J.); Bistricer v. Fed. Insurance Co., No. 02 Civ.5366(JSR), 2003

WL 22251290 (S.D.N.Y. 2003)(Rakoff, J.).  Notably, Evanston Insurance has elsewhere written a

similar policy exclusion more broadly, to specifically exclude claims against innocent insureds

that arise out of other insureds misappropriation.  Thames v. Evanston Insurance Co., No. 13-CV-

425 PJC, 2015 WL 7272214 (N.D. Okla. Nov. 17, 2015), for example, concerns a policy that

barred claims

> "based upon or arising out of any conversion, misappropriation, commingling,
> defalcation, theft, disappearance, insufficiency in the amount of escrow funds,
> monies, monetary proceeds, funds or property, or any other assets, securities,
> negotiable instruments or any other things of value.  This exclusion shall apply
> irrespective of which individual, party, or organization actually or allegedly
> committed or caused in whole or part the conversion, misappropriation,
> commingling, defalcation, theft, disappearance, insufficiency [*sic*] in amount[.]"

Thames v. Evanston Ins. Co., 2015 WL 7272214, at *7 (alterations in Thames v. Evanston).

Because the Supreme Court of New Mexico reads insurance contracts strictly against insurers, see

United Nuclear Corp v. Allstate Ins. Co., 2012-NMSC-032, ¶ 10, 285 P.3d 644, 648 (quoting Cal.

Cas. Ins. Co. v. Garcia-Price, 2003-NMCA-044, ¶ 20, 63 P.3d 1159, 1163); Rummel v. Lexington

Ins. Co., 1997-NMSC-041, 945 P.2d 970, the Court concludes that Moya and Ms. Bennett have

coverage under the Insurance Policy for the former clients' negligence claim.

## III.   THE NEW MEXICO STATUTES THE FORMER CLIENTS CITE DO NOT ALTER THE COURT'S ANALYSIS.

68.    At the close of trial, the former clients moved for judgment as a matter of law based

on two New Mexico statutes, N.M. Stat. Ann. §§ 59A-18-11 and 59A-14-5.  See Oct. 9 Tr. at

692:24-693:1 (Jacobus); <u>id.</u> at 735:22-25 (Jacobus).   Rule 50 of the Federal Rules of Civil

Procedure governs judgments as a matter of law, but this rule does not apply to bench trials.   <u>See</u>

Fed. R. Civ. P. 50(a)(1) ("If a party has been fully heard on an issue during a jury trial and the

court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for

the party on that issue, the court may . . ."); <u>Creative Consumer Concepts, Inc. v. Kreisler</u>, 563 F.

3d 1070, 1078 n.3 (10th Cir. 2009).   The Court did not grant either oral motion for judgment as a

matter of law.   <u>See</u> Oct. 9 Tr. at 735:15-16 (Court); <u>id.</u> at 760:2-6 (Court).   Contrary to the former

clients' arguments at the close of trial, neither statute provides sufficient, independent support to

rule against Evanston Insurance.

### A.   N.M. STAT. ANN. § 59A-18-11 DOES NOT PREVENT EVANSTON INSURANCE FROM CONTESTING THE INSURANCE POLICY'S COVERAGE.

69.   Desert States' former clients propose that "[n]one of the insureds, including

Donisthorpe, shall be bound by any representations or omissions on the application contained in

Plaintiff's Exhibit 18, because of Evanston's failure to comply with NMSA 1978, Section 59A-

18-11(A)."   Former Client Brief ¶ 8, at 7.   The Court addressed extensively New Mexico's

attachment requirement for insurance policies in the MOO.   <u>See</u> <u>Evanston Ins. Co. v. Desert State</u>

<u>Life Mgmt.</u>, 434 F. Supp. 3d at 1113-18.   The Court noted that this statute is similar to statutes in

at least thirty-three other states and that a handful of courts have interpreted this provision over the

years.   <u>See</u> <u>Evanston Ins. Co. v. Desert State Life Mgmt.</u>, 434 F. Supp. 3d at 1113.   The Court

stated:

> The attachment requirement is generally understood to guarantee that the applicant is aware of the contract's terms and can correct any mistakes surrounding the contract.   <u>See</u> <u>Copeland v. United Sec. Life Ins. Co.</u>, 154 So.2d 747, 747 (Ala. 1963)("[T]he statute was designed to put all facts relating to the insurance before the insured; to guard against overzealous or unscrupulous agents selling insurance to an applicant only to have the insurance policy defeated in a subsequent lawsuit

by purportedly false answers in the application form, of which the insured was not fully informed."); John Hancock Mut. Life Ins. Co. v. Banerji, 858 N.E.2d 277, 285 (Mass. 2006)("The requirement that an insured's application be attached to the policy primarily protects the insured by giving him the opportunity to "correct material errors in the application."); Schiller v. Metro. Life Ins. Co., 3 N.E.2d 384, 386 (1936)(stating that attachment's purpose is to "furnish to every person holding insurance . . . a copy of the application, upon which the effectiveness of the policy may in some circumstances depend, so that he may know the exact terms of the contract"); John D. Ingram, *Misrepresentations in Applications for Insurance*, 14 U. Miami Bus. L. Rev. 103, 109 (2005)(stating that the attachment's purpose is "clearly to 'allow for objective evidence of negotiations at the time of application for protection of the insured from possible frauds by insurance agents in falsifying answers given by the insured in applying for insurance.'" (quoting Gibraltar Cas. Co. v. A. Epstein & Sons, Int'l, Inc., 562 N.E. 2d 1039, 1042 (Ill. App. Ct. 1990))).

The parties dispute how to interpret N.M. Stat. Ann. § 59A-11-18(A)'s three sentences. Every single other court facing the same issue have interpreted identical or highly similar language as creating separate attachment requirements for initial applications, on one hand, and renewals or reinstatements, on the other; initial applications automatically require attachment, while attachment is only upon request for insurance policy renewals or reinstatements. See Juneau v. Pittman, No. CIVA 07-9782, 2008 WL 4758611, at *3 (E.D. La. Oct. 27, 2008)(Barbier, J.); Nieto v. Blue Shield of Cal. Life & Health Ins. Co., 181 Cal. App. 4th 60, 81 (Ct. App. 2010); John Hancock Mut. Life Ins. Co. v. Banerji, 858 N.E.2d at 286. The Supreme Judicial Court of Massachusetts held that its insurance code, which is identical in all material respects to N.M. Stat. Ann. § 59A-18-11(A), "permits two exceptions to the attachment requirement: reinstatement or renewal of an insurance policy." John Hancock Mut. Life Ins. Co. v. Banerji, 858 N.E.2d at 286. This is longstanding policy in Massachusetts:

> Nearly one century ago, this court determined that the requirements currently contained in G. L. c. 175, §§ 131 and 132 (3) -- which essentially prevent insurers from denying coverage based on alleged misrepresentations in an application for life insurance unless that application was attached to the policy when issued -- do not apply to applications to reinstate a lapsed life insurance policy.

Opara v. Mass. Mut. Life Ins. Co., 806 N.E.2d 924, 925 (Mass. 2004). The Honorable Carl Barbier, United States District Judge for the Eastern District of Louisiana, meanwhile, rejected an argument that Louisiana and Mississippi laws nearly identical to New Mexico's statute require attachment for all applications. See Juneau v. Pittman, 2008 WL 4758611, at *3. Judge Barbier held that reinstatement applications were inadmissible as evidence "[o]nly if a reinstatement application *exists*, is *requested* by the insured, and is *not properly mailed* within the 15 day period." 2008 WL 4758611, at *3 (emphasis in the original). See Nieto v. Blue Shield of California Life & Health Ins. Co., 181 Cal. App. 4th at 81 (noting

that the law's second and third sentences "provide[] that the consequence of nondelivery following the insured's request is that the application may not be introduced into evidence"); N.Y. Life Ins. Co. v. Rosen, 227 A.D. 79, 82 (N.Y. App. Div. 1929)("[T]he insurance company was not required to attach the application for reinstatement to the policy,"); Larson v. Union Cent. Life Ins. Co., 137 N.W.2d 327, 335 (Minn. 1965).  This interpretation makes sense, given the statute's purposes: to guarantee that the insured has full knowledge of the contract's terms and to protect against fraud.  Applications for renewal of insurance policies do not alter the policy's fundamental terms and conditions.  See Occidental Life Ins. Co. of Cal. v. Fried, 245 F. Supp. 211, 216-17 (D. Conn. 1965)(Timbers, C.J.).

      The only court to require attachment of a renewal policy interpreted a statute written differently than N.M. Stat. Ann. § 59A-18-11.  In National Union Fire Insurance Co. of Pittsburgh, Pa. v. Continental Illinois Corp., 658 F. Supp. 781 (N.D. Ill. 1987)(Shadur, J.), the Honorable Milton Shadur, United States District Judge for the Northern District of Illinois, interpreted Illinois' attachment requirements, which state, in part:

> No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor, of which a copy is attached to or endorsed on the policy, and made a part thereof.

215 Ill. Comp. Stat. 5/154.  Judge Shadur concluded that, under this Illinois law, "[t]o rely on the alleged misrepresentations in the [renewal applications] as a basis for rescinding the Policies, Insurers must be able to allege in good faith that copies of the relevant documents were *physically* attached to the Policies when issued." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Cont'l Ill. Corp., 658 F. Supp. at 787. There are two important differences between Illinois' and New Mexico's attachment laws that suggest that the Supreme Court of New Mexico would not reach the same conclusion.  First, while New Mexico's law addresses requirements for instatement and renewal applications, Illinois does not expressly address reinstatement or renewals at any point in its attachment law.  Compare N.M. Stat. Ann. § 59A-18-11(A) ("If any such policy . . . shall be reinstated or renewed and the insured . . . shall make written request to the insurance company for a copy of the application, . . . the insurance company shall . . . deliver or mail to the person making such request, a copy of such application.") with 215 Ill. Comp. Stat. 5/154 ("No misrepresentation or false warranty made by the insured . . . shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor, of which a copy is attached to or endorsed on the policy.").  Similarly, Illinois does not, like New Mexico,

require the insurer to attach the application to the policy "when issued," which suggests that the attachment requirement extends beyond the initial issuance. N.M. Stat. Ann. § 59A-18-11. <u>Cf.</u> 215 Ill. Comp. Stat. 5/154. Accordingly, the Court predicts that the Supreme Court of New Mexico would interpret N.M. Stat. Ann § 59A-11-18(A) like every other court that has interpreted similar language and hold that insurers are only required to attach applications along with initial applications. Desert State's application was indisputably an application for renewal. <u>See</u> Client Response ¶ 8, at 4. Accordingly, Evanston Insurance was not required to attach the application and is entitled to rely on Donisthorpe's misrepresentations in the application.

<u>Evanston Ins. Co. v. Desert State Life Mgmt.</u>, 434 F. Supp. 3d at 1113-15.

70.     The Court then reviewed the Supreme Court of New Mexico's interpretation of New Mexico's attachment requirements for uninsured and underinsured motorist coverage. <u>See</u> <u>Evanston Ins. Co. v. Desert State Life Mgmt.</u>, 434 F. Supp. 3d at 1116-18. It concluded that, although the Supreme Court of New Mexico had interpreted strictly attachment provisions in this context, its cases "do not suggest that it will apply the same strict regime to N.M. Stat. Ann. § 59A-18-11." <u>Evanston Ins. Co. v. Desert State Life Mgmt.</u>, 434 F. Supp. 3d at 1118. The parties' closing briefs do not provide new authority or different arguments that convince the Court to alter its earlier conclusion that § 59A-18-11 applies only to initial policies and not to renewal policies. <u>See</u> Former Client Brief ¶¶ 7-8, at 7; Moya Brief ¶ 8, at 11; Bennett Brief ¶ 7, at 7. The Insurance Policy at issue here is a renewal policy. <u>See</u> FOF ¶ 40, at 13. Accordingly, the Court concludes that § 59A-18-11 does not apply to these facts and therefore does not prevent Evanston Insurance from challenging coverage for the insureds.

### B.     N.M. STAT. ANN. § 59A-14-5 DOES NOT IMPOSE AN OBLIGATION ON EVANSTON INSURANCE.

71.     The former clients' second motion for judgment as a matter of law[21] concerned

---

[21]Although the former clients phrased their request as a motion for judgment as a matter of law, as discussed above, rule 50 does not apply to bench trials. <u>See</u> Fed. R. Civ. P. 50(a). The Court treats these arguments as another part of the former clients' closing argument.

Evanston Insurance's purported violation of N.M. Stat. Ann. § 59A-14-5. <u>See</u> Oct. 9 Tr. at 735:22-25 (Jacobus).  This provision states:

> Every insurance contract procured and delivered as surplus lines insurance pursuant to Chapter 59A, Article 14 NMSA 1978 shall bear the name, address and signature of the surplus lines broker who procured it and have stamped, printed or otherwise displayed prominently in boldface ten-point or larger type either upon its declarations page or by attachment of an endorsement, the form of which may be promulgated by the superintendent, the following: "This policy provides surplus lines insurance by an insurer not otherwise authorized to transact business in New Mexico. This policy is not subject to supervision, review or approval by the superintendent of insurance.  The insurance so provided is not within the protection of any guaranty fund law of New Mexico designed to protect the public in the event of the insurer's insolvency."

N.M. Stat. Ann. § 59A-14-5.  The Insurance Policy is a surplus lines policy, but it does not contain any language or declaration regarding its status as a surplus lines policy in type-written 10-point font.  <u>See</u> FOF ¶¶ 42-43, at 13.

72.     In discussing its argument with the Court, the former clients conceded that the argument that Evanston Insurance violated § 59A-14-5 did not entitle them to judgment, and Evanston Insurance's violation of the statute was instead "another factor in the equitable equation." Oct. 9 Tr. at 750:10 (Court)(characterizing the former clients' argument).  <u>See id.</u> at 760:7 (Jacobus)(agreeing with this characterization).  Although the Court has already concluded that Evanston Insurance is not entitled to invoke the Court's equitable powers to rescind the Insurance Policy, even if it weighs § 59A-14-5, it would have no effect.  This statute imposes an obligation on surplus lines insurance brokers and not non-admitted insurers.  Accordingly, whether ADCO General, the surplus lines broker for Desert State, complied with the statute is irrelevant for determining Evanston Insurance's entitlement to the Court's equitable powers.

73.     New Mexico's Legislature has not stated whether surplus lines brokers are the insureds' agents.  In some states, such a finding is enough to absolve an insurer of obligation when

a surplus lines insurance broker does not apply the stamp or even deliver the policy.  See James River Ins. Co. v. Med Waste Mgmt., LLC, 46 F. Supp. 3d 1350, 1359 (S.D. Fla. 2014)(Moore, C.J.).  The Insurance Code's definition of "broker" makes clear that, ordinarily, insurance brokers are agents for insureds and not for insurers.  See N.M. Stat Ann. § 59A-12-3 (defining "broker" as an insurance producer who is "not being an agent of the insurer"); Fryar v. Emps. Ins. of Wausau, 1980-NMSC-026, ¶ 5, 607 P.2d 615, 617-18 (interpreting a precursor statute narrowly).  This definition specifically excludes surplus lines brokers from the definition.  See N.M. Stat. Ann. § 59A-12-3.  New Mexico's definition for "surplus lines broker" does not contain the same express notification that surplus lines brokers are not agents for insurers.  N.M. Stat. Ann. § 59A-14-2(T) (defining "surplus lines broker" as "an individual, firm or corporation licensed . . . to place insurance with eligible surplus lines insurers").

74.     At trial, the former clients argued that the remedy for § 59A-14-5 violations is in § 59A-14-15.  See Oct. 9 Tr. at 754:18-756:12.  This statute holds unauthorized, out-of-state insurers to policies for which New Mexican insureds have paid.  See N.M. Stat. Ann. § 59A-14-15(A).  It imposes no remedy for insureds that received unstamped surplus lines coverage.  Statutory remedies for insurance code violations for surplus lines coverage is instead in § 59A-14-14(E), which states that "[a]ny surplus lines broker who fails to comply with the requirements of this section shall be subject to the penalties provided in Section 59A-1-18 NMSA 1978 or to any greater applicable penalty otherwise provided by law."  N.M. Stat. Ann. § 59A-14-14(E).  The statute cross-referenced, § 59A-1-18, provides only for monetary penalties that the New Mexico Insurance Department can assess, although the statute also states that these express penalties "shall be in addition to any other penalty provided by law."  N.M. Stat. Ann. § 59A-1-18(E).

75.     The statutes provide no additional explicit remedy for the former clients, and there

is no implied right of action in the statutes either.   Private rights of action may be implied in New Mexico statutes based upon public policy, not merely legislative intent.   See Bailey v. Markham, 2020 WL 1324477, at *21 (D.N.M. March 20, 2020)(Browning, J.)(citing San Juan Agric. Water Usres Ass'n v. KNME-TV, 2011-NMSC-011, ¶ 40, 257 P.3d 884, 893).   New Mexico public policy factors insureds over insurers.   See, e.g., Evanston Ins. Co. v. Desert State Life Mgmt., 434 F. Supp. 3d at 1111, 1116-18.   Nevertheless, there is little justification to infer a private right of action here, as the harms the former clients have suffered are not because of Evanston Insurance's insolvency, or related in any conceivable way to the lack of a stamp on the Insurance Policy.

76.     The Court assesses, therefore, only the extent to which ADCO General's failure to stamp the Insurance Policy means that Evanston Insurance has invoked the Court's equitable jurisdiction with unclean hands.   Section 59A-14-5, by its terms, imposes an obligation on surplus lines brokers to ensure that policies are stamped, not out-of-state insurers such as Evanston Insurance.   The regulations governing this statute emphasize that it is the surplus line broker's responsibility.   N.M. Admin. Code. § 13.19.2.18 provides that, should § 59A-14-5's statement "not fit on the declarations page of the policy," the surplus line broker must attach a separate statement found in N.M. Admin. Code § 13.19.2.22.   N.M. Admin. Code § 13.19.2.18.   This separate statement is titled the "Surplus Lines Brokers Countersignature Endorsement," N.M. Admin. Code. § 13.19.2.22, and it requires only the surplus lines broker's signature, not the unadmitted insurer's signature, see N.M. Admin. Code § 13.19.2.22.   The regulation, in combination with the statute's text and statutory scheme, place the burden on the surplus lines broker to inform the insured of the insurers' status, and, therefore Evanston Insurance invokes the Court's equitable jurisdiction without unclean hands.

**IT IS ORDERED** that: (i) the Insurance Policy provides Moya and Ms. Bennett coverage against the State Complaint's claim for negligence, but it does not provide coverage for Donisthorpe; (ii) the Motion to Strike Affidavits, Expert Report and to Exclude Expert Testimony of Christopher Moya at 1, filed September 30, 2019 (Doc. 133), is granted; (iii) the Plaintiff's Motion to Admit Certain Evidence Pursuant to Federal Rule of Evidence 402, filed October 6, 2019 (Doc. 144), is granted; (iv) Evanston's Motion in Limine to Allow Defendant Donisthorpe to Testify From Prison By Audio Teleconference at 1, filed October 6, 2019 (Doc. 141) is granted; (v) Plaintiff's Motion to Take Judicial Notice of and Admit Certain Evidence Pursuant to Federal Rules of Evidence 201(c)(2) and 902(1), filed October 6, 2019 (Doc. 142), is granted in part and denied in part; and (vi) and Paul Donisthorpe's Motion to Set Aside Clerk's Entry of Default and Memorandum in Support Thereof, filed December 2, 2019 (Doc. 164), is granted.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Ann Maloney Conway
Elisabeth Anne Millich
Sheehan & Sheehan, P.A.
Albuquerque, New Mexico

--and--

Joseph Borders
McJessy, Ching & Thompson, LLC
Chicago, Illinois

   _Attorneys for the Plaintiff_

Maureen Sanders
Sanders & Westbrook, P.C.
Albuquerque, New Mexico

     *Attorney for Defendant Helen Bennett*

Paul J. Kennedy
Kennedy, Hernandez & Associates, P.C.
Albuquerque, New Mexico

     *Attorney for Defendant Liane Kerr*

Kevin Arthur Graham
Daniel Ross Rubin
New Mexico Regulation and Licensing Department
Santa Fe, New Mexico

     *Attorneys for Defendant Christopher Moya*

Ray M. Vargas
Vargas Law Firm, LLC
Albuquerque, New Mexico

     *Attorney for Defendant Paul Donisthorpe*

Joseph Goldberg
H. Jesse Jacobus, III
Frank T. Davis, Jr.
Freedman Boyd Hollander Goldberg Urias & Ward P.A.
Albuquerque, New Mexico

     *Attorneys for Defendants Cameron Graham, Joseph Perez, Christine Gallegos, Scott*
       *Atkinson, and Charles Reynolds*

John C. Anderson
  United States Attorney
Brandon Fyffe
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the United States of America*